IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| MELINDA BEAZLEY PEARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act No. _____ |
| | ) | |
| AUGUSTA, GEORGIA, through its Mayor | ) | Complaint |
| Deke Copenhaver, in his official capacity, | ) | Damages |
| and its commission, in its official capacity, | ) | Injunctive Relief |
| | ) | Jury Trial Requested |
| FRED RUSSELL, individually and in his | ) | |
| capacity as City Manager, as a final | ) | |
| policy maker, under color of law, | ) | |
| | ) | |
| BILL SHANAHAN, individually and in his | ) | |
| official capacity, under color of law, | ) | |
| | ) | |
| SAM SMITH, individually and in his | ) | |
| official capacity, under color of law, | ) | |
| | ) | |
| JOHN and JANE DOE, whose true names | ) | |
| are not known, individually and in his or | ) | |
| her individual capacity, under color of law, | ) | |
| | ) | |
| Individually or jointly, and in conspiracy with | ) | |
| one another, | ) | |
| Defendants. | ) | |

COMPLAINT

1

COMES NOW, Plaintiff Melinda Beazley Pearson, by and through her undersigned counsel, and files her complaint and shows the Court the following in support of her claim for damages against the Defendants, individually, jointly or in conspiracy:

### Jurisdiction and Venue

1.     This action is brought pursuant to Section 15(c) of the Fair Labor Standards Act, ("FLSA") 29 USC § 215, and the overtime provisions as amended by statute and regulations, the Family Medical Leave Act ("FMLA"), 42 USC § 1983 ("§ 1983") and 42 USC § 1981 and 1991a ("Civ. Rts. Act 1991").

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331, because it arises under federal law, and under 28 U.S.C. § 1334, because it involves civil rights under the FLSA, FMLA, and the constitution as it relates to claims of race and gender discrimination and retaliation.

3.     This Court has supplemental jurisdiction for state law claims under 28 U.S.C. §1367.

4.     Venue in this Court is proper under 28 USC § 1391. This court has proper subject matter jurisdiction over the matters asserted herein.

5.     Venue is proper in the Southern District of Georgia because the challenged action occurred in the Southern District of Georgia.

6.     The Augusta Division is the proper division because the counties around Atlanta.

### Parties

7.     Plaintiff Melinda Beazley Pearson was an employee of the Defendant City of Augusta, at all material times.

8.     Prior to one of the adverse actions or treatment, a demotion from a position titled Maintenance Supervisor to laborer on May 2, 2012, Plaintiff had one or more serious medical conditions requiring absence of three or more consecutive days, and she had one or more

disabilities covered under the ADA requiring accommodation by, among other things, time off in the fall of 2011, and that during the spring of 2012, she was protected by the FMLA and was engaging in activity protected by the FMLA, as to which the employer could not interfere, when she engaged in activity to assert rights under and use FMLA leave and protections, and suffered the challenged adverse demotion leading to a constructive termination.

9.     Prior to the challenged adverse actions Plaintiff was engaged in action she reasonably believed to be protected under the FLSA.

10.     Prior to the challenged adverse action, Plaintiff was relying on laws about wages, leave and hours, and also had a protected liberty and independent property interest from following pre-existing City policy, formal and  de facto, that created a mutual expectation of continuing employment on similar employment between Plaintiff and Defendant Augusta, Georgia, about cy and rules, as to timekeeping, leave, comp time for excessive amounts of time working in the public interest under control and color of law, and catastrophic leave and the right to pay and leave consistent with meaningful notice of how the Defendant Augusta, Georgia would apply rules as to time worked, pay and various forms of leave, such that the rules were not applied arbitrarily to her, or in a manner that violated law or public policy.

11.     Plaintiff Pearson's race is White, and she is protected from adverse treatment by Defendants on account of race.

12.     Plaintiff Pearson is a woman, and she is protect6ed from adverse treatment by Defendants on account of her gender.

13.     Defendant Augusta, Georgia, is a consolidated government and political subdivision of the State of Georgia, who employed Plaintiff, and that may be served through its Chief

Executive Officer, Deke Copenhaver, who is sued in his official capacity, at his office at the Municipal Building at 530 Greene Street, Augusta, Georgia 30911.

14.     At all times herein, Defendant, Augusta, Georgia was one of the possible decision-makers and policy-makers regarding the employment terms and conditions of Plaintiff, including as to comp time, leave, grade, position and pay.

15.     Defendant Fred Russell,  ("Defendant Russell" or "Russell") is sued individually and  in his capacity as City Administrator, and in the alternative as a policy maker, for making the final decision to demote Plaintiff, for denying her due process and equal protection, where the demotion was not subject to subsequent review, and where the demotion was a proximate cause of the constructive termination, for actions and  refusing to act under color of, though not necessarily within the law.

16.     Defendant Bill Shanahan ("Defendant Shanahan" or "Shanahan") is sued individually and in his former capacity as Deputy City Administrator, Interim Recreation Director and Interim HR Director, and in the alternative as a policy maker, for actions and  refusing to act, for being one of the proximate causes of Plaintiff being demoted, for denying her due process and equal protection, where the demotion was not subject to subsequent review, and where the demotion was a proximate cause of the constructive termination, for actions and  refusing to act under color of, though not necessarily within the law.

17.     Defendant Sam Smith ("Defendant Smith" or "Smith") is sued individually and   in his former capacity as Operations Supervisor for actions and refusing to act, for being one of the proximate causes of Plaintiff being demoted, for denying her due process and equal protection, where the demotion was not subject to subsequent review, and where the demotion was a

proximate cause of the constructive termination, for actions and refusing to act under color of, though not necessarily within the law.

18.     John and Jane Doe, whose true names are not known, are sued individually and in his or her individual capacity, whose titles are unknown, for actions and refusing to act, for being one of the proximate causes of Plaintiff being demoted, for denying her due process and equal protection, where the demotion was not subject to subsequent review, and where the demotion was a proximate cause of the constructive termination, for actions and refusing to act under color of, though not necessarily within the law.

19.     All defendants are sued in the alternative both individually or jointly, and for acting in concert with one or more of the other individuals.

Statement of Facts

20.     Plaintiff Pearson began working for the city of Augusta, Georgia full time as a Park Leader in 1983.

21.     Ms. Pearson was promoted to Operations Manager of the Recreation and Parks Department in the 1990's, and held the position until the challenged demotion of May 2, 2012.

22.     On October 31, 2005, Ms. Pearson filed a grievance through Ms. Brenda Byrd-Pelaez (HR Director) and City Administrator Fred Russell regarding the following components:

> a.  "Presently serving as Operations Manager and Shop Foreman without compensation"
>
> b.  "Increase in job responsibilities"
>
> c.  "Different rules apply to different managers"
>
> d.  "At times, I (Plaintiff) feel that I am personally discriminated against"

23.     Plaintiff filed a grievance in October 2005 and during the grievance process, the compensation time procedure permitted by Augusta Recreation and Parks was discussed and accepted as practice in the Recreation Department.

24.     The comp time policy was that Plaintiff, and any similarly situated employee, could report time worked over eight hours or a regular day that was significant, for special events or emergencies to which they had to respond as part of the Recreation Department, to the Recreation Department.

25.     For instance if Plaintiff had to stay at the Boat Races until 2:00 am to clean up, or a refrigerator broke in the middle of the night and she had to respond, then comp time was recorded in house, within the Recreation Department, and then used later.

26.     The City/County Bookkeeping Department kept time of regular time, that is hours worked Monday through Friday, 8-5, and time off or absences during regular time.

27.     If an employee like Pearson missed work during regular work hours M-F time was deducted.

28.     On August 3, 2006, when Mr. Tom Beck was Director of the Recreation and Parks Department, Ms. Pearson filed a sex discrimination claim against Mr. Beck with the local EEOC office of Augusta called the Richmond County Human Relations Commission.

29.     Ms. Pearson's claim also asserted discrepancies in her comp time calculations and compensation for hours worked above and beyond 37.5 hours weekly.

30.     Mr. Beck tracked Plaintiff's time closely where male supervisors were not monitored, which meant their whereabouts was not tracked.

31.     In one event, Ms. Brenda Byrd-Pelaez (HR Director) and Ms. Pearson observed, and took pictures of the male managers from the same division playing golf during their shift.

32.     However, Ms. Pearson's "on-clock time" was closely monitored, and was consistently filled in as seven and a half (7.5) hours a day.

33.     The Defendant Augusta had a practice or policy of designating Plaintiff as "exempt," not subject recording of over-time hours and compensating by pay at time and one half, because according to Defendant, her position of managing and supervising, though she also performed manual labor.

34.     Ms. Pearson was not allowed to turn in a time-sheet with anything more than thirty-seven and one-half (37.5) hours a week.

35.     Employees were instructed by Mr. Beck to turn in overtime only for "special events," which included planned events that took place after normal work hours or emergency special events or calls.

36.     Ms. Pearson was not allowed to accrue compensation for normal duties beyond 7.5 hours daily, except as stated above for special events and emergency circumstances.

37.     A similar practice and policy was followed as to "exempt" managers and supervisors with the Fire and Sheriff's Departments.

38.     Ms. Pearson supervised the maintenance crews, whose crews worked 40 hours a week, while Ms. Pearson would be reported if she claimed more than 37.5 hours a week.

39.     In addition, on many occasions, the Maintenance workers did not get credited with nor paid for overtime.

40.     On June 19, 2011, Ms. Pearson was hospitalized with a virulent staph infection, and was out of work until December 5, 2011.

41.    Ever since then, because her immune system was compromised, she can episodes, form just a scratch it can become infected because she is positive for the staff, which can result in a hospitalization.

42.    Manager Beck knew about this and Mr. Russell knew or should have known of this.

43.    During this time, Ms. Pearson applied, and used, her FMLA leave.

44.    Ms. Pearson eventually exhausted her formal FMLA leave, then went a few weeks without pay, until she began to use catastrophic leave.

45.    On July 8, 2011, Ms. Pearson requested to utilize her accrued comp time.

46.     She requested that Renee Kaufman, a payroll clerk to submit all of her approved compensation time pending on the books for use to cover further FMLA leave.

47.    Plaintiff told Renee that she was worried about losing her insurance premiums and wanted to use all of her time to insure that she didn't lose this coverage.

48.    Plaintiff informed Renee Kaufman that she would start the process of requesting catastrophic leave.

49.    Plaintiff then spoke with Marilyn Newton, another payroll clerk to tell her that she had requested to use all of her compensation time on the books, and that she needed them to initiate the process for her to request catastrophic leave.

50.    At a later date, in July 2011, Marilyn Newton called Ms. Pearson's home to check on her recovery.

51.    During the conversation between Marilyn and Plaintiff, Marilyn wanted Plaintiff to know that City Management was unable to assist with her request to use her remaining compensation time, due to the fact that the time was not posted on her payroll card, kept within Bookkeeping.

52.     Marilyn told Plaintiff that she was unable to receive credit for this time and that the time would have to be put back on the books for use at a later time.

53.     Marilyn stated that Plaintiff would have to wait until she returned back to work from medical leave to be able to use this time.

54.     Marilyn was going to inform Renee, who kept time records within the Recreation Department, that they should keep the record of the approved compensation back in the Recreation Department, to be considered and used when Plaintiff returned from medical leave.

55.     In or around August, 2011, Renee Kaufman contacted Plaintiff and told her that some fellow employees wanted to donate their accrued catastrophic leave to Plaintiff.

56.     While speaking with Rene, who was performing a Bookkeeping function, Plaintiff requested that her comp time be used.

57.     For catastrophic leave to trigger, all other leave and vacation must be exhausted.

58.     Plaintiff was concerned that because her insurance premiums are a pay-roll deduction, and that because she had been without a pay check for some time, that her insurance would lapse.

59.     Mr. Beck then wrote a letter, which was sent to Betty Griffin, in Payroll, on August 19, 2011 requesting that Payroll give comp time to Ms. Pearson.

60.     This was done because it was considered appropriate and consistent with policy.

61.     However, this letter was not necessary because consistent policy, formal or de facto, comp time records for Recreational Department employees were kept in the Recreational Department, and not central bookkeeping.

62.     Ms. Griffin eventually said that the letter from Beck, to use Plaintiff's comp time, could not be honored, because the comp time records are kept in the employee's department, and not central bookkeeping.

63.     It was not because it was unauthorized or some kind of fraud.

64.     There are no comp time records that were kept in Bookkeeping for Ms. Griffin to use.

65.     This fact was communicated to Mr. Beck, who requested the letter back.

66.     Beck sent Lisa Hall, a secretary in the Rec Department, to retrieve the letter.

Plaintiff Returns to Work

67.     Plaintiff returned to work in December 5, 2011.

68.     While out of work, Defendant Sam Smith had been tasked with performing those duties previously assigned to the Plaintiff.

69.     As the Plaintiff returned and resumed the duties of Operations Manager back from Defendant Smith, Mr. Smith became increasingly evasive and insubordinate, violating city policy in other ways and generally refusing to accept supervision from Ms. Pearson.

70.     Defendant Smith had worked for years in the Trees and Landscape Department, and had not had supervision.

71.     When the Trees and Landscape was merged into the Recreation Department, Defendant Smith was supervised by Ms. Pearson.

72.     Mr. Smith's pay grade and tenure were well below that of Plaintiff.

73.     The City had GPS installed in Department vehicles, with which Plaintiff could track her employees whereabouts  for accountability.

74.   On December 7, 2011, using this GPS system, Plaintiff discovered that a city vehicle assigned to Mr. Smith was at a private residence on Heard Avenue, Augusta, GA for more than three hours, while Mr. Smith was "missing."

75.   On December 14, 2011, Plaintiff attempted to discipline an African-American female employee, Millie Armstrong, for insubordination.

76.   Plaintiff reported Smith's theft of time and Millie Armstrong's insubordination to Dennis Stroud, Deputy Director Augusta Recreation/Parks/Facilities.

77.   Plaintiff recommended terminating Mr. Smith (a probationary employee) but neither Mr. Stroud, Mr. Beck, nor Mr. Shanahan took any action against this employee regardless of an extensive disciplinary record.

78.   Mr. Stroud, an African-American, told Plaintiff that they did not have problems while she was gone and refused to take any action against Mr. Smith or Ms. Armstrong.

79.   On December 15, 2011, Plaintiff met with Mr. Smith and Mr. Stroud during which time Mr. Stroud belittled the Plaintiff in front of her subordinate, Sam Smith, and subsequently threatened to have Plaintiff fired.

80.   On December 18, 2011, Plaintiff filed a grievance complaint against Mr. Stroud with the Director, Tom Beck.

81.   On December 21, 2011, Plaintiff met with Mr. Stroud informing him of the grievance that she had filed against him for threatening to have her terminated, talking to her in a condescending manner, and failing to support her with disciplinary issues in the shop; thereby creating a hostile work environment.

82.   Plaintiff requested to use comp time ("on the books") accrued through Mr. Stroud and he approved Plaintiff's use of comp time at this time.

83.     Between her return on December 5, 2011 and May 2012, Plaintiff attempted to further enforce city policy, to include resistance from Mr. Stroud until his termination on January 3, 2012.

84.     On January 3, Mr. Beck put Dennis Stroud, on leave.

85.     Stroud was probationary, which meant he could not fight it.

86.     Stroud was terminated, and called Plaintiff and said he would be back by Friday.

87.     City employee Darrell Bennett falsified Tommy Anglin's time cards, and the latter, when a concern arose, spoke with Augusta Commissioner Corey Johnson approximately 45 minutes regarding this matter, who told him to go ahead and take the time even though he was out of town on vacation and shown working by Darrell Bennett.

88.     On February, 28, 2012, or before, Defendant Shanahan called Plaintiff and Renee to his office and asked he asked Rene to bring the time records from the Recreation Department.

89.     Defendant Shanahan asked Rene to come into the room and he talked to her for awhile.

90.     Plaintiff was sitting against the wall with Mr. Beck and Chris Scheuer

91.     Mr. Shanahan then came out of the meeting with Renee and Ms, Foster, in HR, and he told Plaintiff that she kept excellent records and he complimented Plaintiff, in front of Mr. Beck, Ms. Foster, Chris Scheuer and Renee Kaufman.

92.     Defendant Shanahan said that he saw the problem and that he would get with Mr. Russell and let him know everything was fine.

93.     Defendant Shanahan told Plaintiff not to worry about anything and that there was nothing to discuss with me about this issue, and he stated that Plaintiff could return to her work assignments.

94.     On March 5, 2012 Plaintiff gave Beck a letter about the harassment and insubordination she was suffering at the department by the subordinates and Beck informed her that Shanahan and Russell were not interested, so Beck told Plaintiff to seek legal advice.

95.     Plaintiff had a meeting with Defendant Smith and Mr. Beck in which Beck and Plaintiff were pointing out how Smith was abandoning his work assignments, which Plaintiff could tell because of the GPS devices installed on the city vehicles, for that purpose.

96.     On March 6, 2012, Plaintiff gave another letter asking Beck to terminate Sam Smith.

97.     On March 8, 2012, Plaintiff was told by Ms. Hurley and Ms. Dean that other Maintenance employees were going to lie about Plaintiff and say that Plaintiff was creating a hostile work environment.

98.     There is a memo, dated March 12, 2012, by Onajuanita Foster and Ron Clark to Defendant Shanahan, "Subject: Recreation Department Compensation Time for Exempt for Exempt Employees" (1) Malinda Pearson was not at work week of 12/24/2011 - 12/30/2011 paid as if working; (2) Hostile work environment alleged against the following people from multiple employees:  Tom Beck, Malinda Pearson and Joanie Smith (all of whom are White).

99.     There were however no written statements of complaint against Plaintiff in the files.

100.    On the second page it says that Dennis Stroud did not approve the comp time but in fact he had approved the time.

101.    Stroud drafted the Department policies to give "exempt" employees comp time.

102.    Also plaintiff has  "compensatory Time Received" lists time earned and when you want to use it, and attached are six with Stroud, all for 2011.

103.    Later Stroud made a written statement that was used to terminate Plaintiff saying he never approved comp time.

104.    At the hearing, conducted by Mr. Russell, he would not let Plaintiff submit the approved comp time sheers.

105.    Renee Kaufman confirmed and can confirm that Plaintiff had been given written approval by Stroud or Beck for all comp time that Plaintiff had taken.

106.    Defendant Russell would not let Ms. Kaufman testify at the hearing about the fact that she had given Stroud the comp time forms.

107.    On December 21, 2012, Plaintiff was given verbal approval by Stroud to be out four days comp and then the holidays.

108.    If she had not had approval to be out, and she was out a week, and Plaintiff came back to work on January 3, 2012, and, then she was out for a week and no action was taken by Stroud or anyone to find out why she was gone or to start disciplinary or termination proceedings, yet no adverse action was taken.

109.    After Stroud lost his job, some of the paperwork was missing, including comp sheets that Renee Kaufman had attached to Plaintiff's payroll card.

110.    Beck had signed the payroll card, but no comp sheet was attached.

111.    Also, Stroud updated the Department manual or policies, and in the draft, it stated that "exempt" employees such as Plaintiff, did get comp time.

112.    On March 23, Renee had, for the second time, to send Pearson's comp time records to HR, at that time headed by Defendant Shanahan.

113.    During April, there are communications from Dennis Stroud, who has been terminated, and Ron Clark, about the investigation being conducted by Shanahan about the comp time, and Mr. Beck and Plaintiff.

114.    Dennis Stroud submits a statement about the period December 24, 2011 - January 6, 2012, to Defendant Shanahan, which is done after a statement Plaintiff has given, and is done to counter whatever Plaintiff had said.

115.    On April 12, 2012, Stroud signed a statement saying that he did not approve comp time for exempt employees, but see the attachments showing he did approve comp time for Plaintiff, who they treated as an exempt employee.  See Attachments.

116.    On April 12, 2012, a notice of administrative leave was created, but not given to Plaintiff, and it put her out on leave, until April 18, 2012, and it does not reference any possible demotion, returning to regular work site.

117.    On April 13, 2012, Plaintiff reported an incident of time card fraud committed by Sam Smith (falsified time cards for two employees) to Ron Clark (HR Director) and Defendant Bill Shanahan (interim HR Director, in addition to being Deputy City Administrator).

118.    Neither Ron Clark nor Defendant Shanahan allowed any disciplinary action to be taken against Sam Smith.

119.    Mr. Beck placed was placed on leave during the week of April 16, 2012.

120.    On April 13, 2012, News 12 WRDW ran a news feature saying that Plaintiff was creating a hostile work environment.

121.    On April 17, 2012, Defendant Shanahan does instruct Ron Clark, in HR, to discipline Sam Smith, for time card fraud, not that he was disciplined, because he was not, but that there was evidence of the same.

122.    Based on failed communication from Ron Clark, Sam Smith was not disciplined.

123.    During 2013, everyone in HR were given pink slips and Ron Clark was not rehired.

124.    On April 18 and 19, 2012, Millie Armstrong, and employee supervised by Plaintiff, that Ms. Armstrong was threatening Plaintiff sending notice to Defendant Shanahan and both Deputy Directors.

125.    No action was taken against Ms. Armstrong.

126.    On April 19, 2012, Plaintiff reported to Bill Shanahan that two recreation employees were wasting county resources and time, Anthony Smith and Eugene Harris, using City trucks to do personal business, going to different gas stations, out of an assigned work area.

127.    Shanahan took no action against these African-American male employees.

128.    Mr. Beck was terminated April 23, 2012.

129.    On April 24, 2012, Millie and others were threatening Plaintiff , so Plaintiff called Defendant Shanahan's office, and called several times.

130.    Eventually Ms. Hudson called and said that Shanahan was out but would be there in a few minutes, and she would have him call or have Mr. Russell call.

131.    Plaintiff also called Mr. Clark in HR.

132.    No one ever called back.

133.    Called Joanie and Clark and did not get them either.

134.    Eventually Joanie called while Plaintiff was drafting an email with the statement of what happened, told her what happened and that she would send the statement soon.

135.    Then Chris Scheur called and she complained to him about what happened.

136.    Plaintiff sent an email to Joanie, Chris and Ron Clark, at 11:55 am., and has the language in it, about Joe Boyles and his rich white neighborhood, White ass f'in white neighborhood would not answer to a white woman.

137.    Defendant Shanahan did return to work and the email was given to Shanahan.

138.    Then Shanahan called Jody Smitherman, in legal for the City, and framed the question about whether people at work can have private conversation that might be racists.

139.    Then Shanahan said that he asked about policies about eves-dropping, trying to change the issue of employees using race to threaten insubordination, to pin something on Plaintiff.

140.    Within a week Plaintiff had to confront Joanie about what would be done, and she said nothing would be done.

141.    At the time Defendant Shanahan was serving as Deputy City Administrator, Interim Recreation Director and Interim HR Director and was supervised by City Administrator Defendant Fred Russell.

142.    Deputy Director of Recreation, Joanie Smith (White female) and Deputy Director of Recreation Chris Scheur (white male) were "probationary" deputy directors.

143.    Their period of probation lasted one year, ending May 4, 2012.

144.    Joanie Smith was fearful of reporting this behavior such as time theft, abandoning jobs, using city vehicles for personal business, etc. because she was afraid Defendant Shanahan would terminate her.

145.    Joanie Smith was aware of Defendant Shanahan thought that Plaintiff was mean.

146.    During this time, Plaintiff was attempting to make her employees follow policy and procedure, but had to through Defendant Shanahan to get any corrective action.

147.    Plaintiff first went to the Deputy Directors, but had to carry the claims to Shanahan.

148.    Shanahan refused to offer any assistance to Plaintiff, nor support any disciplinary recommendations with the Operations Division of Augusta Recreation.

149.    On April 25, 2012, WRDW ran a news release about time card fraud investigation.

150.    This means something was leaking this news to WRDW.

151.   On April 26, Rene sent an email complaining about Sam Smith saying that Bill Shanahan was a British Cocksucker, and that he needs to go back to where he came from and that he wasn't F'n impressed.

152.   Ms. Kaufman was upset by the profanity.

153.   Plaintiff had warned Smith before.

154.   So Plaintiff sent Shanahan an email, about verbal and offensive language by Smith.

155.   Shanahan back an email saying that he was actually born in the USA, Ha Ha Ha, and Shanahan asked that Smith be at his the next day.

156.   Shanahan did not have the meeting the next day but even though Smith met with Shanahan he was not disciplined.

157.   On April 27, Renee went to Shanahan to complain about the insubordination of  Smith relative to Plaintiff, and Shanahan said, that big changes were coming next Wednesday, May 2, 2012.

158.   On May 2, 2012, Plaintiff was given a Demotion letter, demoting her to the position of Maintenance Worker II on allegations of Time Card Fraud.

159.   Plaintiff's pay was reduced from pay grade 54 ($60,017.88) to pay grade 38 ($30,671.44) annually, effectively a reduction in pay of 50%.

160.   In spite of a promise amounting to a property and liberty interest as to which meaningful due process and equal protection attaches, Plaintiff's salary was reduced in violation of City policy 500.122, which states, "A demotion of four (4) grades or more shall result in a reduction in salary up to fifteen percent (15%)."

161.   So even if the Defendants were right to demote Plaintiff, which they were not, the penalty for the demotion was wrong and much larger than allowed.

162.    The incorrect or retaliatory reduction in pay has and will with reasonable certainty continue to impact Plaintiff's the amount of money Plaintiff gets in retirement.

163.    On May 7, 2012, Plaintiff filed an appeal of demotion.

164.    Plaintiff was entitled to meaningful due process and equal protection, regardless of what the policies were about what evidence of witnesses could be considered.

165.    On May 8, 2012, Mr. Wimberly, Plaintiff's supervisor, placed Ms. Pearson in a position of manual labor.

166.    On May 10, 2012, Plaintiff was injured while on duty and subsequently required  back surgery caused by the retaliatory and dangerous work environment.

167.    On May 24, 2012, Plaintiff attended an appeal hearing of the demotion.

168.     Defendant Russell was in charge of and conducted the hearing.

169.    Defendant Russell was interested party and could not consider the matter fairly.

170.    If the City, under his Administration was letting person employed in positions that were lawfully construed to be exempt, and they were allowing comp time, that they should not have been, under his watch.

171.    Russell also had a duty to have policies administered consistent with the law, then he ought not be imposing discipline against the Plaintiff for attempting to comply with the law.

172.    Defendant Russell did not provide a meaningful and fair hearing in light of the interests at stake and the factual issues.

173.    The hearing was attended by Plaintiff, Fred Russell (City Administrator), Law Department (Andrew MacKenzie – General Counsel), Bill Shanahan, Ron Clark, Onajuanitta Foster, another staff attorney, and Plaintiff's attorney Batson.

174.    Defendant Russell was in charge of supervising Mr. Beck and Mr. Shanahan and insuring that laws under the FLSA and FMLA were followed.

175.    Defendant Russell knew or should have known that regular work hours Monday thru Friday were kept on time cards in Bookkeeping.

176.    Defendant Russell knew or should have known that any time for which a person in a position like Plaintiff worked a special event or exceedingly long hours, that a record of those hours was kept within the Recreation Department, or the Fire of Sheriff's Department.

177.    Defendant Russell knew or should have known that City practice, policy and custom allowed, tracked and approved comp time for employees like Plaintiff in the Recreation, Fire and Sheriff's Department, even though the City labeled them as "exempt."

178.    Defendant Russell, individually and as the final decision maker, conducting the hearing that could not be appealed as to the demotion, did not allow Plaintiff to present any witnesses on her behalf or evidence.

179.    On May 30, 2012, City Administrator Fred Russell upheld the Plaintiff's demotion and falsely accused her of theft.

180.    Plaintiff was disciplined for using compensatory time to obtain additional leave time, even though this time had been used to compensate her for time she had been denied as an hourly worker.

181.    The policy, enforced by Defendant Russell, was to limit Plaintiff and other so-called "exempt workers" from obtaining any overtime pay, in spite of the fact that they were being paid by the hour and were not "exempt" employees under the regulatory requirements of the Wage and Hour Division of the United States Department of Labor.

182.    Russell also specifically denied Plaintiff leave even though she was never paid for regular time over 37.5 hours a week up to 40 hours a week and even though she was routinely denied overtime pay for times she worked over 40 hours.

183.    Russell also denied these so-called exempt employees pay based on hourly computations for pay whenever they worked less than 40 hours a week.

184.    Russell knew, or should have known, that the denial of overtime for these so-called exempt employees on the basis that they were "exempt" required that they be paid a weekly salary and could not have time deductions from their pay.

185.    Russell knew, or should have known, that the job requirements of the work performed by employees like Plaintiff would not qualify as "exempt" employees under the FLSA.

186.    The Plaintiff was not afforded a reasonable opportunity to clear her name even though the City had wrongfully and falsely proclaimed that she was demoted to the level of those she supervised, which was tantamount to a constructive termination, because she had committed time card fraud.

187.    Subsequently, in depositions in the action of Beck v. Augusta, Georgia, S.D. Ga. 1:12-cv-00188 defendant Russell claim as an alternative for the demotion that it was wrong for Plaintiff to take catastrophic leave when she had comp time.

188.    May 31, 2012, Plaintiff was placed on medical leave pursuant to continued problems with injury sustained on May 10, 2012, as a result of her job assignment because of the demotion.

189.    August 30, 2012, Plaintiff went to City Shop to drop off a birthday card for an employee when Rick Acree, Facilities Manager approached the Plaintiff and ordered her off of City Property.

190.    August 30, 2012, Plaintiff was falsely accused of workers comp fraud through the media.

191.    Plaintiff learned that Defendant Shanahan maliciously notified the media with this allegation and further released protected HIPAA information/documentation of the plaintiff to the media without any approval to do so.

192.    November 8, 2012, Plaintiff underwent back surgery for work related injury.

193.    February 7, 2013, Plaintiff received letter from Ms. Styles (HR) advising that the Plaintiff had exhausted all eligible FMLA leave.

194.    Upon speaking with Ms. Styles, the Plaintiff was informed that the City of Augusta was not only using the Plaintiff's FMLA leave from this work related injury in 2012 but also was adding this time to an FMLA incident from 2011 that the Plaintiff had sought assistance from.

195.    February 7, 2013, Plaintiff met with Becky Godbee and Ms. Styles stating that she had to be back to work on February 13, 2013.

196.    Plaintiff informed HR that she had not been given a fit for duty report by her physician, nor had the city requested a fit for duty from the city approved physician.

197.    Plaintiff was advised that the City of Augusta wouldn't make any concessions for the Plaintiff regarding her work status.

198.    February 13, 2013, Plaintiff met with HR (Becky Godbee) regarding her work status only to learn that the City of Augusta had already involuntarily retired the Plaintiff on February 1, 2013 without first consulting her.

199.    Plaintiff has suffered and will in the foreseeable future continue to suffer lost wages and retirement benefits, and mental anguish as a result of the wrongful acts of one or more of the defendants individually, jointly or in conspiracy.

200.    Defendants Russell, Shanahan and Smith acted with deliberate indifference and in willful and wanton reckless disregard of the rights of all.

## Claim I

201.   Plaintiff incorporates each and every paragraph above as if stated herein.

202.   Plaintiff was engaging in activity protected under the FMLA when she was trying to arrange leave, for which she was punished and demoted.

203.   Defendant Shanahan and/or Defendant Russell caused Plaintiff to be demoted because she had taken FMLA leave, and they did not want he taking comp time, because she had been on FMLA.

204.   The Defendant Augusta, Georgia, of which Defendants Shanahan and Defendant Russell knew or should have known, of double record-keeping for time worked whereby comp time was kept within the Department.

205.   Defendants knew or should have known of the use of comp time approval forms that had been in use for years and were used for employees the Defendant Augusta, Georgia to and did grant "exempt" employees like Plaintiff comp time.

206.   Defendant Augusta, Georgia demoted Plaintiff on May 2, 1014 in violation of the FLMA because she had engaged in protected activity under the FMLA.

## Claim II

207.   Plaintiff incorporates each and every paragraph above as if stated herein.

208.   By seeking a hearing to protect her right to seek leave, Plaintiff challenged the demotion, which is protected activity under the FMLA.

209.   The Defendants originally had no plans to demote Plaintiff.

210.   In response and in retaliation, the Defendant Augusta, Georgia, Defendant Russell and/or Defendant Shanahan, retaliated by demoting Plaintiff to a laborer position and by taking fifty

percent of her pay, which is a greater pay reduction than authorized under accepted procedure and policy, in violation of the FLMA.

## Claim III

211.    Plaintiff incorporates each and every paragraph above as if stated herein.

212.    Plaintiff was engaging in activity protected under the FLSA, when she was trying keep track of her comp time and use comp time.

213.    Plaintiff, who could not control hiring and firing of subordinates and who did manual labor, was not an exempt employee under the FLSA.

214.    Plaintiff had good faith belief that she was entitled to comp time under the FLSA.

215.    The Defendant Augusta, Georgia had a long time policy and practice of treating Plaintiff as if she were not an exempt employee, including to deduct pay based on time during the week when she missed, and among other things she did extensive manual labor.

216.    At all material time Plaintiff had sufficient comp time that as a public employee it should have been paid.

217.    The Defendant Augusta, Georgia, had a complicated, double record-keeping system of relative to comp time, catastrophic leave and FMLA leave, or leave for purposes of disability accommodation.

218.    Defendant Augusta, Georgia demoted Plaintiff on May 2, 1014 because she was engaging in protected activity under the FLSA in violation of the FLSA.

## Claim IV

219.    Plaintiff incorporates each and every paragraph above as if stated herein.

220.    Plaintiff challenged the potential demotion, which is protected activity under the FLSA, by seeking a hearing.

221.    In response and in retaliation, the Defendant Augusta, Georgia retaliated by demoting Plaintiff to laborer and by taking fifty percent of her pay, which is greater pay reduction than authorized under accepted procedure, in violation of the FLSA.

Claim V

222.    Plaintiff incorporates each and every paragraph above as if stated herein.

223.    In violation of due process and equal protection, and without any notice, in an arbitrary and outrageous manner, the Defendants Augusta, Georgia and Defendant Russell as a policy-maker knowingly failed to provide Plaintiff a hearing that was consistent with meaningful due process and equal protection, in light of the interests at stake and punishment or taking rendered.

224.    Defendant Russell was not a disinterested decision maker.

225.    Policy provided that Plaintiff could have had witnesses and presented evidence, but Defendant Augusta, Georgia and policymaker Russell did not allow Plaintiff to present meaningful evidence about whether her comp time was approved.

226.    Because of the policy of Defendant Augusta, Georgia, Defendant Russell would not let Plaintiff appeal the demotion, and therefore Russell became the final policymaker on the demotion, and punishment.

227.    Defendant Augusta, Georgia and Defendant Russell relied upon evidence they knew or should have known was false, because the Defendant City and the Recreation Department had long time practice of allowing comp time for persons in positions held by Plaintiff and others similarly situated in other Departments.

228.    The hearing provided was in violation of due process and equal protection, as guaranteed under the Fourteenth Amendment.

Claim VI

229.    Plaintiff incorporates each and every paragraph above as if stated herein.

230.    Even if the Defendant City had provided a hearing that complied with due process, the Defendant Augusta, Georgia and Defendant Russell, as a policy maker, deprived plaintiff of liberty and property interests by taking too much pay.

231.    City policy limited the amount of pay deduction for this demotion to 15% but Defendants took 50% depriving her of a property interest as to which there was a mutual and certain expectation that would continue and not be deprived.

232.    In an arbitrary and capricious manner too much pay was taken, in violation of City policy and due process and equal protection, under the Fourteenth Amendment.

Claim VII

233.    Plaintiff incorporates each and every paragraph above as if stated herein.

234.    Under the totality of the circumstances the demotion of the Plaintiff was a constructive termination.

235.    At the time of the demotion and constructive demotion one or more of the Defendants disseminated to the public and stated that a reason was connected to time theft or time card fraud, and they did not provide an adequate hearing to clear her name depriving her of liberty and property interests protected by the Fourteenth Amendments.

236.    Defendant Russell, individually and as a policy maker, and Defendant Russell use a false claim that Plaintiff was engaged in time theft, or had taken leave that she was not entitled to.

237.    That it stigmatizes the reputation of a person who wants to be a supervisor to have a reputation that she would steal from her employer, especially on something so fundamental as time worked.

238.    Under the totality of the circumstances, with the amount of money deducted in an amount more than three time the amount allowed, and demoting her to work at the level of employee she had supervised, it was a constructive discharge.

239.    The reasons were made public by the Defendant Augusta, Georgia or Defendant Russell or Defendant Shanahan.

240.    Plaintiff was not provided a meaningful hearing, and was not even provided an appeal.

241.    By denying the Plaintiff the right to appeal to the Commission, they denied her a very real chance of not even being demoted and having her name cleared.

242.    The hearing and dissemination of false information deprived plaintiff of a protected liberty interest in violation of City policy and due process and equal protection, under the Fourteenth Amendment.

        WHEREFORE, Plaintiff prays that this Court:

        A)  Afford Plaintiff a trial by jury on all issues so triable;

B)  Award Plaintiff damages to compensate her for all injuries proximately resulting from the Defendants' actions, in an amount to be determined by the enlightened conscience of the jury;

C)  Award Plaintiff punitive damages due to the willful, wanton and deliberately indifferent nature of Defendants' conduct;

D)  Award Plaintiff pre-judgment and post-judgment interest;

E)  Reinstate Plaintiff, or grant her the maximum front pay allowed under law, and all other just and equitable relief to prevent ongoing and future deprivations of the law;

F)  Deem Plaintiff a prevailing party and award her costs, attorneys' fees and expenses of litigation, including expert witness fees;

PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY.

Respectfully submitted, this 2nd May, 2014.

/s/: John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff

Prepared by:

John P. Batson
P.O. Box 3248
Augusta, GA 30914
Phone 706-737-4040
jpbatson@aol.com