UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| MELINDA BEAZLEY PEARSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. Act. No.: 1:14-cv-110 |
| ) | |
| AUGUSTA, GEORGIA, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

PLAINTIFF'S BRIEF IN RESPONSE
TO DEFENDANT SMITH'S MOTION FOR SUMMARY JUDGMENT (DOC 58)

There is a memo from Shanahan to Russell, with the subject line "Implementation of Recreation Department Investigation" that says "[t]he Time Card Investigation, within the Recreation Department, was *started when Lisa Hall, Payroll Clerk, contacted Onajuanita Foster* with the following concerns," which to summarize is that Pearson had been on and received donated catastrophic leave, which is supposed to require having exhausted all vacation leave, sick leave, and 'comp time,' but after being back for a week Melinda used more 'comp time.' Doc. 95-5 (Hall Dep. Ex. 17 intro. at Doc. 91-1 p.8 dep. p. 26). Call this the "catastrophic leave theory" of why Plaintiff could not have had comp time at the end of December 2011. Lisa Hall testifies that the first sentence about the investigation starting when Lisa Hall contacted Foster, is "a lie." Doc. 91-1 p. 8 (dep. p. 26).  Lisa Hall "never contacted Onajuanita Foster," and further, "Mr. Shanahan never talked to me about this." *Id*. Lisa Hall clarifies that not only the first sentence is a lie, but also that she "did not contact Onajuanita regarding anything, [on] this," i.e. the 'catastrophic leave theory.' *Id*. at dep. p. 27. Lisa Hall further clarifies that not only did she not tell Foster this, she never "represent[ed] to anybody the five points that are made in this memo," i.e. the catastrophic

1

leave theory. *Id*.

There is further evidence that Lisa Hall did not make a complaint about the catastrophic leave theory, and that Shanahan was informed of this. Chris Scheuer was in a meeting with Lisa Hall and Shanahan, and says the meeting was "about Ms. Hall's concerns about her name being connected to the allegations against Ms. Pearson." Doc. 114-1 p. 6 (dep p. 19).

It was in fact Sam Smith, and his now wife Misty Smith[1] who initiated or prompted the Human Resources Investigation into the Rec Department's comp time system. Lisa Hall testifies that "Misty made the statement to me that she . . . was the one that brought this issue forward," referring to the catastrophic leave theory. Doc. 91-1 p. 8 (dep. p.28-29).

There is evidence that Misty wasn't acting on her own when she prompted the Human Resources Investigation into comp time by bringing forward the 'catastrophic leave theory.' Lisa Hall also testifies that it was "Misty *and Sam*" who "came to me about being upset with [Plaintiff] using the time," i.e. using the comp time in December 2011, when according to the 'catastrophic leave theory' she shouldn't have had any to use. Doc. 91-1 p.8 (dep. p. 27) (emphasis added).

Sam Smith says he and Misty "started actual[ly] dating" June of 2012 (Doc. 104-1 p.8 (dep. p. 28)), with the fair inference being that they were already intertwined, friendly, and working together, and as discussed in what follows, Lisa Hall confirms that Misty and Sam Smith became close when Sam Smith started working in the shop, i.e. was transferred as part of the May 2011 merger/reorganization of department structure. Lisa Hall testifies that "[a]bsolutely" "Misty [was] interested in getting Mr. Smith in for Melinda and replacing Melinda." Doc.91-1 p.24 (Dep. p. 93). Misty told Lisa Hall that "[Mr. Beck] was just a casualty to get to [Melinda]," because "the only way they could get Melinda was to get Mr. Beck with the timecard." *Id*. p. 25, dep. p. 94. Lisa Hall

---

[1] She was formerly named Misty Scrozynski. She and Sam Smith got "married" on "August 23, 2014." Doc. 113-1 p.1 (dep. p. 6).

testifies that "they were all after Melinda," that Misty "talked to me every day," that Misty "was obsessed with it," and that Misty started talking to her about it "[a]s soon as . . . Sam Smith got brought into the shop to start work over there[2] and [Misty] met him, soon after that it started." *Id*.; see also *Id*. at p. 30 dep. p. 114-115 ("Once [Sam Smith] started working there, they became close, and . . . she changed. And it was whatever she had to do to help [Sam Smith] get to where she thought he should be." Misty thought Sam should be "[i]n charge," i.e. in charge of "[t]he shop," and Lisa Hall knows this because "[Misty] would say that to me [i.e. Lisa].").

In addition to the evidence that Sam and Misty Smith initiated the investigation in comp time, during the investigation Sam Smith created false evidence and lodged false complaints against Plaintiff, albeit about hostile work environment, as opposed to comp time. "In March, -- I believe March the 8th, 2012, I was at a job site working all day and two of Sam Smith's employees approached me, females. . . . Jeanette Hurley and Deen Williams. . . . [T]hey said, Ms. Melinda, you're a nice lady. We just want to tell you what they're going to do to you. And they named Angelo Collier, Jeanette Johnson, *Sam Smith*, Vittirio Washington, Millie Armstrong . . . [a]nd said they were going to fabricate a story about me creating a hostile work environment . . . ." by inference, based on race.[3] Doc. 31 p. 72 (Dep. p. 282-284) (emphasis added). As further evidence of Sam Smith's role in the conspiracy there is a record of him alleging that Plaintiff was creating a hostile work environment. Doc. 116-10 p.2 ("Mrs. Pearson is making these allegations for retaliatory purposes against me for filing a grievance with the E.E.O. As far as myself and most of the staff are concerned, she is also creating hostile work environment.").

Sam Smith was part of a conspiracy to demote Plaintiff, so that he would get her job and

---

[2]   This is referring to the May 2011 reorganization/merger when Sam Smith started working under Plaintiff. See e.g. Dff. SOMF # 27 above.
[3]   Angelo Collier and Millie Armstrong are all African American. Doc. 110-1. Jeanette Johnson and Vittirio Washington are also Black. Judicial Notice.

would not have to deal with her attempts to discipline him and make him follow city policy, and this conspiracy included Mr. Shanahan who demoted Plaintiff. Lisa Hall testifies that, in reference to the scheme by Misty and Sam Smith to "get rid of Melinda" and "get Sam in there in a better position," "Mr. Shanahan . . . can't be that naive or dumb not to know what was going on. . . . Mr. Shanahan and Misty and Sam would all come to my office . . . come and talk to me every day." Doc. 91-1 p. 25 (dep. p. 95-96).

Smith called Shanahan a "[B]ritish cock sucker" on April 25 2012, right before Plaintiff's demotion. Doc. 104-1 p. 6 dep. p. 19-22; Doc. 105-1 (ex. 1 to Smith dep.). No discipline ensued. Had Plaintiff called Shanahan that, what would the result be? Smith states that as a result of him "call[ing] [Shanahan] a bad name . . . Bill [Shanahan] and I became, you know, better friends because of it." Doc. 104-1 p. 7 (dep. p. 22-23). Meanwhile Renee Kaufman, in front of whom Sam Smith had cursed out Shanahan in front, and who complained about it, which is why Shanahan found out about it, never even received an apology, and Smith was never disciplined for cursing in front of her, and Shanahan just told Kaufman that "for the record, he's 'American.'" Doc. 109-1 ¶79-86.

"When Melinda Pearson left the Operations Division and was demoted on May 2, 2012, Sam Smith was put in charge of the Operations Shop." *Id*. at ¶94. "[T]hey got rid of my title. . . . Now he's a supervisor III. He sits in my desk. He oversees the employees that I saw. He has the duties that I had." Doc. 31 p. 67 (dep. p. 263). Sam Smith started working out of "the same office that Ms. Pearson was in." Doc. 104-1 p. 11 (dep. p. 40). In March 2013 Smith was promoted to "Operation Supervisor III" and given an annual salary of $50,900.64, an increase from the $44,261.36 he was previously given as "Operation Supervisor II." Doc. 116-8.

In reference to "a meeting in May, mid-May of 2012," held by Shanahan, saying that

4

certain employees "should appeal any disciplinary actions imposed by Melinda Pearson," "specifically it [the employee] was Sam Smith." Doc. 97-1 p. 98-99 (dep. p. 198-199). Sam Smith "had been put in Melinda's job when she left [i.e. was demoted on May 2, 2012.]. And then they found out that . . . he had been reprimanded, and that took him out of being able to be in the job. So [Shanahan] said you [Sam Smith] should file an appeal and try to get that overturned so he could have the position." Id. at p. 99 (dep. p. 199).

There was a May 1, 2012, meeting in Mr. Shanahan's office with the "entire operations division but [Plaintiff]." Doc. 31 p. 73 (Dep. p. 286-287); Doc. 109-1 ¶ 87 (generally the same employees were gathered "to meet with Mr. Shanahan."). At this meeting Shanahan apparently told everyone that Plaintiff was going to lose her job and that Sam Smith was going to get it. See Doc. 31 p. 73 (dep. p. 288-289) ("Sam Smith and Millie Armstrong . . . stood in front of my office high-five'ing, high-five'ing, saying I was fixin' to be out. That he was fixin' to be the new shop boss." "Mr. Washington was singing. Going up and down the hall in front of my office door singing the Hammer, the Hammer was fixin to fall"). Kaufman describes the meeting as "like a lynch mob out to get Melinda." Doc. 109-1 ¶90. At the meeting, "Shanahan told us all that were not to say anything to Melinda Pearson otherwise we would be terminated." *Id*. at ¶88. The announcement to the entire division that Plaintiff was going to be demoted prior to the demotion, combined with the celebratory antics by Sam Smith, Millie Armstrong, and Mr. Washington, and the threat by Shanahan that if anyone told Plaintiff they would lose their job; shows that Shanahan and Smith had enacted a knowingly illegal scheme to get rid of Plaintiff.

Smith has gender-based animosity against Plaintiff based on his belief that he is better than her and should not be working for her. See Doc. 104-1 p. 11 (dep. p. 40-41) ("Q. Do you recall telling Mr. Beck that you thought you were smarter than Ms. Pearson and you thought that she

5

was threatened by you? A. Oh, I'm sure of that fact. Q. . . . You're sure that you're smarter than she is? A. Oh, yeah."); Doc. 31 p. 41 (Pearson Dep. p. 159) (In early 2011 before going out on medical leave, Plaintiff meets with Sam Smith to try and get him to obey policy, and "I said, would you just, please, you know, let's try to make an effort. He looked at me, sat back . . . in the couch, threw his arm over the back [of] my couch and said, oh, let me think about that. *Uh, no. I'm not working for you. I'm never going to work for you*.") (emphasis added).

    Smith conspired to help others carry out a scheme for him to get Plaintiff's job by violating her equal protection and due process rights in combination with Shanahan, Russell, and Misty Smith (Scrozynski). The demotion of Plaintiff was knowingly carried out in violation of due process, as a sham through a manipulation of the personnel system and media to obtain the sought after result personally benefitting Defendants. Defendants knew that there was a long history of other exempt employees accruing and using flex or comp time, but Defendants only demoted or punished Plaintiff. They did this to to make it appear that Beck and Plaintiff were rogue individuals, and that the use of comp time in this circumstance was not the product of the Administrators failure to administer the new policy by meaningfully educating departments and learning of conflicts and correcting them, but as a way to protect and improve their own rank with the Commission and the position of Sam Smith. Sam Smith hated and would not work for the woman who he was sure he was smarter than, and fostered disrespect and insubordination of Plaintiff among his employees. The totality of the circumstances support a conspiracy to violate due process and equal protection and to further their own personal interest. All of the citations to the record in this and the other pleadings, are the citations that should legitimately be considered to reach the inferences in this paragraph.

The agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants. For example, a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement may allow a jury to infer the existence of a conspiracy. *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998); *see also Kerr v. Lvford*, 171 F.3d 330, 340 (5th Cir. 1999)

Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) reached an understanding to achieve the conspiracy objectives. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301-02 (Cir. 1999).

There is no requirement to show a covert meeting of the minds. Plaintiffs will rarely have direct evidence of a conspiracy; indeed, part of the essence of a conspiracy is concealing it. *See Hampton,* 600 F.2d at 621. Circumstantial evidence is standard proof of a conspiracy. *Id*. Put simply, "to be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details or even know who the conspirators are. It is enough if you understand the general objective of the scheme, accept them, and agree either explicitly or implicitly to do your part to further them. *Jones v. City of Chicago*, 856F.2d 985, 992 (7th Cir. 1988) (finding sufficient evidence of a § 1983 conspiracy among defendant police officers).

The totality of the evidence, with inferences of intent drawn in Plaintiff's favor, with weight and credibiyt decisions reserved for the jury, defendant cannot show as mater of undisputed fact that he was not a participant in a conspiracy to get rid of Plaintiff, for his own

7

personal gain, by aiding in the manipulation of the personnel system with his now wife, Shanahan his friend, and Russel, who as administrators captaining a ship free afloat in troubled waters had left things undone and had plenty to cover, through the plan that indisputably treated Plaintiff differently than other exempt employees, by depriving Plaintiff of due proceeds and equal protection causing the deprivation of her protected interests, connected to or on account of

Respectfully submitted this 1st day of October, 2015.

    s/ John P. Batson
    John P. Batson
    GA Bar No.: 042150
    Attorney for Plaintiffs
    P.O. Box 3248
    Augusta, GA 30914
    706-737-4040
    jpbatson@aol.com

CERTIFICATE OF SERVICE

    This is to certify that the undersigned attorney did this date serve a copy of the Notice of Filing upon all counsel of record by one or more of the following method(s):

☐     Depositing the same with the USPS in a correctly addressed envelope with adequate first class postage to the following address(es):

> Andrew MacKenzie; and,
> Jody Smitherman
> 520 Greene Street
> Augusta, GA 30901

☐     Delivering a copy to counsel by hand to the following address(es):

☐     Faxing a copy of the same to the following Fax No(s).:

☒     E-mailing a copy of the same through the court's e-mailing system

> MacKenzie: AMackenzie@augustaga.gov
> Smitherman: JSmitherman@augustaga.gov

Respectfully submitted this 1st day of October, 2015.

> /s/ John P. Batson
> John P. Batson
> Ga. Bar No. 042150
> Attorney for Plaintiff

John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
Phone 706-737-4040
FAX 706-736-3391
    Plaintiff's gender and race.

9