IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| MELINDA BEAZLEY PEARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act No. 1:14-CV-110 |
| | ) | |
| AUGUSTA, GEORGIA, et al., | ) | Plaintiff's Brief In Support of |
| | ) | Partial Summary Judgment |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.       Introduction

This is a partial motion under the American with DA for the failure to engage in the interactive communicative process.

## II.      Background Material

Plaintiff was demoted on May 2, 2012, and she was assigned to be a laborer (Doc 39-1), Doc. 40-7), (77-3 Ex 3, new job description), (77-1 Ex. 1, news article describing demotion). Plaintiff informed Wimberly, her supervisor, that she had past work-related injuries while employed with Augusta Recreation but Wimberly still put the Plaintiff in harm's way by subjecting her to strenuous manual labor (Pearson Dep., Doc 31, p.55 of 193, p. 215, ll. 10-11).

Pearson was assigned on May 10, 2012 to kneel on the ground and chisel tile all day and reported the resulting injury to her back to the worker's compensation carrier and to her work place supervisor, Todd Thomas. (Doc. 35-7, Ex. 27), (Pearson Dep., Doc 31, p.55 of 193, p. 217, ll. 7-11), (Pearson Dep., Doc 31, p.56 of 193, p. 218, ll. 9-11). Plaintiff was on FMLA leave and

1

unable to work; perform physical labor or administrative work, due to her back injury from May 31st through November 8, 2012 (Pearson Dep., Doc 31, p.56 of 193, 219, ll. 7, p.59 of 193, p. 232, ll. 15-16).

By November, Plaintiff's physician recommended that she undergo surgery for her back, which was done on November 8, 2012 (Pearson Dep., Doc. 31, p. 57 of 193, p. 224). Following Plaintiff's surgery, on Dec. 11, 2012, Shanahan, who held simultaneous positons as the deputy city administrator, interim HR director, and interim Parks and Recreation director, approved FMLA status for Plaintiff to recover from surgery, which on paper, was to be granted until March 8, 2013 (Doc. 35-3, Doctors note) (Doc 41-11), (47-1 Ex. 51, letter granting leave of absence) (Shanahan Dep, Doc 41-5, p.175, ll. 17-18, acknowledge signature).

Later that same day December 11, 2012, Shanahan emailed Robbie Burns (HR), referring to Plaintiff, asking, "how long do we have to go before we can fill that position?" (Doc. 41-7, Plaintiff Ex 6) (Shanahan Dep, Doc 41-5, p.72, ll. 20, acknowledge authorship). Shanahan further questioned the validity of the Plaintiff's doctor's excuse after a "typo" was recognized on the doctor's excuse (Doc. 41-7, Plaintiff), (Shanahan Dep, Doc 41-5, p.73, ll. 20-23).

In early January Starina Styles began contacting Plaintiff by phone to discuss when Plaintiff could come back to work, what her health condition was, and set up an appointment for February 7th (Pearson Dep., Doc 31, p.57 of 193, p.224, ll. 22-23).

Plaintiff met with Styles and Becky Godbee on February 7th, where Styles hand delivered Pearson a letter stating Plaintiff would be terminated if she was unable to return to work by February 13th (Doc. 35-4) (Pearson Dep., Doc 31, p. 59 of 193, p.230). Plaintiff asked why she had not been given time to complete a fitness for duty report to determine what work she was capable of doing and what would be a reasonable accommodation, per City Policy Section

800.038 (Doc. 43-8), and when the city had approved a follow up appointment for March 8, 2012 with her treating provider Dr. Oetting, which would determine at that time if she would be able to return to work (Doc. 35-3) (Pearson Dep. Doc 31. p. 51 of 193, p.223, ll. 21.).

As of the February 7, 2013 meeting neither the Plaintiff nor agents or representatives of the Defendant had any knowledge of, or awareness, as to what were the precise limitations of the Plaintiff's medical condition; "I told them, I can't make that decision I'm not -- I'm not qualified to say I can come back, you know, and do that kind of labor when I just had major back surgery." (Doc 31, p. 59 of 193, p. 232, ll. 4-6).

The Plaintiff wanted a fitness for duty test in order to inform Styles by their next discussion so that Ms. Styles could determine what would be a reasonable accommodation for Plaintiff. (Doc. 31 p. 58 of 193, p. 226, ll. 2-17, p. 59 of 193, p. 231, ll. 21-25, p. 232, ll. 1-3) Ms. Godbee realized that Plaintiff had not been given time to get a fitness for duty completed and she thought it only fair because the city normally allows two weeks to complete a fitness for duty test. (Doc. 31 p. 59 of 193, p. 231, ll. 21-25, p. 232, ll. 11-4) Becky Godbee told the Plaintiff to come back next week, February 13th, and they would discuss the whether to allow Plaintiff to have time to complete a fitness for duty test and be allowed to go to the March 8th appointment. (Doc. 31 p. 58 of 193, p. 227, ll. 23-25, p. 228, ll. 1-7)

During the meeting on February 7, 2013, Bill Shanahan appeared in the doorway, reached up with his hands to hold onto the overhead door frame and said, "Good afternoon, what are you doing, how's your day?" to Becky and Starina. (PearsonM Dec. 6.7.16)

When Plaintiff came back on February 13th, she asked Ms. Godbee about the possibility of an accommodation of additional time for a Fit for Duty test in light of the fact that the City had approved and set up an evaluation for Plaintiff on March 8, 2013. (Doc. 31 p. 58 of 193, p.

227, ll. 23-25, p. 228, ll. 1-7) Plaintiff learned on February 13, 2013 that she had involuntary been released from employment with the City of Augusta on February 1, 2013 (Pearson Dep., Doc. 31, p.58 of 193, p.228). The City document MS 05/2010, Request for Personnel Action, produced during discovery, about which various defendants and their agents were questioned, indicates that the Plaintiff resigned and is submitted/approved by Shanahan on February 1, 2013. (Doc 40-3, Plaintiff Ex. 44). The City falsified the Plaintiff's separation paperwork by indicating that she resigned when in fact there is no signature by Plaintiff indicating her agreement to resign.(Doc 40-3, Pltff Ex. 44) (Russell Dep, Doc 37-1, p. 63, ll. 23-25). The City failed to provide the Plaintiff with any Termination Appeal Process as provided by City PPPM Sections 300.013 and 300.014.(absence in record).

Plaintiff was granted one week to return with a doctor's excuse on February 14, 2013, after she had already been terminated. (82-5, Clark Ex 43).According to the testimony of Judy Blackstone, Ron Clark was the individual who should have met and discussed reasonable accommodations with Plaintiff. (Blackstone, J Dep. p. 11, ll. 10-25, p. 12, ll. 1-4).

No agent of the city talked to the Plaintiff about the limitations to her injuries, the nature of any jobs which may have been available, any reasonable accommodations which could be provided to her, or engaged in any meaningful interactive process with the plaintiff. (absence in record). Plaintiffs include herein citations for Statement of Material Facts 18-24.

### III.    Argument and Citation of Authority

The Americans with Disabilities Act (ADA) is intended to protect people with disabilities' right to seek employment. The law states that "a qualified individual with a disability may be unlawfully discriminated against because of the individual's disability when the individual's employer does not reasonably accommodate the disability—unless such an accommodation would impose an undue hardship on the employer." 42 U.S.C. § 12112(b)(5)(A).

Plaintiff is entitled to summary judgement because she suffered from a disability, a back injury, which prevented her from doing her job in her previous capacity. Her employer, City of Augusta, was aware of her disability, but when the plaintiff attempted to engage in an interactive process with her employer to determine a reasonable accommodation, she was fired. The circumstances and facts, as alleged by Pearson, show that Plaintiff was unlawfully discriminated against under *Knowles v. Sheriff*, (11th Cir. 2012), *Gaston v. Bellingrath Gardens & Home, Inc* (11th Cir.1999), and from subsequent cases, which show that the defendant is liable under the ADA for unlawful discrimination when the defendant is responsible for the breakdown of the interactive process and fails to provide reasonable accommodation.

### 1. Plaintiff Pearson Establishes Prima Facie Under the ADA

In order to establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that: (1) she is disabled; (2) she was a qualified individual at the relevant time; meaning she could perform the essential functions of the job in question with or without reasonable accommodations[1] and (3) she was discriminated against because of her disability.

---

[1]    A "qualified individual" is a person who, with or without reasonable accommodations, is able to perform the essential functions of a job she holds or desires. 42 U.S.C. § 12111(8).

*Spears v. Creel*, 607 F. App'x 943, 948 (11th Cir. 2015), quoting, *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir.2003).

### a. Plaintiff Was Disabled

Plaintiff's injury meets the ADA's definition of a disability because it impaired her ability work. The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities," such as performing manual tasks, walking, standing, lifting, bending, and working 42 U.S.C. § 12112(1)(A)-(2)(A). Plaintiff's disability in this case stems from an injury she sustained on May 10, 2012, when she was assigned to kneel on the ground and chisel tile all day and, in the course of doing so, injured her back so that she was unable "to stand up straight" and "was hurting bad." (Pearson Dep., Doc 31, p.55 of 193, p. 217, ll. 19, p.56 of 193, p. 218, ll. 10-11). Due to the severity of her back injury, Plaintiff was on FMLA leave and unable to work; perform physical labor or administrative work, May 31st through November 8, 2012. (Pearson Dep., Doc 31, p.56 of 193, p. 219 ll. 7, p.59 of 193, p. 232, ll. 15-16).

Plaintiff reported the back injury to her work place supervisor, Todd Thomas, the day of the incident, and to the worker's compensation carrier. (Doc. 35-7, Ex. 27), (Pearson Dep., Doc 31, p.55 of 193, p. 217, ll. 7-11), (Pearson Dep., Doc 31, p.56 of 193, p. 218, ll. 9-11). Plaintiff continued to communicate to her employer the condition of her injury. By November, Plaintiff's physician recommended that she undergo surgery for her back, which was done on November 8, 2012 (Pearson Dep., Doc. 31, p. 57 of 193, p. 224). On December 11, 2012 Plaintiff was approved for leave through March 8, 2013, until she could be re-evaluated by her physician. (Doc. 35-3, Doctors note) (Doc 41-11), (47-1 Ex. 51, letter granting leave of absence) (Shanahan Dep, Doc 41-5, p.175, ll. 17-18, acknowledge signature). By February 2013, Plaintiff was unsure

of exact limitations of her injuries  Due to the severity of her back injury, which prevented or impaired her from doing a major life activity; physical labor, working, Plaintiff was, for purposes of the ADA, disabled.

### b. Plaintiff Was a Qualified Individual

Plaintiff was a qualified individual at the relevant time; February 2013, but due to the Defendant's breakdown of the interactive process, Plaintiff was precluded from identifying reasonable accommodations; such as vacant positions, or, alternatively, a leave of absence for a limited period of time to complete a fitness for duty report through a medical examination, which would have allowed her to better identify what her physical limitations were. A "qualified individual" is a person who, with or without reasonable accommodations, is able to perform the essential functions of a job she holds or desires. 42 U.S.C. § 12111(8). The ADA provides that the term "reasonable accommodation" may include, among other things, "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). An accommodation of an extended leave of absence of a definite duration until an employee is able to return to full-time work may also be a reasonable accommodation. See *Wood*, 323 F.3d at 1312–13.

There were several vacant positions available at the time of Plaintiff's termination, whose essential functions Plaintiff could have performed, which Plaintiff could have been reassigned to, and which therefore would have provided a reasonable accommodation for Plaintiff's limitation from performing physical labor. In identifying what were the essential functions of these vacant positions, and whether the Plaintiff was qualified to perform them, "'consideration shall be given to the employer's judgment ... and if an employer has prepared a written description ... for the job, this description shall be considered evidence of the essential functions of the job.*" Earl v.*

*Mervyns*, Inc., 207 F.3d 1361, 1365 (11th Cir.2000) (quoting 42 U.S.C. § 12111(8)); see also 29 C.F.R. § 1630.2(n) (listing additional factors to consider in determining whether a particular job function is essential), quoted in *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249-1260, 1258 (11th Cir. 2001).

Plaintiff's qualifications included a high school diploma and extensive experience of nearly thirty years of personnel management, and familiarity with city and state policies. Plaintiff graduated from Glenn High School in 1981. (Doc 31, p.12 of 193, p. 42, ll. 21-25). Plaintiff complete one year of Augusta College1980. (Doc 31, p. 19 of 193, p. 70). Plaintiff began her career working for the City of Augusta, first as a part-time employee while in high school in 1980. (Doc 31, p. 16 of 193, p. 61). She was promoted to a program coordinator positions, working full time for the City of Augusta, in March 1984 (Doc 31, p. 18 of 193, p. 68). In 1989, Plaintiff was an activities coordinator. (Doc 31, p. 20 of 193, p. 74). Plaintiff was eventually promoted to operations manager in 1996. (Doc 31, p. 20 of 193, p. 76). Having ascended through many positions, and having nearly thirty years' experience by February 2013, Plaintiff was well versed in the roles and responsibilities of many different City of Augusta Parks and Recreation Department positions, and was well qualified to fill many of them.

Plaintiff's limitations at the time of her termination were unknown, as she was waiting for a March 8th examination to assess her limitations. However, Plaintiff, based on her subjective awareness, attested in sworn declarations that she was ready as of February 13, 2013 to perform jobs that required only light physical labor. (Doc 146, seriatum 1-44, p. 1-44)..Plaintiff has identified certain jobs as ones she was qualified to perform and were vacant around February 2013. This determination of qualification was based upon her previous job experience, her knowledge of the roles and responsibilities of employees at the City of Augusta, and by

8

reviewing the qualifications listed on City of Augusta job descriptions. Plaintiff has sworn

declarations supporting that she believes she was, and is, qualified for the following positions:

(1) On the February 7th meeting Plaintiff was told there would be no accommodations made for her, and that she could not be given her previous job.[2] However, her previous job was rated for light duty, and therefore she could have returned to it. (Doc 35-1).

(2) Deputy Director II– Parks and Facilities Branch, requires a Bachelor's degree and five years of experience, is rated for light duty; and the job posting became available 11.2.12. (Doc 146-1, seriatum, 5,6, p.9-12 ).

(3) Operations Supervisor II – Operations Supervisor II – Construction, (Maintenance Shop), requires a Bachelor's degree and three years of experience, and was posted 7.15.13. (Doc 146-1, seriatum, 15, 16, p. 29-32).

(4) Property & Maintenance Supervisor (Recreation Administration), requires a High School diploma, three-five years of experience, and was posted 8.24.12. (Doc 146-1, seriatum, 3,4 p. 5-8).

(5) Property & Maintenance Supervisor I (Maintenance Shop), requires a High School diploma, three-five years of experience, and was posted 4.9.13. (Doc 146-1, seriatum, 13, 14, p.25-28).

(6) Recreation Specialist II, Center Program Coordinator (Sand Hills) Recreation Specialist II, requires an Associates Degree, three years of experience, was rated for light work, and was posted 7.15.13. (Doc 146-1, seriatum, 17,18, p. 33-36).

(7) Recreation Specialist II, Center Program Coordinator (Diamond Lakes), requires a Associate's Degree, three years of experience, was rated for light work, and was posted 4.9.13. (Doc 146-1, seriatum, 11, 12, p. 21-24).

(8) Recreation Specialist II, Center Program Coordinator (Warren Road Community Center), requires a Associate's Degree, three years of experience, was rated for light work, and was posted 8.23.12. (Doc 146-1, seriatum, 1,2 p. 1-4).

(9) Recreation Specialist II, Center Program Coordinator, requires an Associate's Degree, three years of experience, was rated for light work, and was posted 1.11.13. (Doc 146-1, seriatum, 7,8 p. 13-16).

---

[2]     Plaintiff was told by city HR personnel she should apply for social security disability instead of returning to work. (Doc. 148-2, l. 15), see Godbee's notes from the meeting (Doc 148, Ex A-1, A-2).

(10) Senior Services/Community Center Director (Savannah Place Nutrition), requires a High School Diploma or Bachelor's, three years of experience, no work requirement, posted 1.11.13. (Doc 146-1, seriatum, 7,8 p. 13-16).

(11) Deputy Director – Parks, (Recreation Administration), requires a Bachelor's degree and five years of experience, is rated for light duty; and the job posting became available posted 3.19.14

In the alternative, it can be argued that Plaintiff was requesting a reasonable accommodation of a leave of absence for a determined length of time, until, either, March 8, 2013, or two more weeks, to complete an examination which would inform Plaintiff as to what were her physical limitations. Courts have held that, "an extended leave of absence of a definite duration, as opposed to an indefinite duration, may be a reasonable accommodation in certain circumstances." *See Wood,* 323 F.3d at 1312–13, quoted in *Spears v. Creel*, 607 F. App'x 943, 950 (11th Cir. 2015). Plaintiff requested, in her February 7, 2013 meeting time to complete a fitness for duty report, which would determine what work she was capable of doing to assist in identifying a reasonable accommodation, and was already scheduled for March 8, 2012. (Doc. 35-3) (Pearson Dep. Doc 31. p. 51 of 193, p.223, ll. 21).

Precedent law has found that Defendants cannot be found liable for a failure to engage in an interactive communicative process with the Plaintiff if no relevant vacant positions or reasonable accommodations existed. The Eleventh Circuit has held that, "establishing that a reasonable accommodation exists is a part of an ADA plaintiff's case," *Willis v. Conopco, Inc.*, 108 F.3d 282-287, 286 (11th Cir. 1997), and also that employee bears the burden of identifying an accommodation that would allow her to perform the essential functions of her job. *Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir.2000).* In *Willis v. Conopco*, the Eleventh Circuit denied an appeal and affirmed summary judgement for an employer because "Plaintiff-as a litigant bringing an ADA action-has failed to produce evidence (after the completion of

discovery) of the existence of any "accommodation" at all, "reasonable" or otherwise." *Willis v. Conopco*, at 287. Plaintiff here has clearly met its burden by demonstrating through evidence in the record of the existence of accommodations, namely transfer to a vacant position which would not have required more than light physical labor, or, alternatively, a leave of absence for a definite period of time to better identify what her limitations were.

### 2. Defendant Failed to Engage in Interactive Communication Process

#### a.   Summary of the Elements for Claim of Failure to Engage in Interactive Process

The regulations governing the ADA provide that, to determine the appropriate reasonable accommodation, it may be necessary for an employer "to initiate an informal, interactive process with the individual with a disability in need of an accommodation" to identify the person's limitations and possible accommodations. 29 C.F.R. § 1630.2(o)(3) (2007). "[T]he interactive process is a mandatory rather than a permissive obligation on the part of employers," *Barnett v. U.S. Air*, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000), vacated sub nom. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002).

Rulings in *Stewart* and *Beck v. University of Wisconsin Board of Regents* offer guidance as to elements of the interactive process to review, isolate cause of breakdown, and to then assign responsibility. *Knowles v. Sheriff* has interpreted *Stewart v. Happy Herman's Cheshire Bridge, Inc.* to say that there can be liability under the ADA where the employer obstructs the informal interactive process, did not make reasonable efforts to communicate with the employee or provide accommodations based on the information it possessed, and where the employer's actions caused the breakdown in the interactive process. *Knowles v. Sheriff*, 460 F. App'x 833-836, 835 (11th Cir. 2012) quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278-1287, 1285 (11th Cir. 1997), referring to *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d

1130-1137, 1137 (7th Cir.1996). Similarly, the Ninth Circuit Court has said the interactive process requires; "(1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). Where the interactive process breaks down, the court "'should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility" as "liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135–1137, 1137 (7th Cir.1996).

**b.    Defendants Had Duty to Engage in Interactive Process**

The Ninth Circuit Court held that "once an employee requests an accommodation or an employer recognizes the employee needs an accommodation," then "employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir.2000) (en banc), vacated on other grounds, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). An employee is not required to use any particular word, phrasing, or form when requesting an accommodation but need only "inform the employer of the need for an adjustment due to a medical condition." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080-1089 (9th Cir. 2002). The EEOC's interpretive guidelines state that a doctor's note outlining medical restrictions for an employee constitutes a request for reasonable accommodation, and requests may be as simple as an oral statement made in plain English to an employer that the employee is having medical trouble. ("Requesting Reasonable Accommodation," EEOC Notice Number 915.002, ADA Division, Office of Legal Counsel, October 17, 2002).

Defendants recognized that Plaintiff had a medical problem and would need reasonable accommodations in order to facilitate her return to work. Plaintiff had submitted a request for continued leave of absence to recover from her back surgery, which made Defendants aware of her medical problems.  Following Plaintiff's surgery, on Dec. 11, 2012, Bill Shanahan approved FMLA status for Plaintiff to recover from surgery which was granted until March 8, 2013. (Doc. 35-3, Doctors note) (Doc 41-11), (47-1 Ex. 51, letter granting leave of absence) (Shanahan Dep, Doc 41-5, p.175, ll. 17-18, acknowledge signature).  Plaintiff attended the February 7, 2013 meeting with HR personnel to discuss when, and under what conditions or with what accommodations, Plaintiff would be able to return to work. See (Doc. 31, p. 57-58 of 193, p. 225-226), Personnel "call[ed] me [Pearson] and wanted to know could I be back [to work] in January," Plaintiff explained she had "just had major back surgery," and "they were going to set up a meeting in Febuary....to discuss....what I thought my condition was." Defendants were thus on notice that Plaintiff would need a reasonable accommodation to return to work, and this should have triggered an interactive process between both parties.

   **c.    Refusals and Reckless Failures to Engage in Interactive Communication Process**

         **i. Failure to Initiate Interactive Process**

Facts in this case are analogous to facts presented in *Yonemoto v. McDonald*, 114 F. Supp. 3d 1067-1122 (D. Haw. 2015), where Yonemoto produced a note from a doctor and requested certain accommodations to allow him to continue to work, despite his diabetes. The note from Yonemoto's doctor clearly established that his supervisor, Carethers, was aware of Yonemoto's medical limitations, and subsequent letters from Plaintiff's attorney triggered Defendant's obligation to engage in the interactive process *Yonemoto v. McDonald* at 1119. Cathers' failure to respond to these letters, much less discuss requests for accommodation, did

not follow Veterans Administration proper procedure and were found to not be reasonable. "Carethers should have engaged in some type of dialog seeking to facilitate Plaintiff's return" and "Carethers is therefore responsible for the breakdown in communication." *Yonemoto v. McDonald,* at 1122.

With Pearson, similar to *Yenomoto,* Defendants were aware that Plaintiff had a medical condition which could require accommodations for Plaintiff to return to work. The February 7, 2013 meeting, similar to Yonemoto's letters from his lawyer, established that Plaintiff wanted to return to work but Plaintiff would need a reasonable accommodation. Plaintiff attended the February 7, 2013 meeting with HR personnel to discuss when, and under what conditions or with what accommodations, Plaintiff would be able to return to work. See (Doc. 31, p. 57-58 of 193, p. 225-226) Personnel "call[ed] me [Pearson] and wanted to know could I be back [to work] in January," Plaintiff explained she had "just had major back surgery," and "they were going to set up a meeting in Febuary....to discuss....what I thought my condition was." Instead of engaging in a dialogue, at the February 7, 2013 meeting Plaintiff was informed that she was going to be terminated if she was "unable to return to work by February 13, 2013" (Doc. 35-4) (Pearson Dep., Doc 31, p. 59 of 193, p. 230). This meeting could have established the beginning of an interactive process, instead, the Defendants did not respond or engage any further in the interactive process.

Plaintiff's termination was allowed to stand and there was no further attempt at direct communication between employee and employer or any further attempt to facilitate Plaintiff's return to work. See Plaintiff's termination paperwork. (Doc 40-3, Plaintiff Ex. 44). In fact, Plaintiff learned that she had involuntary been released from employment with the City of Augusta since February 1, 2013. (Pearson Dep., Doc. 31, p. 58 of 193, p.228). The termination

occurred despite some staff, Godbee, saying there had been a deviation from official policy, as usually time was given to complete a fitness for duty. (Doc. 31 p. 59 of 193, p. 231:21-25, 232:1-4). As a result of Defendants proceeding with Plaintiffs' termination, there was no direct communication between the employer and employee to explore in good faith the possible accommodations. The Defendants are therefore responsible for the breakdown of the communication process.

### ii. Failure to Consult Medical Expert

Courts have ruled that under the ADA, requesting medical information or consulting a medical expert is appropriate, and in fact recommended, to help employers offer reasonable accommodations for employees.  In *William v. Bon Secours Richmond Health*, far from committing a breach of good faith when employer requested a doctor's note outlining just how schedule changes aggravated an employee's PTSD; the employer's action was "squarely in line with the ADA's expectations for employers." *Williamson v. Bon Secours Richmond Health Sys.,* Inc., 34 F. Supp. 3d 607-17, 613 (E.D. Va. 2014).

> The ADA encourages such action; the courts applaud it: "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has…Ibid.

The request was part of the interactive process, a genuine give and take between employer and employee, so that the employer could better understand the limitations affecting the employee.

*Fahey v. Twin City Fan Companies* also offer guidance for this case. Fahey was impaired in one eye, and had asked for several reasonable accommodations in the position of a forklift operator, such as attaching a mirror. Steffes, Fahey's supervisor, made no good faith effort and determined unilaterally not to accommodate Fahey and that his request was not feasible or reasonable. Regardless of whether or not the accommodation was reasonable, the Court held that

the employer was wrong to make this determination without requesting medical information, consulting a medical expert, or consulting the employee.

> Steffes made this determination, however, without any information—from Dr. Edinger or from any medical or other relevant literature—about Fahey's specific limitations or how those limitations would affect his ability to perform the parts expediter position. Nor did Steffes discuss Fahey's limitations with Fahey. Steffes's decision that Fahey could not be accommodated, therefore, necessarily was based on stereotypes, generalizations, and prejudices. As this court noted in its summary judgment order, this is the type of decision-making that the ADA seeks to avoid by requiring the employer to engage in an interactive process, involving both the employer and applicant.

*Fahey v. Twin City Fan Companies, Ltd.*, 994 F. Supp. 2d 1064, 1079 (D.S.D. 2014).

Reasonable accommodations cannot be provided without a basis of shared medical information and clear understanding; which is impossible if parties do not show good faith and cooperate in the interactive process.

*William v. Bon Secours Richmond Health* and *Fahey v. Twin City Fan Companies* are directly relevant to Pearson, where the decision to terminate the Plaintiff was made unilaterally by the interim director, Bill Shanahan, who did not have necessary information about the Plaintiff's condition, nor did he make a good faith effort to learn such relevant information. On December 11, 2012, Shanahan approved FMLA status for the Plaintiff until the Plaintiff could re-evaluated to determine the Plaintiff's medical condition on March 8, 2013. (Doc. 35-3, Doctors note) (Doc 41-11), (47-1 Ex. 51, letter granting leave of absence) (Shanahan Dep, Doc 41-5, p.175, ll. 17-18, acknowledge signature). The same day, Shanahan, obviously not knowing any further details about Plaintiff's condition, emailed Robbie Burns (HR), referring to Plaintiff, asking, "how long do we have to go before we can fill that position?" (Doc. 41-7, Plaintiff Ex 6) (Shanahan Dep, Doc 41-5, p.72, ll. 20, acknowledge authorship). From this, one can infer that Defendants had already determined to proceed with Plaintiff's termination, despite lacking knowledge of her medical condition.

The lack of information about the Plaintiff's medical condition was evident in the February 7, 2013 meeting, where neither the HR personnel nor the Plaintiff herself knew what her current medical status was. (Doc 31, p. 59 of 193, p. 232, ll. 4-6)**.** The distance between the behaviors described in *William v. Bon Secours Richmond, and the Defendants*, "request a doctor's note," "meet with the employee," is miles apart, night and day, from what occurred to the Plaintiff.   In contrast to *William v. Bon Secours Richmond Health*, Defendants made no request for information about the Plaintiff's medical condition on February 7th or 13th and instead proceeded with her termination, consequently demonstrating bad faith. (absence in record). Going beyond *Fahey v. Twin City Fan Companies*, not only did Defendants not seek out a medical expert, they <u>denied</u> the Plaintiff's request to have time to see a doctor, which they themselves had previously approved. By failing to engage in any dialogue with Pearson or to seek medical advice, Defendants specifically failed to attempt to "identify the precise limitations" resulting from Plaintiff's limitation as stated in the Code of Federal Regulations. See 29 C.F.R. § 1630.2(o)(3). It was an attempt to fill this knowledge gap and better inform the interactive process that motivated the Plaintiff to request time to see her doctor on March 8, 2013, or sooner if needed. (Doc. 31 p. 58-59 of 193, p. 226, l. 2-17, p. 231 l. 21-25. p. 232, l. 1-3). Defendants' actions evince they made no good faith effort to engage in an interactive process with the Plaintiff, and therefore they are responsible for the breakdown of the interactive process.

### iii. Abortive-Interactive Process

Denying a reasonable accommodation by ending the interactive process because the employer has already made a decision, or unilaterally made a decision without consulting the employee, is a failure to engage in the interactive process. Several courts have found the

employer responsible for a breakdown in the interactive process because they aborted the interactive process for refusing to continue to engage and communicate with the employee.

In *Minter v. District of Columbia*, C.A.D.C.2015, 809 F.3d 66,.Minter, a District of Columbia employee, alleged that her request for disability accommodation was denied when, in a meeting with the District's ADA coordinator, she was asked for further information regarding her injury. Instead of denying her request, the Court found this was part of the interactive process in which Minter was engaged in. In order to "establish that her request was 'denied,' [a plaintiff] must show either that the [agency] in fact ended the interactive process or that it participated in the process in bad faith." *Minter v. D.C.*, at 69. Therefore, the Court ruled Minter had not been discriminated against if there was no genuine dispute which alleged the District ended interactive process.

In *Miranda-Fernandez v. Grupo Medico San Pablo*, 914 F. Supp. 2d 206 (D.P.R. 2012), an employee suffering from Arteriovenous malformation (AVM), a condition in which common symptoms include headaches and seizures, requested several reasonable accommodations in accordance with her disability. Instead the Plaintiff was unilaterally transferred to a different department, which did nothing to attempt to meet her requests. The Court found "the absence of any interactive process with the plaintiff, that any communication on the matter was even attempted with plaintiff." *Miranda-Fernandez v. Grupo Medico San Pablo*, at 220. Consequently, the Court found no genuine issues of material facts on Plaintiff's request for partial summary judgment, "insofar that Miranda–Fernández is a qualified individual with disability and the employer did not engage in the interactive process to properly attend a request for reasonable accommodation," and plaintiff's partial motion for summary judgment was granted. Ibid.

*Minter v. District of Columbia* and *Miranda-Fernandez v. Grupo Medico San Pablo* are relevant to Pearson. In comparison to *Minter v. District of Columbia,* there is evidence in the record to show that the Defendants ended the interactive process because they had already made a final employment decision. As early as December 11, 2012 Bill Shanahan had sent an email asking "how long do we have to go before we can fill that position?" (Doc. 41-7, Plaintiff Ex 6) (Shanahan Dep, Doc 41-5, p.72, ll. 20, acknowledge authorship).   In her February 7th meeting with HR Godbee, Godbee said, "we're not going to be able to make any accommodations" for the Plaintiff, demonstrating the Defendant's unwillingness to attempt to engage in an interactive policy. (Doc. 148-2, l. 10). On February 13, 2013 the Plaintiff learned she had involuntary been released from employment with the City of Augusta on February 1, 2013, pre-dating the February 7, 2013 meeting. (Pearson Dep., Doc. 31, p.228).

The facts here, the pre-dating of the Plaintiff's dismissal from before any initial conversation between employee and employer started, and an email with an intention already made to terminate the employee, support the inference that Defendants did not engage in the interactive process in good faith. Like *Minter*, these facts, where Defendants unilaterally made an employment decision, firing the Plaintiff, without engaging in an interactive process, are grounds for summary judgement.

Like in *Miranda-Fernandez*, unilaterally making an employment decision represents a failure in the interactive process. The February 7, 2013 meeting could have established the beginning of an interactive process between HR personnel and the Plaintiff, in which both shared information to facilitate the Plaintiff's return to work. Plaintiff's actions demonstrate she believed that was the correct process to begin when she asked for time to complete a fitness for duty with her treating provider Dr. Oetting. (Doc. 35-3), (Pearson Dep. Doc 31. p. 51 of 193,

p.223, ll. 21). Instead, receiving no further information or engagement from the Defendants, Defendant never discussed with Plaintiff the possibility of positions (absent in record). It must be concluded that Defendant had already unilaterally made the decision to terminate Plaintiff.

Because the facts are undisputed that Defendants failed to engage in the interactive process consistent with the law, Plaintiffs should have summary judgement under the law.

Respectfully submitted this 8th day of June, 2016.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff

PO Box 3248
Augusta, GA 30914-3248
706-737-4040
jpbatson@aol.com

Prepared by:
John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
Phone 706-737-4040
FAX 706-736-3391

CERTIFICATE OF SERVICE

This is to certify that the undersigned attorney did this date serve a copy of the within and foregoing Plaintiff's In Support of Motion for Partial Summary Judgment on counsel of record for the above named Defendant by one or more of the following method(s):

☐     Depositing the same with the United States Postal Service thereon
        to the following address(es):

                        Jody Smitherman
                        Augusta, Georgia Law Department
                        520 Greene Street
                        Augusta, Georgia 30901
                        JSmitherman@augustaga.gov

☒     E-mailing a copy of the same through the court's e-mailing system:

Respectfully submitted this 8th day of June, 2016.

                        /s/ John P. Batson
                        John P. Batson, GA Bar # 042150
                        Attorney for Plaintiff
                        PO Box 3248
                        Augusta, GA 30914-3248
                        706-737-4040
                        jpbatson@aol.com

Prepared by:
John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
Phone 706-737-4040
FAX 706-736-3391