Case 1:14-cv-00110-JRH-BKE   Document 166   Filed 07/14/16   Page 1 of 38

MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.
Ronald L. Houck on 05/07/2015                           Page 1

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF GEORGIA
                     AUGUSTA DIVISION


MELINDA BEAZLEY PEARSON,      )
                              )
      Plaintiff,              )
                              )   Civil Action File
vs.                           )   No. 1:14-CV-110
                              )
AUGUSTA GEORGIA, et al.,      )
                              )
      Defendants.             )
_____)



                    - - - - -

            DEPOSITION OF RONALD L. HOUCK

         Taken By Counsel For the Plaintiff

      Before Gina L. Smith, Certified Court Reporter

    At Prestige Reporting, 2603 Commons Boulevard,

         Suite B, Augusta, Georgia 30901

    On Thursday, May 7, 2015, Commencing at 12:14 p.m.

                    - - - - -
```

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**          Pages 2..5

**Page 2**

APPEARANCES OF COUNSEL

For the Plaintiff::     Mr. John P. Batson

                        Attorney at Law

                        1104 Milledge Road

                        Augusta, Georgia  30904

                        jbatson@aol.com

For the Defendant:      Ms. Jody Smitherman

                        Augusta Georgia Law Department

                        520 Greene Street

                        Augusta, Georgia  30901

                        Jsmitherman@augustaga.gov

Also Present:           Ms. Melinda Pearson

                        Plaintiff

                        - - - - -

INDEX TO DEPOSITION

                                                     Page

EXAMINATION BY MR. BATSON . . . . . . . . . . . .5

EXAMINATION BY MS. SMITHERMAN . . . . . . . . . . .53

REEXAMINATION BY MR. BATSON . . . . . . . . . . . .55

CERTIFICATE OF COURT REPORTER . . . . . . . . . . .61

**Page 3**

INDEX TO EXHIBITS

                                                     Page

Plaintiff's

Exhibit 1    WRDW 3/5/12 News article (1 pg) . . . . . . . 13

Exhibit 2    WRDW Article transcript 8/30/12 (2 pp) . . . 20

Exhibit 3    Augusta Recreation and Parks Dept
             Compensatory Time Request (50 pp) . . . . . . 21

Exhibit 4    Augusta Recreation and Parks Dept
             Monthly Payroll Form (43 pp) . . . . . . . . 23

Exhibit 5    Augusta-Richmond County Recreation and
             Parks Department Compensatory Time Request
             And Time Received (9 pp) . . . . . . . . . . 26

Exhibit 6    4/12/12 Statement by Dennis Stroud (1 pg) . . 29

Exhibit 7    Section 4.0 Parks & Facilities Branch (8 pp) 29

Exhibit 8    8/8/12 Memo- Important Preservation Notice
             Augusta Law Department (4 pp) . . . . . . . . 30

Exhibit 8A   Section 800.029 Personal Information and
             Personnel Records  (1 pg) . . . . . . . . . 30

Exhibit 9    Memo from Mr. Ron Houck - Summary Interview
             (1 pg) . . . . . . . . . . . . . . . . . . 31

Exhibit 10   Augusta Recreation and Parks Dept
             Vacation change request form (7 pp) . . . . . 33

Exhibit 11   5/3/12 email from Kenneth Bray to Gaynell
             Bonner and attachments (7 pp) . . . . . . . . 36

Exhibit 15   5/7/12 Request for Personnel Action - Melinda
             Pearson (3 pp) . . . . . . . . . . . . . . .

**Page 4**

INDEX TO EXHIBITS, CONTINUED

Plaintiff's

Exhibit 16   12/12/14 Open records Act Request and
             attachments (13 pp) . . . . . . . . . . . . . 57

Exhibit 18   Augusta Recreation GPS analysis (2 pp) . . . 40

Exhibit 18A  Augusta Recreation GPS Cost Analysis (1 pg) . 40

Exhibit 19   Analysis of GPS on Vehicle 994164 and 994162
             (1 pg) . . . . . . . . . . . . . . . . . . 40

Exhibit 20   Vehicle 994164 Overtime Pay Weekend Assignment
             (1 pg) . . . . . . . . . . . . . . . . . . 43

Exhibit 20A  Analysis of GPS on Vehicle 994164 (1 pg) . . 43

Exhibit 24   Application for Leave of Absence (1 pg) . . . 51

Exhibit 25   List of Gross payroll for Melinda Pearson
             (1 pg) . . . . . . . . . . . . . . . . . . 51

Exhibit 26   12/11/12 email and attachment from Robby Burns
             To Starina Styles (2 pp) . . . . . . . . . 52

Exhibit 27   4/16/14 letter to Maurice McDowell from Robert
             Levine (2 pp) . . . . . . . . . . . . . . . 53

**Page 5**

 1                    DEPOSITION OF

 2                    RONALD L. HOUCK

 3          [Pursuant to O.C.G.A. 9-11-28(d), Prestige

 4     Reporting has no contract with any of the parties or

 5     their counsel.  The court reporter's charges are the

 6     usual and customary charges for services within the

 7     industry and are available upon request by either

 8     party, with no financial or services discount being

 9     given to any party named in this litigation.]

10          MR. BATSON:  This is the deposition of Ron Houck.

11     This deposition is taken pursuant to agreement of

12     counsel.  All objections except as to the form of

13     question are reserved until such time as this

14     deposition is submitted in this or tendered in this

15     action or any other action.  Any other conditions?

16          MS. SMITHERMAN:  No.

17          MR. BATSON:  Swear the witness, please.

18                    - - - - -

19               RONALD L. HOUCK,

20          Having Been First Duly Sworn, was Examined

21                 and Testifies as Follows:

22                    EXAMINATION

23     BY MR. BATSON:

24     Q.   Could you state your name, please.

25     A.   Ronald L. Houck, H-O-U-C-K.

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                    Pages 6..9

Page 6

1    Q.    And what's your current position?
2    A.    Interim director recreation parks and facilities.
3    Q.    Did you apply for the permanent position?
4    A.    It has not been advertised yet.
5    Q.    How long have you been interim director?
6    A.    Middle of December of last year.
7    Q.    '14?
8    A.    Yes, sir.
9    Q.    And who was the interim before that?
10   A.    There was a director before my interim position,
11   Bob Levine.  And he resigned back in December 2014.
12   Q.    Do you know where Bob Levine is now?
13   A.    New Haven, Connecticut.
14   Q.    And the interim before Mr. Levine was who?
15   A.    I believe Bill Shanahan.
16   Q.    When did you start with the City of Augusta?
17   A.    1977.
18   Q.    In what position?
19   A.    Part time maintenance worker.
20   Q.    What was your first promotion and to what position
21   was it?
22   A.    I think it was -- I don't know what they called it
23   back then but it was in charge of a little park, Chaffee
24   Park.  It was probably a center director for lack of better
25   words.

Page 7

1    Q.    And what's your education?
2    A.    Got a BS in Recreation Park Administration at
3    Clemson University.
4    Q.    Did you have that in '77?
5    A.    I did.
6    Q.    When did you graduate from Clemson?
7    A.    '76.
8    Q.    '76.  What directors have you worked for with the
9    Department of Recreation?
10   A.    Here I believe it's been Tommy Boyles, Tom Beck,
11   Bill Shanahan and Robert Levine.
12   Q.    Could you tell me who your immediate supervisors
13   have been during your time with Augusta?
14   A.    Couldn't tell you when I was in the maintenance
15   position for about six months or so.  But I believe Tom Beck
16   was my immediate supervisor my entire time prior.  And then
17   I left for a period of time and came back.
18   Q.    Where did you go and what period of time was that?
19   A.    I left in '86 and took a job in Florida with the
20   City of Jacksonville with their recreation department.
21   Q.    Were you gone what a year, two years?
22   A.    No, sir.  I was gone until '97 I came back.
23   Q.    And what position did you have in Jacksonville?
24   A.    I was a division chief.
25   Q.    What kind of division was it?

Page 8

1    A.    It was waterfront parks.
2    Q.    What's the reason you left there?
3    A.    I was in an appointed capacity and didn't survive
4    the mayoral transition.
5    Q.    Did you ever supervise Melinda Pearson?
6    A.    I can't really remember when Melinda left.  I was
7    in a position of interim deputy director for Parks and
8    Facilities from May of 2012 to December of 2012.  And that
9    position would have supervised all of the facilities in the
10   maintenance operations.
11   Q.    Before -- well, in December 2011, in early 2012,
12   what position did Melinda hold?
13   A.    I'm not real sure.
14   Q.    Was she a recreations manager?
15   A.    She was one for a number of years.  I can't really
16   recall the dates on that.
17   Q.    Okay.  Before she was demoted, what title would
18   you say she held?
19   A.    I think operations manager.  For a number of years
20   we were the same.  I was a manager and she was at that same
21   level.
22   Q.    And what division did you manage?
23   A.    I was in charge of our Planning and Development,
24   Park Development.  And it was a one-man operation for 14
25   years from '97 to 2011.

Page 9

1    Q.    And primarily in that -- in that position that you
2    had, were you looking at budgets, spreadsheets, planning?
3    What were you doing?
4    A.    Pretty much nothing with the operating end of
5    things.  This was managing our sales tax, park projects.  So
6    I really had nothing to do with the operating side of our
7    department from '97 through, outside of my interim deputy
8    slots until.
9    Q.    Well, explain to me how that process worked from a
10   collection of sales tax to the deciding of what projects to
11   do and how you would -- what you would do.
12   A.    Everything from conceptual plans to meeting with
13   the public and neighborhood associations on projects to
14   doing everything it would take to retain an architect, to
15   hiring contractor, to managing and closing out the projects.
16   Q.    So it was building of new facilities and things
17   for parks.
18   A.    Rebuild and rehab of existing.
19   Q.    With sales tax money.
20   A.    Yes.
21   Q.    And then the Commission every year would say this
22   amount from the sales tax is going to under your control or
23   that you would have --
24   A.    The department.  It was in five-year increments.
25   We had programs, set dollars allocated for five year

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                                    Pages 10..13

**Page 10**

1   stretches.
2       Q.   I got you.  In that capacity, did you ever get out
3   in the field and see whether Melinda Pearson performed
4   manual labor?
5       A.   I was out in the field and I can attest she did
6   perform manual labor.
7       Q.   All right.  Can you give us an example of the
8   kinds of manual labor you've seen her do?
9       A.   Anything to get the job done.
10      Q.   Did you ever see her rake leaves?
11      A.   I've probably seen her do just about all general
12   maintenance tasks.
13      Q.   Okay.  Did you ever see her run lawn mowers?
14      A.   Probably.  I won't say exactly, but I'm sure.
15      Q.   How about heavy machinery?
16      A.   That I can't tell -- I can't remember that.
17      Q.   How about -- how about running a shovel?
18      A.   Running a shovel?
19      Q.   Yeah.
20      A.   Probably so.
21      Q.   Do you know whether the physical labor were duties
22   that were expected of Ms. Pearson?
23      A.   Again, I think she was in a managerial role but
24   she took that -- again, I think she was the type of
25   individual just like myself that did whatever it took to get

**Page 11**

1   the job done.
2       Q.   Were you aware of Melinda being called out to
3   respond to physical plant problems at recreational
4   facilities after hours?
5       A.   Uh-huh.  Yes.
6       Q.   Tell me what kind of incidents she would have to
7   respond to at the different facilities.
8       A.   At the time when we were just recreation parks
9   before the '11 merger, it was the entire park maintenance
10   operation, including issues in parks in general or community
11   centers or any of our facilities that her division oversaw.
12      Q.   So what -- what kind of incident might she get
13   called out for?
14      A.   Break-ins, mechanical failures, irrigation issues.
15   I can remember rodent issues at one of our facilities.  It
16   was just a variety of items because we -- we were -- each
17   individual was on call on a regular basis.
18      Q.   Do you know whether she had a pager?
19      A.   I think we probably had pagers back in those days,
20   yes.
21      Q.   Did you have a pager?
22      A.   I did.
23      Q.   Through 2014, did you receive comp time?
24      A.   I did.
25      Q.   Do you still receive comp time?

**Page 12**

1       A.   No, sir.
2       Q.   Did anybody announce to you that effective a
3   certain date or something, you were no longer going to get
4   comp time?
5       A.   You know, I can't remember.  Probably came hand in
6   hand when the city converted to the automated ADP Time
7   Management System.  I'm not exactly sure.
8       Q.   Are you aware of a system under ADP where people
9   will take time off and comp -- and somehow people go into
10   the ADP system and back time out and take some time off if
11   they've worked a bunch of time?
12      A.   Yes.  I think as long as they have the minimum of
13   -- if they're a full time employee, 75 and a half hours.
14      Q.   Right.  Per two weeks.
15      A.   Per two weeks, yes.
16      Q.   And is there a policy of trying to use that comp
17   time within the next two weeks, the next pay period?
18      A.   Within the pay period, yes.
19      Q.   So what -- what is that called now?  Is it called
20   comp time or what word do you use now that ADP is in place?
21      A.   I'm not sure if we call it comp time at all.  But
22   it's just all the hours are indicated on your time sheet,
23   hours worked.  And if you've got your hours and you happen
24   to be off for two hours that day, then your hours worked, if
25   you're a full time employee instead of seven and a half

**Page 13**

1   would be five and half that day.
2       Q.   Got you.  So then -- but then the day that you had
3   worked extra, it would reflect 9.5 hours.
4       A.   Or whatever.
5       Q.   Yeah.  Or whatever.  Okay.  So back when you were
6   still using paper records on comp time, were you aware that
7   Melinda got comp time and that her records for come time or
8   extra time worked were kept and the paperwork was done to
9   try to get comp time that Melinda did that?
10      A.   Not just for her but I think that was a standard
11   procedure with most everyone in -- in the department.
12      Q.   Would you agree that Mr. Beck was terminated
13   around April of 2012?
14      A.   I believe that's right.
15      Q.   Let me have you look at what we've marked as
16   Exhibit 1.  Do you remember an article on the TV, not an
17   article, a representation on the news that there was an
18   allegation of falsification of time cards made in March of
19   2012?
20      A.   I'm sure I heard that on the news.
21      Q.   Do you know whether in March of 2012, complaints
22   had been filed against Melinda Pearson for a hostile work
23   environment?
24      A.   I don't know for a fact, no.
25      Q.   So you wouldn't know whether they had or had not?

Case 1:14-cv-00110-JRH-BKE   Document 166   Filed 07/14/16   Page 5 of 38

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                    Pages 14..17

**Page 14**

1    A.   In March of 2012, no.  Because I would have had no
2  reason to really.
3    Q.   Do you remember a period of time when Tom Beck was
4  hard on Melinda?
5    A.   I think he was hard on a lot of folks on
6  occasions, yes.
7    Q.   Do you think that he was harder on Melinda than
8  others?
9    A.   I'm not sure.  It's hard to -- that's hard to say.
10  He got on everyone's case pretty good at times.
11    Q.   Do you remember a period of time where Mr. Beck's
12  attitude or treatment of Ms. Pearson had changed and he was
13  more favorable to her?
14    A.   Not really.
15    Q.   Do you recall in late 2011/early 2012 whether Ms.
16  Pearson was making complaints to Mr. Beck about a hostile
17  work environment arising from some of the new employees from
18  Trees and Parks?
19    A.   I don't.  I can't recall.  Let's put it that way.
20    Q.   Do you ever recall being asked any questions by
21  anyone from HR about whether Melinda was creating a hostile
22  environment for employees?
23    A.   No, sir.
24    Q.   Do you have any knowledge of any allegations
25  against Ms. Pearson?

**Page 15**

1    A.   I'm not sure what --
2    Q.   All right.  Do you ever have any knowledge that
3  she was falsifying time cards?
4    A.   No, sir.
5    Q.   Did you ever have any knowledge that she was or
6  that anyone alleged that she was causing a hostile
7  environment for employees?
8    A.   No, sir.
9    Q.   Do you recall any conversations or overhearing
10  conversations in which people made allegations about Ms.
11  Pearson falsifying time cards or comp time cards or
12  falsifying a leave request?
13    A.   No, sir.
14    Q.   Did you ever hear that Misty Sroczynski was
15  interested in -- in getting rid of either Tom Beck or
16  Melinda Pearson?
17    A.   I'd say no, not directly.  I think people -- some
18  people in our department had had personal agendas more than
19  department agendas or would take them over at times.
20    Q.   Would it be your opinion that you believe that
21  Misty Sroczynski had a personal agenda to try to run the
22  department the way she wanted it run?
23    A.   I don't think I can say one way or another really.
24    Q.   Do you feel that she is one of the people who was
25  trying to implement her personal agenda?

**Page 16**

1    A.   I think so.
2    Q.   Did she ever make you aware of what her personal
3  agenda was?
4        MS. SMITHERMAN:  You have to answer out loud.
5    A.   Oh, I'm sorry.  No.
6    Q.   [Mr. Batson]  Did -- so you became interim
7  director after Melinda had already been demoted; is that
8  correct?
9    A.   I became interim director when Ms. Pearson was
10  already gone because I just was --
11    Q.   Okay.  All right.
12    A.   -- in December of this past year.
13    Q.   All right.  Can you explain the process or
14  procedure if someone makes a complaint against a supervisor
15  that they're creating a hostile work environment?  What
16  process is supposed to occur?
17        MS. SMITHERMAN:  Objection to the form.  Go ahead.
18    A.   You know I would think there would be something in
19  writing that would be given to their supervisor and/or
20  director for them to do an investigation whether it was --
21  whether it would be to bring in someone from HR, depending
22  on what type of complaint it was, if the EEO office needed
23  to be contacted.
24    Q.   Do you remember who the EEO officer was in late
25  2011/early 2012?

**Page 17**

1    A.   No.  The only thing I do remember is having a
2  conversation with Ron Clark.  And I can't remember what his
3  actual position he was with HR.
4    Q.   Do you ever recall a conversation with Ron Clark
5  that involved the topic of Melinda?
6    A.   Not specifically.  I had, I think one conversation
7  with him regarding compensatory time and use of comp time
8  and how it was used in our department.
9    Q.   Can you tell me about when that conversation was
10  with Mr. Clark?
11    A.   I can't.  I just don't -- I don't remember when
12  that was.
13    Q.   Was that relative to -- I mean frame it in terms
14  of events.  Was it before Melinda was demoted or after or do
15  you know?
16    A.   I would say before but I'm not a hundred percent
17  sure.
18    Q.   Did Mr. Clark schedule the appointment with you?
19    A.   He did.
20    Q.   And what can you recall about the conversation
21  that the two of you had?
22    A.   The biggest thing I think was the fact that how
23  comp time was handled in the past as sort of a standing
24  operating procedure.  Probably from even before when Tom
25  Beck was director, when Tommy Boyles was director and that

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                                      Pages 18..21

---

Page 18

1   if you worked hours over, you were compensated for that.
2   Not necessarily hour for hour by any means but you were --
3   you were compensated for the hours worked above and beyond.
4        Q.   In other words, they were given time -- employees
5   were given time off.
6        A.   Yes.
7        Q.   And that's what you told Mr. Clark.
8        A.   I believe I did, yes.
9        Q.   And if Mr. Clark had represented that you had said
10  that no comp time was given, Mr. Clark would not be
11  accurate.
12       A.   That's correct.
13       Q.   Did Mr. Clark ever try to have you sign a
14  statement saying that your department did not keep comp
15  time, did not award comp time?
16       A.   To my knowledge, no.
17       Q.   In Exhibit 1, four or five, six lines down it
18  says, the whistle blower detailed the issues in an email
19  regarding "augustawreckreation".  Do you see that line
20  there?  Four, five, six lines down.
21       A.   I do.
22       Q.   Do you have any idea who in the department may
23  have used the name "augustawreckreation" like it's spelled
24  there?
25       A.   I don't.

Page 19

1        Q.   Do you recall any formal complaints made against
2   Ms. Pearson alleging that Ms. Pearson had threatened
3   employees for not attending her mother's funeral?
4        A.   Not that I'm aware of.
5        Q.   Do you know whether Melinda was working during the
6   time her mother had died and that they had the funeral?
7        A.   No, sir, I don't know.
8        Q.   How do you know Misty Sroczynski?
9        A.   Professional relationship.
10       Q.   What division or department was she in?
11       A.   She worked in the Special Events for a while and
12  now she's in the -- a supervisor over some of our community
13  centers.
14       Q.   Do you know who promoted her to be a supervisor?
15       A.   I do not.
16       Q.   Was it before your -- before you became interim
17  director?
18       A.   Yes.
19       Q.   So it probably was either Levine or Shanahan.
20       A.   I probably think it goes back to Mr. Shanahan.
21       Q.   Have you heard anything that would indicate that
22  Misty Sroczynski had made false allegations against Ms.
23  Pearson?
24       A.   No.
25       Q.   What do you know about the relationship between

Page 20

1   Misty Sroczynski and Fred Russell?
2        A.   I mean I think they were friends.  Probably more
3   than the average employee and administrator were.
4        Q.   Do you whether she ever worked for Mr. Russell
5   with his side business of bike -- Bike Race Barricades?
6        A.   I believe so.
7        Q.   What do you know about the relationship between
8   Misty Sroczynski and Bill Shanahan?
9        A.   I would say it was the same.  They probably had
10  more of a friendlier relationship than most employees and
11  deputy administrators would have.
12       Q.   Do you have any knowledge about whether Ms.
13  Pearson had sufficient comp time banked in late December
14  2011 to try to take four days off comp time in late December
15  of 2011?
16       A.   I do not.
17       Q.   Okay.  What's your understanding of how accurate
18  of records Ms. Pearson kept as to her and her employees as
19  to their attendance and time records?
20       A.   I'd say probably pretty meticulous, just based on
21  her work ethic in general.
22       Q.   Let's turn.  Let's go to Exhibit 12.
23            MS. SMITHERMAN:  12 or 2?
24            MR. BATSON:  2.
25       Q.   [Mr. Batson]  Do you remember when Melinda was out

Page 21

1   on workers' comp leave in the summer of 2012?
2        A.   I recall her being off, yes.
3        Q.   Did you have any dealings with an allegation that
4   she was involved in workers' comp fraud and not really hurt?
5   Did anybody come to you about that?
6        A.   No, sir.
7        Q.   Did you ever hear any statements by Mr. Shanahan
8   about an allegation that Ms. Pearson was not really hurt?
9        A.   Not that I recall, no, sir.
10       Q.   Could you tell us who Robert Howard is?
11       A.   Yes.  Robert Howard was our assistant director for
12  a long time.  Back in the early days when I was here, he
13  actually worked for me and then when I left and came back,
14  he was in a position of assistant director.
15       Q.   Did he keep a book that tracked accrual of comp
16  time and then use of comp time for certain employees?
17       A.   I don't know.  Since I never worked for Robert, I
18  don't know.
19       Q.   If you would look at Exhibit 3, first page.  Were
20  you familiar with Robert Howard's signature?
21       A.   Yes, sir.
22       Q.   Whose signature is on the first page of Exhibit 3?
23       A.   Right offhand, I would say that was Robert's.
24       Q.   Turn to the fourth page in Exhibit 3.  Whose
25  signature is on the immediate supervisor line?

---

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                    Pages 22..25

Page 22

1    A.   Again, it looks like Robert Howard.
2    Q.   All right.  Look at page 6 and it's a -- it's a
3  compensatory time received.  The date on it is 1/24/03.  Do
4  you recognize those initials under division manager?
5    A.   Probably Robert Howard.
6    Q.   If you would turn to one that says State Track
7  Meet.  It's about 10 more pages down on the right-hand side
8  of that document it's dated 5/8/04.
9    A.   Yes, sir.
10   Q.   Are those Robert Howard's initials or is one of
11  them yours?
12   A.   I would have had nothing to do in '04 so I would
13  say both of those are Robert's.
14   Q.   So why is it that you have the same initials as
15  Robert Howard?
16   A.   I can't answer that.
17        MR. BATSON:  Off the record.
18        [Momentarily off the record.]
19   Q.   [Mr. Batson]  Now, if you would, describe that
20  page from Exhibit 3 that's before you right now.  What's the
21  date on the left-hand side of that page?
22   A.   11/9/05.
23   Q.   And --
24   A.   Well, there's two dates actually on this.
25   Q.   Okay.  What's the second date?

Page 23

1    A.   11/11/05.
2    Q.   And what's the reason on the right-hand side?
3    A.   It indicates hours received for working over.
4    Q.   And who has signed off on that besides Melinda
5  Pearson?
6    A.   That's the initials of Tom Beck.
7    Q.   We'll go to the last page of Exhibit 3 now, so
8  just flip it over.  And what are the dates on the left-hand
9  side of that page?
10   A.   I'm thinking that says 8/12/11.  Then's there's
11  hours of comp to be taken 8/8 through 8/19.
12   Q.   And who is -- who has signed off on the immediate
13  supervisor section?
14   A.   No one.  Oh, I'm sorry.  On the right-hand side?
15   Q.   Yes.
16   A.   Looks like Dennis Stroud who was the deputy
17  director at that time.
18   Q.   Were you familiar with Dennis Stroud's signature?
19   A.   I mean I worked for Dennis for a short period of
20  time so I've seen it, yes, sir.
21        MR. BATSON:  Off the record.
22        [Momentarily off the record.]
23   Q.   [Mr. Batson]  We'll go to Exhibit 4.  Turn to the
24  sixth page in Exhibit 4.  Seven.  First of all in 1999, were
25  you with the department?

Page 24

1    A.   Yes.
2    Q.   And tell me what the Georgia Games are.
3    A.   It was a statewide athletic competition that -- I
4  can't remember exactly how long it lasted.  But it was
5  probably at least a week long worth of activities at a
6  number of venues throughout the CSRA.
7    Q.   And the seventh page, what would Melinda's name
8  have been back in '99?  You got that?  That's it.
9    A.   Okay.  I'm sorry.  If this is correct, I'm
10  assuming it's Moody.  I can't remember but I believe so.
11   Q.   And what is Exhibit 4?  What are these?
12   A.   Monthly payroll forms that each -- probably each
13  managing area did.
14   Q.   And was it done on a per two-week basis even
15  though it says monthly at the top?
16   A.   You know, I don't know if I can answer that
17  accurately because again back in '99, I was a one-man show
18  so I never filled these out and never really had access or a
19  reason to see these.
20   Q.   Was it -- in '99, were you paid bi-weekly, every
21  two weeks?
22   A.   Yes, sir.  I believe we were bi, every two weeks.
23  At one time early in our careers it was probably monthly.
24  But I believe in '99, it was every two weeks.
25   Q.   If you would continue to look at 7.

Page 25

1    A.   Yes.
2        MS. SMITHERMAN:  Is that page 7?
3        [Mr. Batson]  Yeah.  Page 7 of Exhibit 3, page 7.
4  Did you ever -- what period of time did you have to complete
5  monthly payroll forms?  Did you ever have employees you had
6  to do them for?
7    A.   No, sir.
8    Q.   Did you have to do them for yourself?
9    A.   Not this form.  It was just a -- probably a time
10  sheet or time card we were filling out back in those days.
11   Q.   When you were doing your time card, how did you
12  log in to keep a record of working overtime, working beyond
13  the 37.5 hours per week?
14   A.   Probably never did.  It was probably just whatever
15  the hours.  If it was seven and a half or eight hours that
16  day from what I can remember.
17   Q.   So your practice would have been to say if you had
18  some project on that particular day and your day ended up
19  being nine hours long, you would simply list nine hours for
20  that day as opposed to a separate entry for 7.5 regular, 1.5
21  overtime.
22   A.   No.  I think we -- I would probably -- I was
23  probably just doing seven and half or eight hours.  I mean
24  if I worked 10 hours or the likelihood of not being two
25  hours but whatever hours worked, I probably just entered the

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                    Pages 26..29

**Page 26**

1    seven and half or eight hours, whatever the day long was.
2         Q.   So did you ever -- in filling out your time card,
3    would you make an entry for 7.5 and then put a separate
4    entry for 1.5 hours?
5         A.   I don't believe I did, no, sir.
6         Q.   So if you had a day where you worked nine hours,
7    how would you have listed that on the time sheet?
8         A.   Seven and a half or eight hours, whichever the
9    normal working hour was for that day.
10        Q.   But how did you keep track of what comp time you
11   might be entitled to?
12        A.   I probably didn't back in those days.
13        Q.   Do you ever remember a period when you started
14   keeping accurate records of time that you could use for comp
15   time?
16        A.   No, sir.
17        Q.   Turn to Exhibit 5.  On the first page, did you
18   ever -- in any supervisory role, did you ever sign off on
19   people's awarding them -- award comp time to somebody?
20        A.   Not to my knowledge.
21        Q.   Did you ever have to fill out these kinds of comp
22   time requests for you to get comp time?
23        A.   I don't recall.  I may have.  I don't recall.  I
24   think the practice was that normally our director knew the
25   hours people in general were working, especially if there

**Page 27**

1    were events.
2         Q.   So who would have approved you to take comp time?
3         A.   My -- in my case, it would have been a director.
4    That's who I worked for.
5         Q.   On Exhibit 5, that first page there, do you
6    recognize the initials in the division manager slot on the
7    right hand side?
8         A.   Tom Beck.
9         Q.   All right.  Let's go to the second page.  Do you
10   recognize the initials in the division manager slot there?
11   This is in Exhibit 5.
12        A.   Tom Beck.
13        Q.   Look at the division manager where it says
14   5/9/2011.
15             MS. SMITHERMAN:  That's page 3.
16             MR. BATSON:  Oh, that's 3?
17        Q.   [Mr. Batson]  All right.  We'll have to identify
18   it a different way then.  Look at the page that has 8/17/11
19   in the top left under date.
20        A.   Yes, sir.
21        Q.   I must be missing a page in mine.  Whose initials
22   are in the division manager slot on the one that's 8/17/11?
23        A.   Dennis Stroud.
24        Q.   How about the next page that's also 8/17/11?
25        A.   I would say Dennis Stroud.

**Page 28**

1         Q.   Go to the one that is -- it says 8/17/11.  It's
2    two or three more down.  It says 8/17/11 requesting for and
3    then it goes 8/8-8/19.
4         A.   Yes, sir.  I've got it.
5         Q.   Got it?
6         A.   Yes, sir.
7         Q.   And whose initials are those in the division
8    manager?
9         A.   Dennis Stroud and the other one appears to be
10   Joanie Smith.
11        Q.   And on the page you're referring to, it says for
12   the reason on the right hand side, it says Turpin Hill Block
13   Party.
14        A.   Yes.
15        Q.   Turn to the next page and the reason says --
16             MS. SMITHERMAN:  We have a different page the next
17   page.
18             MR. BATSON:  You have a different one?
19             MS. SMITHERMAN:  Yeah.
20        Q.   [Mr. Batson]  All right.  Turn two more.  Go to
21   the one that says McBean no water at building - church
22   rental.
23        A.   Okay.  8/17/11?
24        Q.   Yes.
25        A.   Okay.

**Page 29**

1         Q.   And whose the division manager -- whose initials
2    are there for division manager?
3         A.   Tom Beck.
4         Q.   If you would, turn to Exhibit 6.  Do you know
5    whether your department considered Melinda as an exempt
6    employee?
7         A.   Yes.
8         Q.   If Dennis Stroud made a statement in April of 2012
9    that he did not approve comp time for exempt employees,
10   would that be an accurate statement?
11        A.   I don't know.
12        Q.   If you go back and look at what was Exhibit 5 and
13   you see Dennis Stroud's signature is on these comp time
14   sheets, is that him approving comp time for Ms. Pearson?
15        A.   It would appear, yes.
16        Q.   Did you ever hear of any instance in which Ms.
17   Pearson did not follow a department policy?
18        A.   No, sir.
19        Q.   Could you go to Exhibit 7 and tell us what that
20   is.
21        A.   This appears to be part of I think what we
22   probably refer to as our in-house policy and procedure
23   manual.
24        Q.   Do you remember a period during 2011/2012 when
25   there was some rewrites of it, it was being changed

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                      Pages 30..33

---

**Page 30**

1  especially with respect to comp time?
2      A.  I don't recall specifically.  Part of '11 I was
3  out sick for like half the year.
4      Q.  And I may have asked you this before but do you
5  remember any formal announcement by either Mr. Shanahan or
6  some other formal way saying that exempt employees in the
7  Rec Department would no longer get comp time?
8      A.  I can't remember any formal.
9      Q.  How about -- I'm sorry.  How about any meetings in
10  which -- in which Mr. Shanahan discussed that with respect
11  to the Rec Department?
12     A.  I can't really say for certain.
13     Q.  Once there was the switch to ADP, the computerized
14  based system, comp time was still tracked and then just a
15  different computer system was used to award comp time and
16  keep track of it that way; is that correct?
17     A.  Probably so, yes.
18     Q.  Turn to Exhibit 8.  Do you recognize what Exhibit
19  8 is?
20     A.  I have never seen it.
21     Q.  Were you ever informed that you were to preserve
22  any records about Tom Beck and personnel files or payroll
23  records?
24     A.  I believe so.  That was announced to the entire
25  work force.

---

**Page 31**

1      Q.  Was that in or about August of 2012?
2      A.  I couldn't tell you the dates on that really.  It
3  was after Mr. Beck left, I'm sure of that.
4      Q.  Do you know whether any records were shredded
5  after or destroyed after August 2012?
6      A.  I do not.
7      Q.  Do you recall if anybody was hired to shred
8  documents after August 2012?
9      A.  I do not know.
10     Q.  Did you ever authorize anyone in your department
11  to shred or destroy documents?
12     A.  No, sir.
13     Q.  Did anybody ever come in and tell you that some
14  documents, personnel records like time records were missing?
15     A.  Not to me, no, sir.
16     Q.  And you became interim director after Levine.
17     A.  That's correct.
18     Q.  And that would have been '13?
19     A.  December of last year, '14.
20     Q.  '14.  Okay.  If you would, look at Exhibit 9.  Are
21  you familiar with this document?
22     A.  I've never seen it.
23     Q.  Did you ever send a memo to Ron Clark in which you
24  alleged that exempt employees do not accrue compensatory
25  time?

---

**Page 32**

1      A.  To my knowledge, no.
2      Q.  Did Mr. Clark ever ask you to sign a statement
3  saying that exempt employees do not accrue compensatory
4  time?
5      A.  No, sir.
6      Q.  Would you have assigned -- would you -- had you
7  been presented such a statement that said, exempt employees
8  do not accrue compensatory time, would you have signed such
9  a statement?
10     A.  Probably not, because I wasn't in the capacity to
11  do so for any reason.
12     Q.  But you -- as far as your knowledge was, that
13  within the Rec Department, exempt employees did accrue
14  compensatory time in even 2012?
15     A.  I'd say yes.
16     Q.  Do you remember making an allegation to Mr. Clark
17  that management does not always utilize employees in the
18  best position?
19     A.  I don't know if it was an allegation, but I think
20  I do remember making that statement.
21     Q.  Was that in the one -- how many conversations did
22  you have with Ron Clark?
23     A.  I want to say I can only remember going to his
24  office once for a conversation about basically compensatory
25  time.

---

**Page 33**

1      Q.  And did you have general discussions about how the
2  department was managed also?
3      A.  I think the questions in general were presented
4  like that.
5      Q.  So the items 2, 3 and 4 were things that were
6  talked about in that meeting?
7      A.  I'd say yes.
8      Q.  Do you remember what Item 5 might have been?
9      A.  No, sir.  I can tell you what it says from me, I
10  never saw this, otherwise I would have signed it and I
11  wouldn't have had a number 5 with nothing there as well.
12     Q.  All right.  And turn to Exhibit 10 and go through
13  those and tell us what that -- what Exhibit 10 is.
14     A.  They're vacation request change forms.  And it
15  would appear on some of those has a changed to date that I
16  was probably asking -- I had those days scheduled as a
17  vacation because we did have to submit vacation requests at
18  one time for the year.  And I would probably say I was
19  requesting to use comp time for working local track meets in
20  lieu of vacation I probably had already scheduled.  That's
21  what it looks like.
22     Q.  And who would you have turned those in to?
23     A.  I can't recall if we would have turned those in to
24  -- anyone doing payroll.  Probably would have turned it
25  directly in to the director.  Probably just the director.

---

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                          Pages 34..37

---

**Page 34**

1    Q.   Was Renee Kaufman his secretary at some point in
2    time? Payroll clerk.

3    A.   She was a payroll clerk at one time, yes.

4    Q.   Did you ever take more than four days or did you
5    ever take more than -- did you ever take four days off in a
6    row for comp time?

7    A.   I can't say if I did or didn't to be honest with
8    you.

9    Q.   Turn to the third page in Exhibit 10.  Now, as I
10   see that page there, it says you're requesting comp time for
11   June 29th and then I assume a weekend intervenes and then
12   you're also requesting for July 2nd and 3rd.  Is that -- is
13   that how you'd read that?

14   A.   Yes, sir.

15   Q.   What is the last page of Exhibit 10, do you know?

16   A.   It's out of some sort of day timer and I -- I'm
17   not sure if I recognize the handwriting.

18   Q.   Was there a day timer kind of book that people
19   signed up to reflect when they wanted to take vacation?

20   A.   Not to my knowledge.  It was normally done on one
21   of the vacation request forms.

22   Q.   Was there a book on the payroll clerk's office
23   that people signed in to reflect when they wanted to take
24   vacation?

25   A.   I do not know.

---

**Page 35**

1    Q.   Do you recall that the Rec Department tried to
2    keep a schedule of when people wanted to take vacation?

3    A.   Yes.

4    Q.   Okay.  And somewhere somebody kept a record of
5    that.

6    A.   Probably it was transcribed from these forms to a
7    list somewhere.

8    Q.   But was there a system that people before the year
9    happened, they would say okay, I want to take, you'd go in
10   and sign something or somebody would make a record some
11   place saying oh, he wants to take off in October, so we'll
12   kind of pencil that in so we know what's going on.

13   A.   I think that was the reason why we did the yearly
14   vacation request.  It was broken out each month.

15   Q.   Okay.  So you recognize it as a yearly vacation
16   request record or something.

17   A.   I do.  I do.

18   Q.   And the next to the last page in there, it looks
19   like a yearly controller or attendance controller.

20   A.   Okay.

21   Q.   Are you familiar with that kind of document?

22   A.   I can't say.  I guess I'm familiar with it.  I
23   can't say I've ever really paid note of it or looked at
24   these things.

25   Q.   Do you recall that in 2006 you may have taken off

---

**Page 36**

1    28th, 29th, 30th and 31st of August and September 1st?

2    A.   I can't recall.  I could have but I can't recall.

3    Q.   Do you recall over the years up through 2012
4    taking four or more days off comp time in a row on any -- on
5    one or more occasions?

6    A.   Perhaps.  I can't -- again, I don't know for a
7    fact.

8    Q.   Do you know whether that Item Number -- Exhibit 9.
9    Do you remember whether Exhibit 9 whether anybody ever
10   approached you and said, we're going to present this Exhibit
11   9 during Melinda's hearings about her demotion?

12   A.   No, sir.

13   Q.   Do you know if the City has a discipline policy
14   that indicates that if someone falsely presents information
15   about somebody, that they should be disciplined?

16   A.   Probably sure there's something in our PP&M that
17   addresses that.

18   Q.   In May of 2012, would it be an accurate statement
19   to say that comp time for an exempt employee in the Rec
20   Department had never given -- been given in multiple days?

21   A.   I don't think that's accurate.

22   Q.   If you would turn to, I think the third page of
23   Exhibit 11.  If you would look in the middle of the page
24   there it says -- one paragraph says, Melinda, an exempt
25   employee got paid for four days.  And then the paragraph

---

**Page 37**

1    right below it says, well, Tom Beck and Melinda Pearson.
2    Would you read those two paragraphs to yourself for a minute
3    there.

4    A.   [The witness complies.]

5    Q.   Do you recall that in the spring of 2012 questions
6    were being asked about Melinda and comp time?  Do you recall
7    ever making a statement that no one in the Rec Department
8    ever got four days off in a row for comp time?

9    A.   I do not.  Because I don't understand the question
10   where it said, we spoke to the following individuals.  I'm
11   not sure who we refers to.

12   Q.   All right.  Let's assume it was Ron Clark.  Did
13   you ever tell Ron Clark that no one ever got four days off
14   comp time?

15   A.   No, sir.

16   Q.   Do you know who Kenneth Bray is?

17   A.   I do.

18   Q.   Did he ever ask you questions?

19   A.   To my knowledge --

20        MS. SMITHERMAN:  Objection.  Attorney-client
21   privilege.  Kenneth Bray is a staff attorney in our
22   office.

23        MR. BATSON:  Well, that's still part of an
24   internal investigation.  So that --

25        MS. SMITHERMAN:  He's still an attorney.  He's

---

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                    Pages 38..41

Page 38

1   representing the Government.  All of our activities are
2   in representation of the Government.
3        MR. BATSON:  All right.
4        Q.   [Mr. Batson]  So I'm going to ask you again now
5   for the record.
6        A.   Uh-huh.
7        Q.   Did you ever have to answer questions of Kenneth
8   Bray, from Kenneth Bray?
9        MS. SMITHERMAN:  You can answer that whether you
10       talked to him.  But you just can't --
11       A.   Regarding?
12       Q.   [Mr. Batson]  Anything.
13       MS. SMITHERMAN:  That's what you can't get in to.
14       Q.   Yeah.  Did you ever talk to Kenneth Bray?
15       A.   I've had conversations with Kenneth Bray, yes.
16       Q.   Did you have conversations with him in May of
17  2012?
18       A.   To my knowledge, no.
19       Q.   How about April 2012?
20       A.   To my knowledge, no.
21       Q.   Did Mr. Shanahan ever talk to you about Melinda
22  Pearson?
23       A.   I can't really remember.  No, sir.
24       Q.   Is that an affirmatively -- are you saying
25  affirmatively he did not?  You're pretty sure he never

Page 39

1   talked to you about Melinda Pearson?
2        A.   I'd say no.
3        Q.   I must have -- I asked it wrong again.  Do you
4   recall talking to --
5        A.   I do not.
6        Q.   All right.  Do you remember Ms. Pearson bringing
7   up -- do you remember in the spring of 2012 Ms. Pearson
8   bringing up a concern that Sam Smith was not working?  He
9   wasn't supposed -- he wasn't where he was supposed to be?
10       A.   I do not recall that.
11       Q.   She would not necessarily have made you aware of
12  that anyway at that point in time; right?
13       A.   I'd say no.
14       Q.   Do you have any knowledge of an allegation about
15  Sam Smith committing time card fraud?
16       A.   I do not.
17       Q.   Are you familiar -- turn to Item, Exhibit 15.  Are
18  you aware of a policy that limits the amount of deduction in
19  pay that a person can be subjected to when they're demoted?
20       A.   I don't know that policy right offhand, no, sir.
21       Q.   Were you aware of a open records request about a
22  GPS analysis of the use of vehicles and where people might
23  be in the Rec Department in 2014?
24       A.   I was aware of that.
25       Q.   Were you aware of what that analysis showed?

Page 40

1        A.   I do not.  I mean it probably showed that the City
2   was not doing a very good job monitoring some of the stuff
3   at that time.
4        Q.   Do you recall who -- what particular employees
5   were not where they were supposed to be as a result of the
6   GPS analysis?
7        A.   I do not right offhand.
8        Q.   All right.  Turn to Exhibit 18.  Did you ever
9   receive a copy of the analysis of the GPS or the GPS
10  analysis?
11       A.   I don't believe I have.
12       Q.   Turn to Exhibit -- it's still within 18.  We have
13  it as Exhibit 18A.  And then the Exhibit 19.  Did you ever -
14  - have you ever seen any document like Exhibit 18A, a kind
15  of a spreadsheet?
16       A.   I've not seen this document.
17       Q.   Did anyone ever present you with a spreadsheet
18  about the whereabouts of Vittirio Washington, William
19  Rhodes, George Perry, Michael Fallen, Millie Armstrong?
20       A.   I'm going to say no.  I don't recall ever seeing a
21  spreadsheet regarding that.
22       Q.   Did anyone ever come to you or in 2014, did
23  anybody come to you, though, and say, we have some records
24  that indicate that those people I've just listed weren't
25  supposed -- weren't where they were supposed to be during

Page 41

1   work hours?
2        A.   I knew there was some issues that GPS indicated
3   with some of our staff and locations.
4        Q.   Did Risk Management bring that to -- who brought
5   that to your attention?
6        A.   I probably want to say it was a director.  I don't
7   recall if it was a director with Risk Management.  I wasn't
8   directly involved in that direct conversation with Risk
9   Management.
10       Q.   Do you recall having a conversation with either
11  Mr. Levine or anyone at the director level about the GPS
12  analysis showing some workers weren't where they were
13  supposed to be?
14       A.   I believe it was brought up in staff meetings.
15       Q.   At the director level?
16       A.   Yes, sir.
17       Q.   By that --  that would mean like the director of
18  Risk Management and --
19       A.   No, sir.  I meant internally our department
20  director and the deputy directors or whoever was in those
21  staff meetings.
22       Q.   Do you recall what the proposed solution was?
23       A.   You know, outside of doing better monitoring, I
24  don't know if there was.  I can tell you what our, sort of
25  our policy is now.  But I don't recall.

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                              Pages 42..45

1    Q.   What position did Sam Smith hold in 2014?
2    A.   He was operations supervisor II, I believe.
3    Q.   Is he the one who would be supervising Vittirio
4  Washington, William Rhodes, George Perry, Michael Fallen and
5  Millie Armstrong in 2014?
6    A.   Yes.
7    Q.   Do you know whether Sam Smith was allowed to drive
8  a personal vehicle and not -- and avoid driving a vehicle
9  that had GPS on it?
10   A.   He drove his personal vehicle.  I can't say if
11 that was -- that was a reason or not, to be honest with you.
12   Q.   The decision to let him drive a personal vehicle
13 was made before you became interim director; is that
14 correct?
15   A.   Yes, sir.
16   Q.   Has anyone -- since you've been the interim
17 director, has anyone come to you and suggested that Mr.
18 Smith be -- be put back in a vehicle with GPS?
19   A.   Well, I've had conversations with the deputy
20 director in the Parks Division about that.
21   Q.   And whose the deputy director now?
22   A.   A gentleman, his name is Gary Hegner.
23   Q.   And Mr. Hegner supports putting Mr. Smith in a
24 vehicle that has GPS on it?
25   A.   If we have the vehicles.  Which were -- we don't

1  have enough vehicles right now to put all of our employees
2  in City-owned vehicles.
3    Q.   Is there another employee who you could trust to
4  drive his personal vehicle and then put Mr. Smith in a City-
5  owned vehicle that had GPS?
6    A.   I couldn't make that personal vehicle
7  determination.
8    Q.   Do you recall who was -- whether anyone told Mr.
9  Smith he should stay in a City vehicle?
10   A.   I do not.
11   Q.   Are you familiar with the details of why it is Sam
12 Smith is in a personal vehicle?
13   A.   I do not know.
14   Q.   And that occurred -- that decision to put him in a
15 personal vehicle occurred when Levine was in charge, or do
16 you know?
17   A.   Probably was before that but I don't know for a
18 fact.
19   Q.   Do you know whether that decision was allowed the
20 day that Melinda was demoted?
21   A.   I do not.
22   Q.   Turn to Exhibit 20 and look at Item 20A.  Had you
23 ever been presented with any kind of spreadsheet which
24 reflected that Mr. Vittirio Washington was abusing overtime
25 pay on weekend assignments?

1    A.   No, sir.
2    Q.   Do you know whether any -- do you recall whether
3  anyone came to you with concerns that Vittirio Washington
4  and/or -- whether Vittirio Washington was abusing overtime
5  on weekend assignments?
6    A.   I do not know.
7    Q.   Do you think it would be important for your
8  management of a department to track the use of Vittirio
9  Washington's overtime pay for weekend assignments?
10   A.   I think in general it's important for us to be
11 monitoring overtime on any employees.
12   Q.   How would -- how would that be done?  How would
13 you monitor Vittirio Washington's use of his time on -- on
14 weekends?
15   A.   I mean currently now it would be through the ADP
16 system to know if they're working or not because they'd have
17 to clock in and clock out.
18   Q.   And how about where he was during the weekend?
19   A.   Through the GPS monitoring system as well.
20   Q.   Do you think it would be possible to look at the
21 GPS monitoring system for say a Saturday for Mr. Washington
22 and figure out that he would work downtown on a project and
23 then drive a half hour out to one end of the county, work
24 for 15 minutes and then drive back downtown for a half hour
25 drive time, work for 15 minutes and then another half hour

1  drive time?
2    A.   It depends on what the work assignment was.  If he
3  was doing a trash run on the weekend, possibly.  I would
4  hope they would be on more of a logical run.
5    Q.   So that's something that may be able to be tracked
6  using GPS; is that correct?
7    A.   Uh-huh.  Yes.
8    Q.   Has anyone complained to you about Millie
9  Armstrong and possible work place violence?
10   A.   Yes.
11   Q.   Who is that?
12   A.   I believe it was our deputy director, Gary Hegner.
13   Q.   And what action has been done to try to protect
14 Mr. Hegner?
15   A.   The current situation is we're still under
16 investigation in this case.  We have not made any -- we
17 haven't done -- we've done no action in this incident.
18   Q.   Who did you turn your investigation or concerns
19 over to about possible workplace violence between Millie
20 Armstrong and Mr. Hegner?
21   A.   I believe it was Risk Management.
22   Q.   And who was that, for the record?
23   A.   Joe Crozier.
24   Q.   Has Mr. Crozier gotten back to you with any
25 decisions?

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                    Pages 46..49

Page 46

1    A.   He has formulated a preliminary report, yes.
2    Q.   Have you seen a draft of it?
3    A.   I have.
4    Q.   And what does -- what's the draft propose?
5    A.   I can't really remember what the draft actually
6    entailed right now.  I can tell you that there was a -- I
7    met with Mr. Crozier but there was no one from HR present at
8    that particular meeting.  And that's where we have sent this
9    information to get HR determination as well.  And again,
10   it's -- we have not gotten -- brought this to closure yet.
11   So it's still an open investigation as far as the department
12   is concerned.
13   Q.   Do you recall when you met with Mr. Crozier and
14   went over the draft?
15   A.   I do not.  It's been a couple months ago.
16   Q.   Then the next step was to get HR's involvement.
17   A.   Yes.
18   Q.   As far as you know, were you the one who took it
19   to HR or did Mr. Crozier make the representation to you that
20   he would take it to HR?
21   A.   I did.
22   Q.   Who did you give it to in HR?
23   A.   I believe the information was submitted to Sylvia
24   Williams.
25   Q.   Do you know what her position is at HR?

Page 47

1    A.   I do not know her exact title, no.
2    Q.   Do you know in general, though, is she management
3    in HR or is she a receptionist --
4    A.   No.  She handles --
5    Q.   -- investigator?
6    A.   She handles personnel related issues for us.
7    Q.   If you would turn to Exhibit 22.  Have -- when you
8    were doing that preliminary report or the draft report with
9    Mr. Crozier, did anybody ever make a summary of the
10   disciplinary action against Millie Armstrong?
11   A.   I don't believe so.  That's what HR was going to
12   do for us, assist us with.
13   Q.   And then after you got that, did you -- did you
14   have a plan that once they gave you the record of her
15   disciplinary action, did you have a plan of what step to
16   take next?
17   A.   We were gong to -- we're still again waiting for
18   HR to make a recommendation as well back to us.
19   Q.   So HR was going to do not only to compile or help
20   you put together what her personnel record was, but you were
21   counting on them to make some substantive kind of
22   recommendation about your next action.
23   A.   That's what they normally help the departments
24   with.
25   Q.   Were you ever made aware of an open records

Page 48

1    request for documents about meetings about the discipline
2    problems with Millie Armstrong or possible violence problems
3    of Millie Armstrong?
4    A.   Yes.
5    Q.   Did you provide any documents in response to an
6    open records request about Millie Armstrong's discipline
7    problems?
8    A.   If memory serves me, I provided our law department
9    information that they requested.
10   Q.   Do you recall a meeting in February, February 13,
11   2015, at 3:00 in the afternoon about Millie Armstrong and
12   the problems with her?
13   A.   I believe that was that meeting with Joe Crozier.
14   Q.   Do you remember who else might have been in that
15   meeting?
16   A.   I do.  I believe Steve Cassell was in that
17   meeting.  I believe the new city administrator was in that
18   meeting.  I believe Ms. Jody was in that meeting, myself and
19   Joe Crozier and I think that was it.
20   Q.   Do you know whether anybody was keeping records of
21   that meeting?
22   A.   I do not.
23   Q.   Did you make notes about that meeting?
24   A.   I don't recall.  I do recall --
25        MS. SMITHERMAN:  Don't talk -- I'm sorry.  For

Page 49

1    attorney-client privilege, you can't talk about what
2    was discussed in that meeting.
3        MR. BATSON:  So you're advising he can't say what
4    was discussed in that meeting?
5        MS. SMITHERMAN:  Absolutely.
6    Q.   [Mr. Batson]  Were you told the purpose of that
7    meeting?
8        MS. SMITHERMAN:  Again, objection.
9    Q.   [Mr. Batson]  Do you recall whether you were told
10   the purpose of that meeting?
11   A.   I probably was.  I mean I'm probably sure it was a
12   meeting in reference to Ms. Armstrong.
13   Q.   Did Ms. Smitherman tell you a purpose of that
14   meeting?
15   A.   I can't recall.  I believe actually my
16   notification came from Mr. Cassell.
17   Q.   What was your impression of the purpose of that
18   meeting?
19        MS. SMITHERMAN:  Again, objection.  It's getting
20   to what was discussed at that meeting.
21   Q.   [Mr. Batson]  So are you -- are you not going to
22   answer that based on your -- based on what your -- what the
23   City attorney says?
24        MS. SMITHERMAN:  He does not have the authority to
25   waive the attorney-client privilege.  The privilege

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                    Pages 50..53

Page 50

1   belongs to the Commission and all the employees under
2   the Commission.  Only the Commission has the authority
3   to waive the attorney-client privilege.  Mr. Houck does
4   not have that authority.
5       Q.   [Mr. Batson]  And you're -- you're refusing to
6   answer that question under the direction of Ms. Smitherman;
7   is that correct?
8       A.   I'm assuming that's why the City has legal counsel
9   here at this meeting.
10      Q.   And so you're refusing to answer that question
11  based on the advice of Ms. Smitherman?
12      A.   Yes.
13      Q.   Turn to Item 24.  Would you tell us what Item 24
14  is.
15      A.   It appears to be a request for an extension of
16  leave, medical leave.
17      Q.   And is your signature on the document?
18      A.   It is.
19      Q.   And what would your signature indicate?
20      A.   That there was an approved without pay leave
21  signed by -- signed by myself.
22      Q.   And then below that, whose signature would that
23  be, in department director?
24      A.   I'm thinking Bill Shanahan.
25      Q.   In the lower right-hand corner there's some

Page 51

1   printing.  Do you know who put that printing there?
2       A.   I do not.
3       Q.   Do you have any idea what -- what that -- what
4   those notations mean?
5       A.   I do not.
6       Q.   Did you ever recall receiving Item 24 back after
7   you had signed it?
8       A.   I do not.
9       Q.   Let's look at Exhibit 25.
10          MR. BATSON:  Can we go off the record for a
11  minute?
12          [Momentarily off the record.]
13      Q.   [Mr. Batson]  We need to make a notation on that
14  exhibit.  What I would like you to do is draw a line right
15  underneath there and then I'll make an announcement on the
16  record.
17      A.   On this form?
18      Q.   Yeah, like I'm doing there.
19          MR. BATSON:  For the record, the handwriting below
20  the line that's just been put on Exhibit 25 is a note
21  by Melinda to me.  The -- and it's our understanding
22  that when -- when we got this document, it did have the
23  handwriting above the line.
24          MS. SMITHERMAN:  Okay.
25      Q.   [Mr. Batson]  Did you ever get anything back on

Page 52

1   Melinda about that request for leave time?
2       A.   I cannot recall, no, sir.
3       Q.   Would you have had any information about what HR
4   did -- what decision they rendered about when she should be
5   terminated or whether they should grant leave ultimately?
6   Do you know?
7       A.   I don't believe I was involved in that process.
8       Q.   Turn to Exhibit 26.  Now, did anybody ever come to
9   you and tell you that Melinda was going to be retired
10  effective a certain date?
11      A.   No.
12      Q.   As far as you know, she just never came back?
13      A.   Well, I'm not going to say that's accurate either.
14  But no one told me exactly retirement or whatever the
15  situation was, me personally.
16      Q.   Eventually you learned she either had retired or
17  had been retired for something.
18      A.   Yes.
19      Q.   With respect to Exhibit 26, take a look at that
20  and see if you have any recollection of -- of that
21  situation.  And you should also look at the second page.
22      A.   The only thing I recall is Ms. Pearson being out
23  on leave.  And that's -- I really don't know anything more
24  than that.
25      Q.   Do you recall whether Mr. Shanahan was concerned

Page 53

1   that someone had forged a document to help Ms. Pearson out?
2       A.   I do not know.
3       Q.   Were you aware that Maurice McDowell's discipline
4   was allowed to be established using the Rec Department
5   Policy Manual versus the City Policy Manual?
6       A.   I guess I'm not sure what discipline that's
7   referring to.
8       Q.   Okay.  If you would, go ahead and take a look at
9   Exhibit 27 and see if that refreshes your recollection.
10      A.   And I'm sorry.  The question is -- was?
11      Q.   Were you aware whether the department policy
12  manual was used to make a decision about disciplining Mr.
13  McDowell versus the City's Personnel and Policy Manual?
14      A.   I do not.
15      Q.   Were you involved in the discipline of Mr. Maurice
16  McDowell in April of 2014?
17      A.   I don't believe I was.  I don't believe I've ever
18  seen this.
19      Q.   Was Levine director in April of 2014?
20      A.   He was.
21          MR. BATSON:  I don't think we have anything else.
22          MS. SMITHERMAN:  I have a few questions.
23               EXAMINATION
24  BY MS. SMITHERMAN:
25      Q.   Earlier Mr. Batson had asked you if you received

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
**Ronald L. Houck on 05/07/2015**                    Pages 54..57

**Page 54**

1  comp time through 2014.  Have you in fact received comp time
2  as an exempt employee through 2014?
3      A.  I'd say it's through whenever ADP was, that time
4  management system was put into place.
5      Q.  So if ADP was put in place in the end of 2011 or
6  the beginning of 2012, is it your recollection that that
7  would have been when the comp time system changed?
8      A.  Yes.
9      Q.  You stated that you were out in 2011 for
10 approximately half the year.  What time period were you out
11 in 2011?
12     A.  The first part of the year through May.  I think I
13 came back at the end of May or first of June.  I can't
14 really recall.
15     Q.  And what type of leave did you use when you were
16 out in 2011?
17     A.  I believe it was FMLA.
18     Q.  Did you apply for catastrophic leave while you
19 were out during that time period?
20     A.  I can't recall.
21     Q.  Have you been -- were you exposed to any
22 retaliation for using FMLA leave?
23     A.  Was I?
24     Q.  Yes, sir.
25     A.  No.

**Page 55**

1      Q.  You were -- we were talking about GPS policy and
2  you said that there is a policy in Parks and Rec now with
3  regard to GPS for tracking GPS.  What is that current
4  policy?
5      A.  That we do random checks weekly with the goal of
6  every quarter, making sure that a quarter of that work force
7  is monitored so that over the course of a year, we do random
8  checking on all of our vehicles.  And if we see something
9  that looks strange or different, we do more investigation
10 after that.
11         MS. SMITHERMAN:  That's all I have.
12             REEXAMINATION
13 BY MR. BATSON:
14     Q.  So currently with ADP, people in your department
15 still track extra time worked and they can -- there's still
16 a way in which they can get some comp time awarded; is that
17 correct?
18     A.  Within the pay period, you're supposed to take
19 that time off that you worked extra.
20     Q.  What happens if somebody works say 100 hours?  In
21 a two- week pay period, one week they work 100 hours.  The
22 next week they work their 37.5.  There's no way they can
23 take all that time off in the next pay period, is there?
24     A.  No, sir.
25     Q.  So what's done to track that?

**Page 56**

1      A.  They just don't get that time.
2      Q.  When did the City start doing a policy of random
3  checks of GPS quarterly?
4      A.  I think that was something I instituted probably
5  at the first of the year when I came on board.
6      Q.  2015?
7      A.  Yes, sir.
8          MR. BATSON:  Let me take a little time.
9          [Brief recess.]
10     Q.  [Mr. Batson] Do you recall when it first was
11 brought to your attention that some employees were not,
12 probably not being at the places they should have been
13 during work as a result of GPS studies?
14     A.  I don't recall.  It may be the time when we were
15 going over those spreadsheets.
16     Q.  Do you recall whether a determination was made
17 that some employees in fact had been stealing time?
18     A.  I think the department was made aware of that.
19 People were maybe not where they were supposed to be through
20 monitoring the GPS.
21     Q.  Can you tell us what decision was made about
22 whether to discipline them?
23     A.  I'd have to look and see what employee we'd be
24 talking about.
25     Q.  Well, any of the employees who were found to have

**Page 57**

1  not been where they were supposed to be working, using the
2  GPS.
3      A.  I think at best they were probably counseled and
4  warned at this stage.
5      Q.  Who made the decision to just counsel them?
6      A.  I don't know if that was how each deputy in their
7  areas handled those incidents.
8      Q.  If you would, turn to Exhibit 16.  Go ahead and
9  thumb through that.  Were you aware of the memo from Gary
10 Hegner?  Did you ever have anything to do with the memo from
11 Gary Hegner and that was to Robert Levine?
12     A.  Back in September, I don't believe I even saw this
13 document because I was still in my planning position.
14     Q.  If you go on further down.  This page, it says to
15 Jeanette Hurley.  What is that within Exhibit 16?
16     A.  Looks like a notification of a verbal
17 conversation, a verbal warning maybe between Mr. Hegner and
18 Ms. Hurley.
19     Q.  So this would be some level of discipline against
20 Ms. Hurley.
21     A.  Yes.
22     Q.  And then further on down, is there one -- is there
23 a similar warning for Mr. Vittirio Washington?
24     A.  Yes.
25     Q.  And when Ms. Pearson was still employed with the

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                    Pages 58..61

**Page 58**

1  County, did she rely on and use the GPS system to track
2  employees?
3      A.  I can't really remember when we -- when the GPS
4  was instituted to be honest with you.
5      Q.  Between January 2014 and May 2014, what was your
6  position at the Rec Department?
7      A.  I was interim deputy for Parks during that period.
8      Q.  Did you ever give instructions to Renee Kaufman to
9  monitor the GPS movement of operations personnel while you
10  were the interim deputy director?
11      A.  I can't recall doing that.
12      Q.  Did you ever request that Sam Smith monitor GPS of
13  the employees he supervised?
14      A.  I'm sure it was brought out in staff meetings we
15  had with all personnel.
16      Q.  Do you have -- do you recall whether there's any
17  kind of document, you know, gave Sam Smith a memo or
18  something saying, please start every quarter inspecting the
19  GPS for what your employees are doing?
20      A.  I do not recall that.
21      Q.  Do you know -- how did you implement your new
22  policy of a random check every quarter?  Who does it and
23  how's it done?
24      A.  It's done by each of the deputy directors.  They
25  give me a report every Monday at staff meeting.

**Page 59**

1      Q.  And so Sam Smith would not be involved in that
2  kind of analysis unless -- well, unless his deputy director
3  says, I want you to do it; right?
4      A.  We push it down to have our supervise monitor.
5  But the reports actually come from our deputies.
6      Q.  So in other words, Sam Smith should be involved in
7  doing a GPS analysis of his employees?
8      A.  He should be looking on some sort of basis where
9  his employees are.
10      Q.  And that is as a result of how you set up that
11  quarterly analysis.
12      A.  I'm sorry?
13      Q.  The specific -- the specific assignment of doing a
14  GPS analysis per quarter is a specific assignment pursuant
15  to your quarterly analysis of the GPS use?
16      A.  Yes.
17      Q.  But then are you saying that daily or weekly as a
18  part of a routine matter, Sam Smith should also be
19  monitoring what his people are or are not doing?
20      A.  I'm saying everyone that has vehicles traveling
21  under their responsibility and if they have the GPS system
22  on their computers, should be doing random checks of their
23  employees.
24      Q.  When you were the interim deputy director, was
25  that a period of time where it was made known that some of

**Page 60**

1  Sam Smith's employees were not where they were supposed to
2  be?
3      A.  I can't recall really.
4      Q.  Do you know why it was Mr. Hegner only signed or
5  had them sign these warnings that we've seen?
6      A.  I do not because I was in that planning position
7  at that time.
8      Q.  In September of '14, what was your position?
9      A.  Planning and development manager.
10      Q.  During the period that the actual theft occurred,
11  do you know what period we're talking about about when
12  the -- the employees under Sam Smith were not doing what
13  they were supposed to be doing?
14          MS. SMITHERMAN:  Objection to form.
15      A.  Not sure what dates right offhand.
16          MR. BATSON:  Nothing else.  Thank you.
17          [Deposition concludes at 2:17 p.m.]
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //

**Page 61**

CERTIFICATE OF COURT REPORTER

    I hereby certify that the foregoing deposition was
reported as stated in the caption by the method of Stenomask
and the questions and the answers thereto were reduced to
typewriting by me or under my direction; that the foregoing
pages numbered 5 through 60 represent a true, correct, and
complete transcript of the evidence given on May 7, 2015, by
the witness, RONALD L. HOUCK, and signature was reserved.

    I further certify that I am not kin or counsel to
the parties in the case and I am not in the regular employ
of counsel of said parties.

    I further certify that I have no contract with any
of the parties or their counsel.  The court reporting
charges are the usual and customary charges for services
within the industry and are available upon request by either
party.  No financial or services discount has been or will
be given to any party named in this litigation.

    This the 18th day of May, 2015.

                    Gina L. Smith

    GINA L. SMITH, CCR, CVR
    CERTIFIED COURT REPORTER
    GEORGIA CERTIFICATE # B-2151

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                    Pages 62..63

---

Page 62

SIGNATURE PAGE

I, Ronald L. Houck, do hereby certify that I have

read my deposition given before Gina L. Smith on May 7,

2015.

___ 1)  Said deposition is correct as is and requires no

changes.

___ 2)  I have listed on the following page(s) the changes

I wish incorporated into my deposition.

WITNESS my hand and seal this the ____ day of

_____, 2015

_____

RONALD L. HOUCK

---

Page 63

ERRATA TO THE DEPOSITION OF

RONALD L. HOUCK

_____COUNTY, GEORGIA

I DO HEREBY CERTIFY that I have read the foregoing

deposition and the following corrections are required as a

result of the transcription thereof:

PAGE/LINE       CORRECTION/REASON

_____

_____

_____

This the ____ day of _____, 2015

_____

RONALD L. HOUCK

---

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                                Index: 04..8

**0**

**04**   22:12

**1**

**1**   13:16
  18:17

**1.5**   25:20
  26:4

**1/24/03**   22:3

**10**   22:7
  25:24
  33:12,13
  34:9,15

**100**   55:20,
  21

**11**   11:9
  30:2  36:23

**11/11/05**
  23:1

**11/9/05**
  22:22

**12**   20:22,23

**13**   31:18
  48:10

**14**   6:7  8:24
  31:19,20
  60:8

**15**   39:17
  44:24,25

**16**   57:8,15

**18**   40:8,12

**18A**   40:13,
  14

**19**   40:13

**1977**   6:17

**1999**   23:24

**1st**   36:1

**2**

**2**   20:23,24
  33:5

**20**   43:22

**2006**   35:25

**2011**   8:11,
  25  20:14,
  15  54:5,9,
  11,16

**2011/2012**
  29:24

**2011/early**
  14:15
  16:25

**2012**   8:8,11
  13:13,19,
  21  14:1,15
  16:25  21:1
  29:8  31:1,
  5,8  32:14
  36:3,18
  37:5
  38:17,19
  39:7  54:6

**2014**   6:11
  11:23

**39:23
40:22
42:1,5
53:16,19
54:1,2
58:5**

**2015**   48:11
  56:6

**20A**   43:22

**22**   47:7

**24**   50:13
  51:6

**25**   51:9,20

**26**   52:8,19

**27**   53:9

**28th**   36:1

**29th**   34:11
  36:1

**2:17**   60:17

**2nd**   34:12

**3**

**3**   21:19,22,
  24  22:20
  23:7  25:3
  27:15,16
  33:5

**30th**   36:1

**31st**   36:1

**37.5**   25:13
  55:22

**3:00**   48:11

**3rd**   34:12

**4**

**4**   23:23,24
  24:11  33:5

**5**

**5**   26:17
  27:5,11
  29:12
  33:8,11

**5/8/04**   22:8

**5/9/2011**
  27:14

**6**

**6**   22:2  29:4

**7**

**7**   24:25
  25:2,3
  29:19

**7.5**   25:20
  26:3

**75**   12:13

**76**   7:7,8

**77**   7:4

**8**

**8**   30:18,19

MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.
Ronald L. Houck on 05/07/2015      Index: 8/12/11..approving

8/12/11
  23:10

8/17/11
  27:18,22,
  24 28:1,2,
  23

8/19  23:11

8/8  23:11

8/8-8/19
  28:3

86  7:19

_____

         9
_____

9  31:20
  36:8,9,11

9-11-28(d)
  5:3

9.5  13:3

97  7:22
  8:25 9:7

99  24:8,17,
  20,24

_____

         A
_____

Absolutely
  49:5

abusing
  43:24 44:4

access  24:18

accrual
  21:15

accrue  31:24
  32:3,8,13

accurate
  18:11
  20:17
  26:14
  29:10
  36:18,21
  52:13

accurately
  24:17

action  5:15
  45:13,17
  47:10,15,
  22

activities
  24:5 38:1

actual  17:3
  60:10

addresses
  36:17

Administration
  7:2

administrator
  20:3 48:17

administrators
  20:11

ADP  12:6,8,
  10,20
  30:13
  44:15
  54:3,5
  55:14

advertised

6:4

advice  50:11

advising
  49:3

affirmatively
  38:24,25

afternoon
  48:11

agenda
  15:21,25
  16:3

agendas
  15:18,19

agree  13:12

agreement
  5:11

ahead  16:17
  53:8 57:8

allegation
  13:18
  21:3,8
  32:16,19
  39:14

allegations
  14:24
  15:10
  19:22

alleged  15:6
  31:24

alleging
  19:2

allocated
  9:25

allowed  42:7
  43:19 53:4

amount  9:22
  39:18

analysis
  39:22,25
  40:6,9,10
  41:12
  59:2,7,11,
  14,15

and/or  16:19
  44:4

announce
  12:2

announced
  30:24

announcement
  30:5 51:15

appears  28:9
  29:21
  50:15

apply  6:3
  54:18

appointed
  8:3

appointment
  17:18

approached
  36:10

approve  29:9

approved
  27:2 50:20

approving

MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.
Ronald L. Houck on 05/07/2015     Index: approximately..Batson

29:14

**approximately**
54:10

**April**  13:13
29:8 38:19
53:16,19

**architect**
9:14

**area**  24:13

**areas**  57:7

**arising**
14:17

**Armstrong**
40:19 42:5
45:9,20
47:10
48:2,3,11
49:12

**Armstrong's**
48:6

**article**
13:16,17

**assigned**
32:6

**assignment**
45:2
59:13,14

**assignments**
43:25
44:5,9

**assist**  47:12

**assistant**
21:11,14

**associations**
9:13

**assume**  34:11
37:12

**assuming**
24:10 50:8

**athletic**
24:3

**attendance**
20:19
35:19

**attending**
19:3

**attention**
41:5 56:11

**attest**  10:5

**attitude**
14:12

**attorney**
37:21,25
49:23

**attorney-
client**  37:20
49:1,25
50:3

**August**  31:1,
5,8 36:1

**Augusta**  6:16
7:13

**augustawreckre
ation**  18:19,
23

**authority**

49:24
50:2,4

**authorize**
31:10

**automated**
12:6

**average**  20:3

**avoid**  42:8

**award**  18:15
26:19
30:15

**awarded**
55:16

**awarding**
26:19

**aware**  11:2
12:8 13:6
16:2 19:4
39:11,18,
21,24,25
47:25
53:3,11
56:18 57:9

_____

**B**
_____

**back**  6:11,
23 7:17,22
11:19
12:10 13:5
19:20
21:12,13
24:8,17
25:10
26:12

29:12
42:18
44:24
45:24
47:18
51:6,25
52:12
54:13
57:12

**banked**  20:13

**Barricades**
20:5

**based**  20:20
30:14
49:22
50:11

**basically**
32:24

**basis**  11:17
24:14 59:8

**Batson**  5:10,
17,23 16:6
20:24,25
22:17,19
23:21,23
25:3
27:16,17
28:18,20
37:23
38:3,4,12
49:3,6,9,
21 50:5
51:10,13,
19,25
53:21,25
55:13

56:8,10
60:16

Beck  7:10,
15 13:12
14:3,16
15:15
17:25 23:6
27:8,12
29:3 30:22
31:3 37:1

Beck's  14:11

beginning
54:6

belongs  50:1

bi  24:22

bi-weekly
24:20

biggest
17:22

bike  20:5

Bill  6:15
7:11 20:8
50:24

Block  28:12

blower  18:18

board  56:5

Bob  6:11,12

book  21:15
34:18,22

Boyles  7:10
17:25

Bray  37:16,

21 38:8,
14,15

Break-ins
11:14

bring  16:21
41:4

bringing
39:6,8

broken  35:14

brought
41:4,14
46:10
56:11
58:14

BS  7:2

budgets  9:2

building
9:16 28:21

bunch  12:11

business
20:5

―――――――――
C
―――――――――

call  11:17
12:21

called  6:22
11:2,13
12:19

can't  8:6,15
10:16 12:5
14:19
17:2,11
22:16

24:4,10
30:8,12
33:23 34:7
35:22,23
36:2,6
38:10,13,
23 42:10
46:5 49:1,
3,15
54:13,20
58:3,11
60:3

capacity  8:3
10:2 32:10

card  25:10,
11 26:2
39:15

cards  13:18
15:3,11

careers
24:23

case  14:10
27:3 45:16

Cassell
48:16
49:16

catastrophic
54:18

causing  15:6

center  6:24

centers
11:11
19:13

Chaffee  6:23

change  33:14

changed
14:12
29:25
33:15 54:7

charge  6:23
8:23 43:15

charges  5:5,
6

check  58:22

checking
55:8

checks  55:5
56:3 59:22

chief  7:24

church  28:21

city  6:16
7:20 12:6
36:13 40:1
43:9 48:17
49:23 50:8
53:5 56:2

City-  43:4

City-owned
43:2

City's  53:13

Clark  17:2,
4,10,18
18:7,9,10,
13 31:23
32:2,16,22
37:12,13

Clemson  7:3,

6

clerk   34:2,3

clerk's
34:22

clock   44:17

closing   9:15

closure
46:10

collection
9:10

Commission
9:21 50:1,
2

committing
39:15

community
11:10
19:12

comp   11:23,
25 12:4,9,
16,20,21
13:6,7,9
15:11
17:7,23
18:10,14,
15 20:13,
14 21:1,4,
15,16
23:11
26:10,14,
19,21,22
27:2 29:9,
13,14
30:1,7,14,

15 33:19
34:6,10
36:4,19
37:6,8,14
54:1,7
55:16

compensated
18:1,3

compensatory
17:7 22:3
31:24
32:3,8,14,
24

competition
24:3

compile
47:19

complained
45:8

complaint
16:14,22

complaints
13:21
14:16 19:1

complete
25:4

complies
37:4

computer
30:15

computerized
30:13

computers
59:22

conceptual
9:12

concern   39:8

concerned
46:12
52:25

concerns
44:3 45:18

concludes
60:17

conditions
5:15

Connecticut
6:13

considered
29:5

contacted
16:23

continue
24:25

contract   5:4

contractor
9:15

control   9:22

controller
35:19

conversation
17:2,4,6,
9,20 32:24
41:8,10
57:17

conversations
15:9,10

32:21
38:15,16
42:19

converted
12:6

copy   40:9

corner   50:25

correct   16:8
18:12 24:9
30:16
31:17
42:14 45:6
50:7 55:17

couldn't
7:14 31:2
43:6

counsel   5:5,
12 50:8
57:5

counseled
57:3

counting
47:21

county   44:23
58:1

couple   46:15

court   5:5

creating
14:21
16:15

Crozier
45:23,24
46:7,13,19

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                Index: CSRA..director

47:9
48:13,19

CSRA  24:6

current  6:1
45:15 55:3

customary
5:6

_____

D

daily  59:17

date  12:3
22:3,21,25
27:19
33:15
52:10

dated  22:8

dates  8:16
22:24 23:8
31:2 60:15

day  12:24
13:1,2
25:16,18,
20 26:1,6,
9 34:16,18
43:20

days  11:19
20:14
21:12
25:10
26:12
33:16
34:4,5
36:4,20,25
37:8,13

dealings
21:3

December
6:6,11
8:8,11
16:12
20:13,14
31:19

deciding
9:10

decision
42:12
43:14,19
52:4 53:12
56:21 57:5

decisions
45:25

deduction
39:18

demoted  8:17
16:7 17:14
39:19
43:20

demotion
36:11

Dennis
23:16,18,
19 27:23,
25 28:9
29:8,13

department
7:9,20
9:7,24
13:11
15:18,19,

22 17:8
18:14,22
19:10
23:25
29:5,17
30:7,11
31:10
32:13 33:2
35:1 36:20
37:7 39:23
41:19 44:8
46:11 48:8
50:23
53:4,11
55:14
56:18 58:6

departments
47:23

depending
16:21

depends  45:2

deposition
5:1,10,11,
14 60:17

deputies
59:5

deputy  8:7
9:7 20:11
23:16
41:20
42:19,21
45:12 57:6
58:7,10,24
59:2,24

describe

22:19

destroy
31:11

destroyed
31:5

detailed
18:18

details
43:11

determination
43:7 46:9
56:16

development
8:23,24
60:9

didn't  8:3
26:12 34:7

died  19:6

direct  41:8

direction
50:6

directly
15:17
33:25 41:8

director
6:2,5,10,
24 8:7
16:7,9,20
17:25
19:17
21:11,14
23:17
26:24 27:3
31:16

33:25
41:6,7,11,
15,17,20
42:13,17,
20,21
45:12
50:23
53:19
58:10
59:2,24

**directors**
7:8 41:20
58:24

**disciplinary**
47:10,15

**discipline**
36:13
48:1,6
53:3,6,15
56:22
57:19

**disciplined**
36:15

**disciplining**
53:12

**discount**  5:8

**discussed**
30:10
49:2,4,20

**discussions**
33:1

**division**
7:24,25
8:22 11:11
19:10 22:4

27:6,10,
13,22 28:7
29:1,2
42:20

**document**
22:8 31:21
35:21
40:14,16
50:17
51:22 53:1
57:13
58:17

**documents**
31:8,11,14
48:1,5

**dollars**  9:25

**don't**  6:22
13:24
14:19
15:23
17:11
18:25 19:7
21:17,18
24:16
26:5,23
29:11 30:2
32:19
36:6,21
37:9 39:20
40:11,20
41:6,24,25
42:25
43:17
47:11
48:24,25
52:7,23
53:17,21

56:1,14
57:6,12

**downtown**
44:22,24

**draft**  46:2,
4,5,14
47:8

**draw**  51:14

**drive**  42:7,
12 43:4
44:23,24,
25 45:1

**driving**  42:8

**drove**  42:10

**Duly**  5:20

**duties**  10:21

---
**E**
---

**Earlier**
53:25

**early**  8:11
21:12
24:23

**education**
7:1

**EEO**  16:22,
24

**effective**
12:2 52:10

**email**  18:18

**employed**
57:25

**employee**
12:13,25
20:3 29:6
36:19,25
43:3 54:2
56:23

**employees**
14:17,22
15:7 18:4
19:3
20:10,18
21:16 25:5
29:9 30:6
31:24
32:3,7,13,
17 40:4
43:1 44:11
50:1
56:11,17,
25 58:2,
13,19
59:7,9,23
60:1,12

**end**  9:4
44:23
54:5,13

**ended**  25:18

**entailed**
46:6

**entered**
25:25

**entire**  7:16
11:9 30:24

**entitled**
26:11

entry   25:20
  26:3,4

environment
  13:23
  14:17,22
  15:7  16:15

established
  53:4

ethic   20:21

events   17:14
  19:11  27:1

Eventually
  52:16

everyone's
  14:10

exact   47:1

EXAMINATION
  5:22  53:23

Examined
  5:20

exempt   29:5,
  9  30:6
  31:24
  32:3,7,13
  36:19,24
  54:2

exhibit
  13:16
  18:17
  20:22
  21:19,22,
  24  22:20
  23:7,23,24
  24:11  25:3

26:17
27:5,11
29:4,12,19
30:18
31:20
33:12,13
34:9,15
36:8,9,10,
  23  39:17
40:8,12,
  13,14
43:22  47:7
51:9,14,20
52:8,19
53:9  57:8,
  15

existing
  9:18

expected
  10:22

explain   9:9
  16:13

exposed
  54:21

extension
  50:15

extra   13:3,8
  55:15,19

---
F
---

facilities
  6:2  8:8,9
  9:16  11:4,
  7,11,15

fact   13:24
  17:22  36:7
  43:18  54:1
  56:17

failures
  11:14

Fallen   40:19
  42:4

false   19:22

falsely
  36:14

falsification
  13:18

falsifying
  15:3,11,12

familiar
  21:20
  23:18
  31:21
  35:21,22
  39:17
  43:11

favorable
  14:13

February
  48:10

feel   15:24

field   10:3,5

figure   44:22

filed   13:22

files   30:22

fill   26:21

filled   24:18

filling
  25:10  26:2

financial
  5:8

five-year
  9:24

flip   23:8

Florida   7:19

FMLA   54:17,
  22

folks   14:5

follow   29:17

force   30:25
  55:6

forged   53:1

form   5:12
  16:17  25:9
  51:17
  60:14

formal   19:1
  30:5,6,8

forms   24:12
  25:5  33:14
  34:21  35:6

formulated
  46:1

found   56:25

fourth   21:24

frame   17:13

fraud   21:4
  39:15

| | | | |
|---|---|---|---|
| **Fred** 20:1 | **gong** 47:17 | 27:7 28:12 | **hired** 31:7 |
| **friendlier** 20:10 | **good** 14:10 40:2 | **handled** 17:23 57:7 | **hiring** 9:15 |
| **friends** 20:2 | **Government** 38:1,2 | **handles** 47:4,6 | **hold** 8:12 42:1 |
| **full** 12:13, 25 | **GPS** 39:22 40:6,9 | **handwriting** 34:17 | **honest** 34:7 42:11 58:4 |
| **funeral** 19:3,6 | 41:2,11 42:9,18,24 | 51:19,23 | **hope** 45:4 |
| | 43:5 | **happen** 12:23 | **hostile** 13:22 |
| _____ **G** _____ | 44:19,21 45:6 55:1, | **happened** 35:9 | 14:16,21 15:6 16:15 |
| **Games** 24:2 | 3 56:3,13, 20 57:2 | **hard** 14:4, 5,9 | **Houck** 5:2, 10,19,25 |
| **Gary** 42:22 45:12 | 58:1,3,9, 12,19 | **harder** 14:7 | 50:3 |
| 57:9,11 | 59:7,14, 15,21 | **Haven** 6:13 | **hour** 18:2 26:9 |
| **gave** 47:14 58:17 | **graduate** 7:6 | **haven't** 45:17 | 44:23,24, 25 |
| **general** 10:11 | **grant** 52:5 | **hear** 15:14 21:7 29:16 | **hours** 11:4 12:13,22, |
| 11:10 20:21 | **guess** 35:22 53:6 | **heard** 13:20 19:21 | 23,24 13:3 18:1,3 |
| 26:25 33:1,3 | _____ **H** _____ | **hearings** 36:11 | 23:3,11 25:13,15, |
| 44:10 47:2 | **H-o-u-c-k** 5:25 | **heavy** 10:15 | 19,23,24, 25 26:1,4, |
| **gentleman** 42:22 | **half** 12:13, 25 13:1 | **Hegner** 42:22,23 | 6,8,25 41:1 |
| **George** 40:19 42:4 | 25:15,23 26:1,8 | 45:12,14, 20 57:10, | 55:20,21 |
| **Georgia** 24:2 | 30:3 44:23,24, | 11,17 60:4 | **Howard** 21:10,11 |
| **give** 10:7 46:22 | 25 54:10 | **held** 8:18 | 22:1,5,15 |
| 58:8,25 | **hand** 12:5,6 | **He's** 37:25 | **Howard's** 21:20 |
| **goal** 55:5 | | **Hill** 28:12 | |

22:10

how's  58:23

HR  14:21
  16:21 17:3
  46:7,9,19,
  20,22,25
  47:3,11,
  18,19 52:3

HR's  46:16

hundred
  17:16

Hurley
  57:15,18,
  20

hurt  21:4,8

———————————
          I
———————————

idea  18:22
  51:3

identify
  27:17

II  42:2

implement
  15:25
  58:21

important
  44:7,10

impression
  49:17

in-house
  29:22

incident

11:12
45:17

incidents
  11:6 57:7

including
  11:10

increments
  9:24

individual
  10:25
  11:17

individuals
  37:10

industry  5:7

information
  36:14
  46:9,23
  48:9 52:3

informed
  30:21

initials
  22:4,10,14
  23:6 27:6,
  10,21 28:7
  29:1

inspecting
  58:18

instance
  29:16

instituted
  56:4 58:4

instructions
  58:8

interested
  15:15

interim  6:2,
  5,9,10,14
  8:7 9:7
  16:6,9
  19:16
  31:16
  42:13,16
  58:7,10
  59:24

internal
  37:24

internally
  41:19

intervenes
  34:11

investigation
  16:20
  37:24
  45:16,18
  46:11 55:9

investigator
  47:5

involved
  17:5 21:4
  41:8 52:7
  53:15
  59:1,6

involvement
  46:16

irrigation
  11:14

issues

11:10,14,
15 18:18
41:2 47:6

Item  33:8
  36:8 39:17
  43:22
  50:13 51:6

items  11:16
  33:5

it's  7:10
  12:22 14:9
  18:23
  22:2,7,8
  24:10 28:1
  34:16
  40:12
  44:10
  46:10,11,
  15 49:19
  51:21 54:3
  58:24

I'd  15:17
  20:20
  32:15 33:7
  39:2,13
  54:3 56:23

I'll  51:15

I'm  8:13
  10:14
  12:7,21
  13:20 14:9
  15:1 16:5
  17:16 19:4
  23:10,14
  24:9 30:9
  31:3 34:16

35:22
37:10 38:4
40:20
48:25
49:11
50:8,24
51:18
52:13
53:6,10
58:14
59:12,20

**I've**  10:11
23:20 28:4
31:22
35:23
38:15
40:16,24
42:19
53:17

---

**J**

---

**Jacksonville**
7:20,23

**January**  58:5

**Jeanette**
57:15

**Joanie**  28:10

**job**  7:19
10:9 11:1
40:2

**Jody**  48:18

**Joe**  45:23
48:13,19

**July**  34:12

**June**  34:11
54:13

---

**K**

---

**Kaufman**  34:1
58:8

**keeping**
26:14
48:20

**Kenneth**
37:16,21
38:7,8,14,
15

**kind**  7:25
11:6,12
34:18
35:12,21
40:14
43:23
47:21
58:17 59:2

**kinds**  10:8
26:21

**knew**  26:24
41:2

**knowledge**
14:24
15:2,5
18:16
20:12
26:20
32:1,12
34:20
37:19
38:18,20

39:14

---

**L**

---

**labor**  10:4,
6,8,21

**lack**  6:24

**lasted**  24:4

**late**  14:15
16:24
20:13,14

**law**  48:8

**lawn**  10:13

**learned**
52:16

**leave**  15:12
21:1
50:16,20
52:1,5,23
54:15,18,
22

**leaves**  10:10

**left**  7:17,
19 8:2,6
21:13
27:19 31:3

**left-hand**
22:21 23:8

**legal**  50:8

**Let's**  14:19
20:22 27:9
37:12 51:9

**level**  8:21

41:11,15
57:19

**Levine**  6:11,
12,14 7:11
19:19
31:16
41:11
43:15
53:19
57:11

**lieu**  33:20

**likelihood**
25:24

**limits**  39:18

**lines**  18:17,
20

**list**  25:19
35:7

**listed**  26:7
40:24

**litigation**
5:9

**local**  33:19

**locations**
41:3

**log**  25:12

**logical**  45:4

**long**  6:5
12:12
21:12
24:4,5
25:19 26:1

**longer**  12:3

Case 1:14-cv-00110-JRH-BKE   Document 166   Filed 07/14/16   Page 29 of 38

MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.
Ronald L. Houck on 05/07/2015          Index: looked..Misty

30:7

looked  35:23

lot  14:5

loud  16:4

lower  50:25

_____

M

_____

machinery
 10:15

made  13:18
 15:10
 19:1,22
 29:8 39:11
 42:13
 45:16
 47:25
 56:16,18,
 21 57:5
 59:25

maintenance
 6:19 7:14
 8:10 10:12
 11:9

make  16:2
 26:3 35:10
 43:6 46:19
 47:9,18,21
 48:23
 51:13,15
 53:12

makes  16:14

making  14:16
 32:16,20
 37:7 55:6

manage  8:22

managed  33:2

management
 12:7 32:17
 41:4,7,9,
 18 44:8
 45:21 47:2
 54:4

manager
 8:14,19,20
 22:4 27:6,
 10,13,22
 28:8 29:1,
 2 60:9

managerial
 10:23

managing
 9:5,15
 24:13

manual  10:4,
 6,8 29:23
 53:5,12,13

March  13:18,
 21 14:1

marked  13:15

matter  59:18

Maurice
 53:3,15

mayoral  8:4

Mcbean  28:21

Mcdowell
 53:13,16

Mcdowell's

53:3

means  18:2

meant  41:19

mechanical
 11:14

medical
 50:16

Meet  22:7

meeting  9:12
 33:6 46:8
 48:10,13,
 15,17,18,
 21,23
 49:2,4,7,
 10,12,14,
 18,20 50:9
 58:25

meetings
 30:9
 41:14,21
 48:1 58:14

meets  33:19

Melinda  8:5,
 6,12 10:3
 11:2 13:7,
 9,22 14:4,
 7,21 15:16
 16:7 17:5,
 14 19:5
 20:25 23:4
 29:5 36:24
 37:1,6
 38:21 39:1
 43:20
 51:21

52:1,9

Melinda's
 24:7 36:11

memo  31:23
 57:9,10
 58:17

memory  48:8

merger  11:9

met  46:7,13

meticulous
 20:20

Michael
 40:19 42:4

middle  6:6
 36:23

Millie  40:19
 42:5 45:8,
 19 47:10
 48:2,3,6,
 11

mine  27:21

minimum
 12:12

minute  37:2
 51:11

minutes
 44:24,25

missing
 27:21
 31:14

Misty  15:14,
 21 19:8,22
 20:1,8

Momentarily
   22:18
   23:22
   51:12

Monday   58:25

money   9:19

monitor
   44:13
   58:9,12
   59:4

monitored
   55:7

monitoring
   40:2  41:23
   44:11,19,
   21  56:20
   59:19

month   35:14

monthly
   24:12,15,
   23  25:5

months   7:15
   46:15

Moody   24:10

mother   19:6

mother's
   19:3

movement
   58:9

mowers   10:13

multiple
   36:20

## N

named   5:9

necessarily
   18:2  39:11

needed   16:22

neighborhood
   9:13

news   13:17,
   20

normal   26:9

notation
   51:13

notations
   51:4

note   35:23
   51:20

notes   48:23

notification
   49:16
   57:16

number   8:15,
   19  24:6
   33:11  36:8

## O

O.C.G.A.   5:3

objection
   16:17
   37:20
   49:8,19
   60:14

objections
   5:12

occasions
   14:6  36:5

occur   16:16

occurred
   43:14,15
   60:10

October
   35:11

offhand
   21:23
   39:20  40:7
   60:15

office   16:22
   32:24
   34:22
   37:22

officer
   16:24

one-man   8:24
   24:17

open   39:21
   46:11
   47:25  48:6

operating
   9:4,6
   17:24

operation
   8:24  11:10

operations
   8:10,19
   42:2  58:9

opinion
   15:20

opposed
   25:20

overhearing
   15:9

oversaw
   11:11

overtime
   25:12,21
   43:24
   44:4,9,11

owned   43:5

## P

p.m.   60:17

pager   11:18,
   21

pagers   11:19

pages   22:7

paid   24:20
   35:23
   36:25

paper   13:6

paperwork
   13:8

paragraph
   36:24,25

paragraphs
   37:2

park   6:23,
   24  7:2

```
 8:24 9:5          19:2,23          23 58:7         plans   9:12
 11:9              20:13,18         59:25
                   21:8 23:5        60:10,11        plant   11:3
parks   6:2        29:14,17                         point   34:1
 8:1,7 9:17        37:1 38:22       permanent        39:12
 11:8,10           39:1,6,7          6:3
 14:18             52:22 53:1                        policy  12:16
 42:20 55:2        57:25            Perry   40:19     29:17,22
 58:7                                42:4            36:13
                   pencil  35:12                     39:18,20
part   6:19                         person  39:19    41:25
 29:21 30:2        people  12:8,    personal         53:5,11,13
 37:23              9 15:10,         15:18,21,       55:1,2,4
 54:12             17,18,24          25 16:2         56:2 58:22
 59:18             26:25             42:8,10,12
                   34:18,23          43:4,6,12,      position
parties   5:4      35:2,8            15               6:1,3,10,
                   39:22                              18,20
party   5:8,9      40:24            personally        7:15,23
 28:13             55:14             52:15            8:7,9,12
                   56:19                              9:1 17:3
past  16:12        59:19            personnel         21:14
 17:23                               30:22           32:18 42:1
                   people's          31:14          46:25
pay  12:17,         26:19            47:6,20         57:13 58:6
 18 39:19                            53:13           60:6,8
 43:25 44:9        percent           58:9,15
 50:20              17:16                            possibly
 55:18,21,                          physical          45:3
 23                perform  10:6     10:21 11:3
                                                    PP&M   36:16
payroll            performed        place   12:20
 24:12 25:5         10:3             35:11 45:9      practice
 30:22                               54:4,5          25:17
 33:24             period  7:17,                     26:24
 34:2,3,22          18 12:17,       places  56:12
                    18 14:3,11                      preliminary
Pearson   8:5       23:19 25:4      plan  47:14,      46:1 47:8
 10:3,22            26:13            15
 13:22              29:24                            present
 14:12,16,          54:10,19        planning         36:10
 25 15:11,          55:18,21,        8:23 9:2        40:17 46:7
 16 16:9                             57:13
                                     60:6,9
```

MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.
Ronald L. Houck on 05/07/2015      Index: presented..receive

presented
    32:7  33:3
    43:23

presents
    36:14

preserve
    30:21

Prestige   5:3

pretty   9:4
    14:10
    20:20
    38:25

primarily
    9:1

printing
    51:1

prior   7:16

privilege
    37:21
    49:1,25
    50:3

problems
    11:3  48:2,
    7,12

procedure
    13:11
    16:14
    17:24
    29:22

process   9:9
    16:13,16
    52:7

Professional
    19:9

programs
    9:25

project
    25:18
    44:22

projects
    9:5,10,13,
    15

promoted
    19:14

promotion
    6:20

propose   46:4

proposed
    41:22

protect
    45:13

provide   48:5

provided
    48:8

public   9:13

purpose
    49:6,10,
    13,17

pursuant
    5:3,11
    59:14

push   59:4

put   14:19
    26:3  42:18
    43:1,4,14
    47:20
    51:1,20

54:4,5

putting
    42:23

—————————

Q

quarter   55:6
    58:18,22
    59:14

quarterly
    56:3
    59:11,15

question
    5:13  37:9
    50:6,10
    53:10

questions
    14:20  33:3
    37:5,18
    38:7  53:22

—————————

R

Race   20:5

rake   10:10

random   55:5,
    7  56:2
    58:22
    59:22

read   34:13
    37:2

real   8:13

reason   8:2
    14:2  23:2
    24:19

28:12,15
    32:11
    35:13
    42:11

Rebuild   9:18

Rec   30:7,11
    32:13  35:1
    36:19  37:7
    39:23  53:4
    55:2  58:6

recall   8:16
    14:15,19,
    20  15:9
    17:4,20
    19:1  21:2,
    9  26:23
    30:2  31:7
    33:23
    35:1,25
    36:2,3
    37:5,6
    39:4,10
    40:4,20
    41:7,10,
    22,25  43:8
    44:2  46:13
    48:10,24
    49:9,15
    51:6  52:2,
    22,25
    54:14,20
    56:10,14,
    16  58:11,
    16,20  60:3

receive
    11:23,25
    40:9

received
  22:3 23:3
  53:25 54:1

receiving
  51:6

receptionist
  47:3

recess  56:9

recognize
  22:4 27:6,
  10 30:18
  34:17
  35:15

recollection
  52:20 53:9
  54:6

recommendation
  47:18,22

record
  22:17,18
  23:21,22
  25:12
  35:4,10,16
  38:5 45:22
  47:14,20
  51:10,12,
  16,19

records
  13:6,7
  20:18,19
  26:14
  30:22,23
  31:4,14
  39:21
  40:23

47:25
48:6,20

recreation
  6:2 7:2,9,
  20 11:8

recreational
  11:3

recreations
  8:14

REEXAMINATION
  55:12

refer  29:22

reference
  49:12

referring
  28:11 53:7

refers  37:11

reflect  13:3
  34:19,23

reflected
  43:24

refreshes
  53:9

refusing
  50:5,10

regard  55:3

regular
  11:17
  25:20

rehab  9:18

related  47:6

relationship

19:9,25
20:7,10

relative
  17:13

rely  58:1

remember  8:6
  10:16
  11:15 12:5
  13:16
  14:3,11
  16:24
  17:1,2,11
  20:25
  24:4,10
  25:16
  26:13
  29:24
  30:5,8
  32:16,20,
  23 33:8
  36:9 38:23
  39:6,7
  46:5 48:14
  58:3

rendered
  52:4

Renee  34:1
  58:8

rental  28:22

report  46:1
  47:8 58:25

reporter's
  5:5

Reporting
  5:4

reports  59:5

representation
  13:17 38:2
  46:19

represented
  18:9

representing
  38:1

request  5:7
  15:12
  33:14
  34:21
  35:14,16
  39:21
  48:1,6
  50:15 52:1
  58:12

requested
  48:9

requesting
  28:2 33:19
  34:10,12

requests
  26:22
  33:17

reserved
  5:13

resigned
  6:11

respect
  30:1,10
  52:19

respond
  11:3,7

response
   48:5

responsibility
   59:21

result  40:5
   56:13
   59:10

retain  9:14

retaliation
   54:22

retired
   52:9,16,17

retirement
   52:14

rewrites
   29:25

Rhodes  40:19
   42:4

rid  15:15

right-hand
   22:7 23:2,
   14 50:25

Risk  41:4,
   7,8,18
   45:21

Robert  7:11
   21:10,11,
   17,20
   22:1,5,10,
   15 57:11

Robert's
   21:23
   22:13

rodent  11:15

role  10:23
   26:18

Ron  5:10
   17:2,4
   31:23
   32:22
   37:12,13

Ronald  5:2,
   19,25

routine
   59:18

row  34:6
   36:4 37:8

run  10:13
   15:21,22
   45:3,4

running
   10:17,18

Russell
   20:1,4

_____

        S
_____

sales  9:5,
   10,19,22

Sam  39:8,15
   42:1,7
   43:11
   58:12,17
   59:1,6,18
   60:1,12

Saturday
   44:21

schedule
   17:18 35:2

scheduled
   33:16,20

secretary
   34:1

section
   23:13

send  31:23

separate
   25:20 26:3

September
   36:1 57:12
   60:8

serves  48:8

services
   5:6,8

set  9:25
   59:10

seventh  24:7

Shanahan
   6:15 7:11
   19:19,20
   20:8 21:7
   30:5,10
   38:21
   50:24
   52:25

sheet  12:22
   25:10 26:7

sheets  29:14

she's  19:12

short  23:19

shovel
   10:17,18

show  24:17

showed  39:25
   40:1

showing
   41:12

shred  31:7,
   11

shredded
   31:4

sick  30:3

side  9:6
   20:5 22:7,
   21 23:2,9,
   14 27:7
   28:12

sign  18:13
   26:18 32:2
   35:10 60:5

signature
   21:20,22,
   25 23:18
   29:13
   50:17,19,
   22

signed  23:4,
   12 32:8
   33:10
   34:19,23
   50:21 51:7
   60:4

| | | | |
|---|---|---|---|
| **similar** | 23 43:4,9, | **spreadsheet** | 21:7 |
| 57:23 | 12 58:12, | 40:15,17, | **statewide** |
| **simply** 25:19 | 17 59:1,6, | 21 43:23 | 24:3 |
| **sir** 6:8 | 18 60:12 | **spreadsheets** | **stay** 43:9 |
| 7:22 12:1 | **Smitherman** | 9:2 56:15 | **stealing** |
| 14:23 | 5:16 16:4, | **spring** 37:5 | 56:17 |
| 15:4,8,13 | 17 20:23 | 39:7 | **step** 46:16 |
| 19:7 21:6, | 25:2 27:15 | **Sroczynski** | 47:15 |
| 9,21 22:9 | 28:16,19 | 15:14,21 | **Steve** 48:16 |
| 23:20 | 37:20,25 | 19:8,22 | **strange** 55:9 |
| 24:22 25:7 | 38:9,13 | 20:1,8 | **stretches** |
| 26:5,16 | 48:25 | **staff** 37:21 | 10:1 |
| 27:20 | 49:5,8,13, | 41:3,14,21 | **Stroud** 23:16 |
| 28:4,6 | 19,24 | 58:14,25 | 27:23,25 |
| 29:18 | 50:6,11 | **stage** 57:4 | 28:9 29:8 |
| 31:12,15 | 51:24 | **standard** | **Stroud's** |
| 32:5 33:9 | 53:22,24 | 13:10 | 23:18 |
| 34:14 | 55:11 | **standing** | 29:13 |
| 36:12 | 60:14 | 17:23 | **studies** |
| 37:15 | **Smith's** 60:1 | **start** 6:16 | 56:13 |
| 38:23 | **solution** | 56:2 58:18 | **stuff** 40:2 |
| 39:20 | 41:22 | **started** | **subjected** |
| 41:16,19 | **sort** 17:23 | 26:13 | 39:19 |
| 42:15 44:1 | 34:16 | **state** 5:24 | **submit** 33:17 |
| 52:2 54:24 | 41:24 59:8 | 22:6 | **submitted** |
| 55:24 56:7 | **Special** | **stated** 54:9 | 5:14 46:23 |
| **situation** | 19:11 | **statement** | **substantive** |
| 45:15 | **specific** | 18:14 | 47:21 |
| 52:15,21 | 59:13,14 | 29:8,10 | **sufficient** |
| **sixth** 23:24 | **specifically** | 32:2,7,9, | 20:13 |
| **slot** 27:6, | 17:6 30:2 | 20 36:18 | **suggested** |
| 10,22 | **spelled** | 37:7 | 42:17 |
| **slots** 9:8 | 18:23 | **statements** | |
| **Smith** 28:10 | **spoke** 37:10 | | |
| 39:8,15 | | | |
| 42:1,7,18, | | | |

summary  47:9

summer  21:1

supervise
  8:5 59:4

supervised
  8:9 58:13

supervising
  42:3

supervisor
  7:16
  16:14,19
  19:12,14
  21:25
  23:13 42:2

supervisors
  7:12

supervisory
  26:18

supports
  42:23

supposed
  16:16 39:9
  40:5,25
  41:13
  55:18
  56:19 57:1
  60:1,13

survive  8:3

Swear  5:17

switch  30:13

Sworn  5:20

Sylvia  46:23

system  12:7,
  8,10
  30:14,15
  35:8
  44:16,19,
  21 54:4,7
  58:1 59:21

————————

**T**

————————

taking  36:4

talk  38:14,
  21 48:25
  49:1

talked  33:6
  38:10 39:1

talking  39:4
  55:1 56:24
  60:11

tasks  10:12

tax  9:5,10,
  19,22

tendered
  5:14

terminated
  13:12 52:5

terms  17:13

Testifies
  5:21

that's  13:14
  14:9 18:7,
  12 22:20
  23:6 24:8
  27:4,15,
  16,22,24

31:17
33:20
36:21
37:23
38:13 45:5
46:8
47:11,23
50:8 51:20
52:13,23
53:6 55:11

theft  60:10

Then's  23:10

there's
  22:24
  23:10
  36:16
  50:25
  55:15,22
  58:16

they'd  44:16

they're
  12:13
  16:15
  33:14
  39:19
  44:16

they've
  12:11

thing  17:1,
  22 52:22

things  9:5,
  16 33:5
  35:24

thinking
  23:10

50:24

threatened
  19:2

thumb  57:9

time  5:13
  6:19 7:13,
  16,17,18
  11:8,23,25
  12:4,6,9,
  10,11,13,
  17,20,21,
  22,25
  13:6,7,8,
  9,18 14:3,
  11 15:3,11
  17:7,23
  18:4,5,10,
  15 19:6
  20:13,14,
  19 21:12,
  16 22:3
  23:17,20
  24:23
  25:4,9,10,
  11 26:2,7,
  10,14,15,
  19,22 27:2
  29:9,13,14
  30:1,7,14,
  15 31:14,
  25 32:4,8,
  14,25
  33:18,19
  34:2,3,6,
  10 36:4,19
  37:6,8,14
  39:12,15

40:3
44:13,25
45:1 52:1
54:1,3,7,
10,19
55:15,16,
19,23
56:1,8,14,
17 59:25
60:7

**timer** 34:16,
18

**times** 14:10
15:19

**title** 8:17
47:1

**told** 18:7
43:8 49:6,
9 52:14

**Tom** 7:10,15
14:3 15:15
17:24 23:6
27:8,12
29:3 30:22
37:1

**Tommy** 7:10
17:25

**top** 24:15
27:19

**topic** 17:5

**track** 22:6
26:10
30:16
33:19 44:8
55:15,25

58:1

**tracked**
21:15
30:14 45:5

**tracking**
55:3

**transcribed**
35:6

**transition**
8:4

**trash** 45:3

**traveling**
59:20

**treatment**
14:12

**Trees** 14:18

**trust** 43:3

**turn** 20:22
21:24 22:6
23:23
26:17
28:15,20
29:4 30:18
33:12 34:9
36:22
39:17
40:8,12
43:22
45:18 47:7
50:13 52:8
57:8

**turned**
33:22,23,
24

**Turpin** 28:12

**TV** 13:16

**two-** 55:21

**two-week**
24:14

**type** 10:24
16:22
54:15

---
**U**
---

**Uh-huh** 11:5
38:6 45:7

**ultimately**
52:5

**underneath**
51:15

**understand**
37:9

**understanding**
20:17
51:21

**University**
7:3

**usual** 5:6

**utilize**
32:17

---
**V**
---

**vacation**
33:14,17,
20 34:19,
21,24

35:2,14,15

**variety**
11:16

**vehicle**
42:8,10,
12,18,24
43:4,5,6,
9,12,15

**vehicles**
39:22
42:25
43:1,2
55:8 59:20

**venues** 24:6

**verbal**
57:16,17

**versus** 53:5,
13

**violence**
45:9,19
48:2

**Vittirio**
40:18 42:3
43:24
44:3,4,8,
13 57:23

---
**W**
---

**waiting**
47:17

**waive** 49:25
50:3

**wanted** 15:22
34:19,23

**MELINDA BEAZLEY PEARSON vs. AUGUSTA, GEORGIA, ET AL.**
Ronald L. Houck on 05/07/2015                    Index: warned..you've

35:2

warned   57:4

warning
    57:17,23

warnings
    60:5

Washington
    40:18 42:4
    43:24
    44:3,4,21
    57:23

Washington's
    44:9,13

wasn't   32:10
    39:9 41:7

water   28:21

waterfront
    8:1

week   24:5
    25:13
    55:21,22

weekend
    34:11
    43:25
    44:5,9,18
    45:3

weekends
    44:14

weekly   55:5
    59:17

weeks   12:14,
    15,17
    24:21,22,

24

weren't
    40:24,25
    41:12

we'd   56:23

we'll   23:7,
    23 27:17
    35:11

we're   36:10
    45:15
    47:17
    60:11

we've   13:15
    45:17 60:5

what's   6:1
    7:1 8:2
    20:17
    22:20,25
    23:2 35:12
    46:4 55:25

whereabouts
    40:18

whichever
    26:8

whistle
    18:18

William
    40:18 42:4

Williams
    46:24

won't   10:14

word   12:20

words   6:25

18:4 59:6

work   13:22
    14:17
    16:15
    20:21
    30:25 41:1
    44:22,23,
    25 45:2,9
    55:6,21,22
    56:13

worked   7:8
    9:9 12:11,
    23,24
    13:3,8
    18:1,3
    19:11 20:4
    21:13,17
    23:19
    25:24,25
    26:6 27:4
    55:15,19

worker   6:19

workers
    21:1,4
    41:12

working   19:5
    23:3 25:12
    26:9,25
    33:19 39:8
    44:16 57:1

workplace
    45:19

works   55:20

worth   24:5

wouldn't

13:25
    33:11

writing
    16:19

wrong   39:3

_____

Y

_____

year   6:6
    7:21 9:21,
    25 16:12
    30:3 31:19
    33:18 35:8
    54:10,12
    55:7 56:5

yearly
    35:13,15,
    19

years   7:21
    8:15,19,25
    36:3

you'd   34:13
    35:9

you're   12:25
    28:11
    34:10,12
    38:25 49:3
    50:5,10
    55:18

you've   10:8
    12:23
    42:16