[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15275
_____

D.C. Docket No. 1:14-cv-00110-JRH-BKE

MELINDA BEAZLEY PEARSON,

Plaintiff-Appellant,

versus

AUGUSTA GEORGIA,
through its Mayor Hardie Davis, Jr.,
in his official capacity, and its commission,
in its official capacity,
FRED RUSSELL,
individually and in his capacity as City Manager,
as a final policy maker, under color of law,
BILL SHANAHAN,
individually and in his official capacity,
under color of law,
SAM SMITH,
individually and in his official capacity,
under color of law,
JOHN AND JANE DOE,
whose true names are not known,
individually and in his or her individual capacity,
under color of law, Individually or jointly,
and in conspiracy with one another,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(May 11, 2020)

Before ED CARNES, Chief Judge, JULIE CARNES, and CLEVENGER,[*] Circuit Judges.

PER CURIAM:

Melinda Pearson worked for the City of Augusta, Georgia, for thirty years. For most of that time she complained of unfair and discriminatory treatment. After being demoted, injured on the job, and then fired, Pearson sued her former employer and three of its employees alleging various forms of discrimination and retaliation. The district court granted summary judgment against her on all but one of her claims, which went to trial. At the close of Pearson's evidence, the court granted judgment as a matter of law against her, disposing of her last remaining claim. This is her appeal.

---

[*] Honorable Raymond C. Clevenger, III, United States Circuit Judge for the Federal Circuit, sitting by designation.

# I.  BACKGROUND

## A.  <u>Facts</u>

Pearson, a white woman, started working as a summer employee for the parks and recreation department in the City of Augusta in 1980.[1]  She was promoted several times.  In 1992 she became a Special Activities Supervisor.  During her time as a supervisor she twice complained to human resources that, even though she was a supervisor, she was being forced to do manual labor in an attempt to make her "work out of [her] job."  Nothing came of her complaints.

In 1996, Pearson was promoted to operations manager in the parks and recreation department.  Despite the promotion, she continued to have problems.  One of those problems arose in 1999 from her attempt to use "comp time," which is short for compensatory time, an alternative to overtime.  Under the comp time system, an employee who worked more than 40 hours in a pay week could bank those extra hours for later use as paid time off.  Instead of receiving overtime pay in cash, the employees could take an equivalent number of paid hours off work later.  The City had a general policy of not allowing exempt employees — that is, salaried employees like Pearson who were exempt from the Fair Labor Standards Act's overtime requirements — to accrue or use comp time.  Only those who were

---

[1] We refer to the defendants collectively as "the defendants," and, where context requires, to the City of Augusta by itself as "the City."

considered non-exempt employees under the FLSA were supposed to use comp time.

Despite that, until 1999 the human resources department had allowed Pearson to accrue and use comp time.  But that year her manager denied her request to use comp time on the ground that she was an exempt employee.  After she complained, however, the human resources director wrote a letter to Pearson and her manager, stating that because she had already accrued comp time that was "in the payroll system," there was "no other option other than to compensate her for her time," meaning to let her use it for paid time off.

That letter did not say if Pearson would be allowed to continue accruing comp time, although it did state that "exempt employees do not accrue compensatory time."  And in a conversation they had, the department director told Pearson that, unlike non-exempt employees, she could no longer report comp time on her official timecard.

Both exempt and non-exempt employees submitted weekly timecards to the payroll department.  Exempt employees indicated on their timecards only whether they had worked a full day or taken some sort of paid time off, like vacation or sick time.  Non-exempt personnel, also known as hourly employees, recorded on their timecards the exact number of hours they had worked and also noted how many comp time hours they had accrued that week.  If a non-exempt employee wanted to

use comp time, he would mark the timecard to show that he was not working and would write on the timecard the amount of comp time hours he wanted to use that day.  The payroll department tracked comp time hours accrued by non-exempt employees.  The department did not track comp time for exempt employees, because under City policy they were not supposed to have any.

But they did, at least to some extent and at least in the parks and recreation department, which created a system to allow exempt employees to use comp time, despite it being prohibited.  Under that system, an exempt employee would fill out a piece of paper each time he accrued comp time and place the paper in a binder on the assistant director's desk.  When he wanted to use accumulated comp time hours, the exempt employee would retrieve his comp time paper from the binder and submit it to his supervisor.  The supervisor would then approve the exempt employee's use of comp time to take off a day or some part of it.  That was, however, not quite enough to make the off-the-books operation work.

Before the comp time consuming employee in the parks and recreation department could be paid as though he had worked instead of being off that day, the payroll department had to approve the employee's timecard and, as we have explained, the City supposedly did not allow exempt employees to earn or use comp time.  So Pearson and the other exempt employees in the parks and recreation department, with the approval of their managers, submitted timecards to

the payroll department showing that they were working a full day, even when they were not working all or even part of that day but were instead using comp time to be off.  Under that informal, de facto system, the human resources and payroll departments had no record of any exempt employees, including Pearson, ever accruing and using comp time.

It was under that system that Pearson, like other exempt employees in the parks and recreation department, kept track of and used her comp time.  And even after the 1999 incident, and throughout her remaining employment there, her managers continued to approve her use of it.

Comp time was not the only problem that Pearson complained about.  She also complained that she was required to do manual labor despite her operations manager job description not mentioning that it was required.  And doing manual labor eventually led to serious injury.  In 2004 she was trying to wrestle a tent beam off the back of her truck when the beam got caught and threw her into the back of the truck.  Because she was in pain and had major bruising, she went to the doctor.  He told her that she had dislocated her shoulder, and he put her arm in a sling.  When she returned to work a week later, her manager assigned her more manual labor.

The next week the pain got worse.  She went to another the doctor who discovered that she had three ruptured discs in her spine, which the first doctor had

missed.  Because it was a work-related injury, workers' compensation paid her medical expenses.  Pearson was out of work for six months because of her back injury.

There were more problems.  In 2005 Pearson complained that male managers were receiving extra pay for taking on extra work, but she was not.  That year she filed an EEOC sex discrimination charge against her manager and the City, alleging that she was treated worse and paid less than the other managers — all of whom were men.  All of the male managers had offices, she had none.  All of the male managers could wear what they wanted, she had to wear a uniform.  She was issued a right to sue letter but decided not to sue at that time.

In 2008 Pearson contracted MRSA (Methicillin-resistant Staphylococcus aureus), a serious infection, although the record does not indicate how she got it.  It resulted in her having 29 surgeries between 2008 and 2011.  After each one of those surgeries she was out of work for at least a week.  Sometimes more.

In July 2011 Pearson had a severe MRSA flare up and was out of work until December 2011.  During that time she was placed on Family Medical Leave Act leave.  She was paid through mid-August (using her accrued vacation and sick leave), but after that her leave was unpaid.  Pearson called a parks and recreation administrative assistant who handled timecards for the department and asked to use some of her comp time to extend the paid portion of her leave.  But she was

told parks and recreation was "going to have to hold [her] time of comp until [she] returned."

She was instead granted catastrophic leave, a program under which employees can donate time off to an employee in need of it. Catastrophic leave is available only to employees who have exhausted all other forms of paid leave, including comp time. Many of the employees under Pearson's supervision donated their time off to her.

In December 2011, the City put out a new handbook explicitly providing that exempt employees could not accrue or use comp time. On December 8, 2011, Pearson signed a form acknowledging that she had received and had the opportunity to read the entire handbook.

Shortly after Pearson returned to work in December 2011, she experienced a new set of problems: she did not get along with her new manager, Dennis Stroud, and she found some of the employees under her supervision, particularly Sam Smith and Millie Armstrong, to be insubordinate. After one particularly "horrible conversation" (her description) in late December, Pearson told Stroud that she was going to file a formal complaint against him. She requested time off to cool down, and Stroud agreed: he told her not to come back until after the New Year, which would mean she would be out of work for four days. But there was a complication. Because Pearson had only recently returned from an extended leave

8

of absence, she had exhausted most of her available time off.  All she had left was comp time, which she requested permission to use so she would not lose pay during those days that she would be out of work.  Tom Beck, the parks and recreation director, approved her request.  In keeping with the practice of the parks and recreation department, Pearson submitted a timecard indicating that she had worked each of those four days.

Pearson's four-day leave of absence did not go unnoticed.  In early 2012 the City's human resources department began an investigation into her use of comp time.  Bill Shanahan, who was acting as the interim director of human resources and, later, as the interim director of the parks and recreation department, oversaw the investigation.  During the investigation Shanahan reviewed the parks and recreation payroll records and interviewed several employees including Pearson and Tom Beck, her supervisor (Stroud, her former supervisor, was fired between the time Pearson made the request and the time the comp time was approved).[2]  Pearson also provided a written statement about the matter to Ron Clark, who worked in the human resources department.

---

[2] During the investigation, someone leaked several documents from Pearson's file to the media, including disciplinary write-ups that she had received over her thirty years of employment with the City for infractions such as failing to wear a uniform or leaving without telling a manager.  Later, someone also leaked some medical documents related to her workers' compensation claim to the press and alleged that she had falsified that claim.  The leaked information had been kept in the human resources office, and Pearson testified in her deposition that Shanahan had admitted leaking those documents to the press. But he denied admitting it or doing it.

Shanahan concluded that Pearson's December 2011 use of comp time was improper for two reasons.  First, as an operations manager, she was an exempt employee and was thus ineligible to accrue and use comp time under the City policy.  And second, she was required to have exhausted any comp time she did have during her July 2011 to December 2011 leave of absence before  she used donated leave time from other employees.  Shanahan demoted Pearson from operations manager to maintenance worker on May 2, 2012, a demotion that came with a pay cut of about fifty percent.  Pearson appealed Shanahan's decision; it was reviewed and affirmed by Fred Russell, the City's administrator.

In May 2012, Pearson began working in the new position of maintenance worker to which she had been demoted.  Although she complained that the work was hurting her back, her manager told her that she had to continue working without any assistance.  By the end of the month she had re-injured her back and had to go on medical leave again.  She remained on leave for over eight months, until February 2013.  At that point Pearson had not been medically cleared to return to work, and she had exhausted all of the leave available to her, so the City terminated her employment.

## B.  Procedural History

In October 2012, before she was terminated but after she had been demoted and had left on medical leave, Pearson filed an EEOC charge.  She alleged that her

demotion from operations manager to maintenance worker was the result of race

and gender discrimination and retaliation.  In March 2013, after she was

terminated, she filed a second EEOC charge alleging that she was fired because

she had a disability (her back injury) and in retaliation for filing her October 2012

EEOC charge.  She received right to sue letters in January 2015 and, with the

assistance of counsel, she sued the City.  Pearson had already filed a separate

lawsuit against the City, Shanahan, Russell, and Sam Smith involving related

subject matter.  The district court consolidated the two lawsuits.

In total, Pearson brought a plethora of claims in a plethora of paragraphs on

a plethora of pages in three different complaints.  The complaint in her first lawsuit

was 28 pages and 242 paragraphs long.  The complaint in her second lawsuit was

originally 65 pages and 543 paragraphs long, but she submitted an amended 19-

page, 125-paragraph complaint.  Considering only the two complaints that went to

judgment, and forgetting the second lawsuit's superseded one, in 367 paragraphs

spread over 47 pages Pearson asserted claims under the Fair Labor Standards Act,

the Family Medical Leave Act, the Americans with Disabilities Act, Title VII of

the Civil Rights Act of 1964 (for race-based discrimination, sex-based

discrimination, hostile work environment, and retaliation), the Due Process Clause,

and the Equal Protection Clause.  She brought claims against the City as well as

Shanahan, Smith, and Russell in both their individual and official capacities.  Some

of the claims were based on her demotion, some were based on the City's denial of

her comp time requests, and some were based on her termination. And it is not

obvious from the face of the complaints which claims arose from whose actions.[3]

The district court first dismissed the official capacity claims against the

individuals. It later granted the defendants summary judgment on all but one of

Pearson's claims, the Title VII retaliatory termination claim. The case proceeded

to trial on that one claim and after the close of Pearson's evidence, the court

granted the defendants' motion for judgment as a matter of law on it.

As best we can tell from her briefs to this Court, Pearson challenges the

district court's grant of summary judgment in the defendants' favor on these

claims: procedural due process violations under the Fourteenth Amendment (for

her demotion and for the termination of her employment); Title VII race and sex

discrimination (based on her demotion); 42 U.S.C. § 1983 equal protection

violation (based on her demotion); Title VII retaliatory hostile work environment;

Title VII hostile work environment (based on her race and sex); FLSA retaliation;

and an ADA claim (based on her termination). She also challenges two of the

---

[3] The district court described that complaint as "not clear at all" and "lack[ing] the clarity
and precision that Rule 8 demands in abundance. It is replete with incoherent sentences, many of
which are either missing words . . . or span up to nine lines without a single period . . . . It
references over twenty individuals who are <u>not</u> defendants: some by first name, some by last
name, some who were Ms. Pearson's subordinates, some who served in a supervisory capacity,
some who worked for other City departments, and some whose relevance to Ms. Pearson's
claims are tangential at best."

district court's evidentiary rulings at trial.  Finally, she contends that the district court erred by granting judgment as a matter of law on her Title VII retaliatory termination claim.[4]

Pearson's contentions that the district court erred by granting summary judgment on her Title VII race discrimination claim, Title VII retaliatory hostile work environment claim, Title VII hostile work environment claims based on race and sex, FLSA retaliation claim, and ADA claim are clearly without merit and do not warrant discussion.  We affirm the district court's judgment on those claims without saying more.

That leaves her contention that the district court erred in granting summary judgment on her due process claims, her § 1983 equal protection claim, and her Title VII sex discrimination claim, as well as her contentions that the court erred in its evidentiary rulings and its grant of judgment as a matter of law on her Title VII retaliatory termination claim.  We discuss each of those contentions in turn.

## II.  SUMMARY JUDGMENT

"We review the district court's order[s] granting summary judgment <u>de novo</u>, viewing all the evidence, and drawing all reasonable inferences in favor of"

---

[4] Those are the only claims she addresses on appeal, and as a result she has abandoned any others.  <u>Sapuppo v. Allstate Floridian Ins. Co.</u>, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

the party opposing the motion.  <u>Scott v. United States</u>, 825 F.3d 1275, 1278 (11th Cir. 2016) (quotation marks omitted).  A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'material' fact is one that 'might affect the outcome of the suit under the governing law.'"  <u>Furcron v. Mail Ctrs. Plus, LLC</u>, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  And a "dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

## A.  <u>Due Process Claims</u>

Pearson contends that the defendants violated her due process rights by not providing any pre-deprivation process before her demotion or her termination.  The district court relied on <u>McKinney v. Pate</u>, 20 F.3d 1550 (11th Cir. 1994) (en banc), to deny both of her procedural due process claims on the ground that state law, through a mandamus petition, provided a means to remedy any procedural deprivation she may have suffered, yet she failed to file one.  <u>See</u> <u>id.</u> at 1563.  According to Pearson, the <u>McKinney</u> rule does not relieve the City from providing her with the pre-deprivation process she was guaranteed under <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532 (1985).  She argues that because she didn't

14

receive proper pre-deprivation process under <u>Loudermill</u>, the district court should not have granted summary judgment on her due process claims.

Pearson's argument fails because she <u>did</u> receive adequate pre-deprivation process under <u>Loudermill</u>.  <u>See</u> <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").

Although the Due Process Clause of the Fourteenth Amendment requires a hearing before a public employee with a property right in her continued employment is terminated, the hearing "need not be elaborate" and "need not definitively resolve the propriety of the discharge."  <u>Loudermill</u>, 470 U.S. at 545. The hearing "should be an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  <u>Id.</u> at 545–46. The "employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  <u>Id.</u> at 546.  "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."  <u>Id.</u>

Pearson received at least that much process before her demotion.[5]  She was

demoted in May 2012.  As early as March 2012 she knew that Shanahan was

investigating her December 2011 use of comp time.  Around that time, Shanahan

met with her and gave her the opportunity to explain her comp time use.  She also

knew that the investigators were looking at her payroll binder to see if she had

falsified her timecards.  And she knew that falsifying a timecard could warrant

discipline up to and including termination.  In April 2012, one month before her

demotion, Pearson was given the opportunity to submit a written statement about

her December 2011 use of comp time, and she took advantage of that opportunity.

Taken together, all of this means Pearson knew she was being investigated for an

infraction that could result in her demotion, and she had a chance to respond to the

accusations verbally and in writing and did so.

As for her termination in February 2013, Pearson also received all the

process she was due under Loudermill before that happened.  At the time of the

termination, she had been on leave since May 2012 because of her back injury.  On

February 7, 2013, Pearson met with two human resources employees to discuss her

leave status.  They gave her a letter from Mike Blanchard, who had replaced

Shanahan as the City's interim human resources director.  The letter informed

---

[5] Even though Loudermill addressed only the process required before termination, we
have applied Loudermill's pre-deprivation due process requirements to demotions.  See Hatcher
v. Bd. of Pub. Educ., 809 F.2d 1546, 1553 (11th Cir. 1987).

Pearson that as of January 30, 2013, she had exhausted all available leave.  It warned her that because she was "not eligible for any leave status for a continued absence," the City would "separate [her] from service" if she could not return to work by February 13, 2013.  Pearson told those human resources employees that her doctor had not cleared her to return to work and that her next appointment was not until March 8, 2013, which was three weeks after the back-to-work deadline.

She met with the human resources employees again on February 13, 2013. Because she still had not been cleared to return to work, they told her that she would have to retire.  They gave her one more week for her doctor to clear her to work, but the doctor didn't.  As a result, Pearson's employment with the City was terminated.

Before she lost her job, Pearson had received written notice of the reason why the City was contemplating terminating her employment and an explanation of the City's supporting evidence.  She also had been given more than one "opportunity to present h[er] side of the story" to the two human resources employees, Loudermill, 470 U.S. at 546, and she was given time to secure a medical clearance from her doctor.  That is all the pre-termination process required under Loudermill.[6]  See id.

_____

[6] Pearson also argues that the district court erroneously denied her untimely motion to amend her complaint to add state law due process claims.  The district court denied that motion because Pearson had not shown good cause for filing it late and because the amendment would

B.  <u>Title VII and § 1983 Sex Discrimination Claims Based on the Demotion</u>

Pearson contends that she was demoted because of sex discrimination, in violation of both Title VII and (by way of § 1983) the Equal Protection Clause of the Fourteenth Amendment.[7]  Her Title VII and § 1983 claims are based on the same allegations.  We can analyze those claims together because "the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."  <u>Crawford v. Carroll</u>, 529 F.3d 961, 970 (11th Cir. 2008).

Under the <u>McDonnell Douglas</u> framework, a plaintiff alleging a Title VII or § 1983 discrimination claim must first establish a prima facie case of discrimination, showing: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably."  <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).

"If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its

---

have been futile.  That was not an abuse of discretion.  <u>See</u> <u>Smith v. Sch. Bd. of Orange Cty.</u>, 487 F.3d 1361, 1366–67 (11th Cir. 2018).

[7] Pearson brought her equal protection claims against Augusta, Shanahan in his individual capacity, and Russell in his individual capacity.  She brought her Title VII claims against Augusta only.

actions." Id. at 1221.  If the defendants do so, Pearson "must then demonstrate that the defendant[s'] proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." Id. (first alteration added) (quotation marks omitted).

The parties agree that Pearson satisfied the first three prongs of the prima facie case: she is a woman, she was demoted, and she was qualified to do her job. But they disagree about whether Pearson satisfied the fourth prong by identifying a comparator who was sufficiently similarly situated to her who was treated differently.

"[A] plaintiff must show that she and her comparators are similarly situated in all material respects." Id. at 1224 (quotation marks omitted).  A similarly situated comparator:

- will have engaged in the same basic conduct (or misconduct) as the plaintiff;
- will have been subject to the same employment policy, guideline, or rule as the plaintiff;
- will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and
- will share the plaintiff's employment or disciplinary history.

Id. at 1227–28 (footnote and citations omitted).

Pearson identifies five men as potential comparators for her sex discrimination claims: Donnell Conley, Chris Scheuer, Ron Houck, Christopher Yount, and Sam Smith.  Four of those men, Scheuer, Conley, Yount, and Houck, were "subject to the same employment policy, guideline, or rule as" Pearson and were "under the jurisdiction of the same supervisor" as Pearson.[8]  Id. at 1227–28.  They were all managers and all exempt employees under the Fair Labor Standards Act, meaning that according to the City handbook they were not entitled to accrue or use comp time.

The question is, therefore, whether Pearson showed that any of those four men engaged in the same basic misconduct as she did: accruing comp time as an exempt employee and using it by marking their timecards to show that they were working when they weren't.  Pearson submitted evidence, in the form of deposition testimony and declarations, that those four men used comp time even though they were exempt employees.  And Shanahan would have known that at least some of the men were using comp time as exempt employees because one of them, Scheuer, admitted doing so.  His admission came during an interview that the human resources manager conducted as part of the investigation into Pearson's use

---

[8] Smith is clearly not an appropriate comparator.  Pearson argues that he is because he wrote on an employee's timecard that the employee was using sick leave when he did not show up for work, even though Smith did not know whether that employee was actually sick.  She also asserts that Smith drove around in his car while on the clock. But neither of those alleged offenses is the same basic conduct as Pearson's use of comp time without reporting it on her timecard, which makes him an inappropriate comparator.  See Lewis, 918 F.3d at 1227.

of comp time, and as acting director of human resources Shanahan would have

reviewed the investigation interview notes.  And Shanahan would have known that

because human resources did not track comp time for exempt employees, Scheuer

could not have taken comp time without falsifying his timecard in the same manner

Pearson did.  There was also direct evidence in the record that Yount had falsified

a timecard in the same manner that Pearson did; there were three falsified

timecards from Yount.

Pearson has, therefore, established that Scheuer, Conley, Yount, and Houck

were "similarly situated in all material respects," id. at 1224, and the burden shifts

to the defendants "to articulate a legitimate, nondiscriminatory reason for its

actions," id. at 1221.  The defendants, in their brief, claim that Pearson was

demoted because she "knew that she was not eligible for comp time as an exempt

employee and . . . she engaged in a process which resulted in falsified timecards in

direct violation of [City] policy."  But that cannot be a legitimate, non-

discriminatory reason for Pearson's termination if, as her evidence shows, it is

exactly what the comparators did.

Not only that, but Pearson has submitted other evidence of pretext.  That

evidence included her testimony and a letter that showed she had been told in 1999

that she could use comp time even though she was an exempt employee.  And she

presented evidence that when she attempted to use her comp time before she took

catastrophic leave, she was told that the parks and recreation department was "going to have to hold [her] time of comp until [she] returned."  The implication of that evidence, which we must credit at this stage of the proceedings, is that the use of comp time was permitted — otherwise, why would the department hold it for her?

Taken together and viewed in the light most favorable to Pearson, with this evidence Pearson has raised a genuine issue of material fact as to whether the defendants' articulated reason for demoting her was pretextual.  The defendants should not have been granted summary judgment on her Title VII and § 1983 sex discrimination claims.[9]

## III.  TRIAL RULINGS AND  JUDGMENT

Pearson's Title VII retaliatory termination claim went to trial.  She challenges two of the district court's evidentiary rulings during trial and the judgment as a matter of law it entered.  First, she contends that the district court abused its discretion by excluding all evidence from before October 23, 2012 as not relevant to whether the defendants had retaliated against Pearson for filing the

---

[9] Pearson also makes a mixed-motive argument, see Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1235, 1239 (11th Cir. 2016), and a mosaic theory argument, see Smith v. Lockheed–Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011), for her Title VII sex discrimination claim.  Because we find that a genuine issue of material fact exists about whether the City discriminatorily demoted her under the McDonald  Douglas framework, we need not consider those other arguments.

EEOC charge on that date.  Second, she challenges the court's exclusion of a

December 2012 email from Shanahan that Pearson tried to put into evidence

during the trial.  Finally, Pearson contends that the district court erred by granting

the defendants judgment as a matter of law after her close of evidence.  We

consider each contention in turn.

### A.  Exclusion Of The Pre-October 23, 2012 Evidence

The sole claim that made it to trial was that Pearson was terminated in

retaliation for filing the October 23, 2013 EEOC charge.  The court excluded as

irrelevant evidence about anything that occurred before she filled out a

questionnaire on October 23, 2012 prefatory to filing the EEOC charge. The

parties and the district court treated that date as the beginning of her protected

conduct, and so will we.  The court excluded evidence of any conduct by the

defendants before that date because it could not have been evidence of retaliation

for protected conduct that had not yet happened.

We review that evidentiary ruling only for an abuse of discretion.  Cook ex

rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1103 (11th Cir.

2005).  We will not reverse a district court's decision to exclude evidence "unless

the ruling is manifestly erroneous."  Toole v. Baxter Healthcare Corp., 235 F.3d

1307, 1312 (11th Cir. 2000) (quoting Gen. Elec. v. Joiner, 522 U.S. 136, 142

(1997)).  And even if the decision is manifestly erroneous, we will not reverse if

the error was harmless.  <u>United States v. Langford</u>, 647 F.3d 1309, 1323 (11th Cir. 2011).

    According to Pearson, the district court erred by ruling any and all pre-October 23 evidence per se irrelevant instead of considering each piece of proffered evidence individually to determine its relevance.  We disagree. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

    The alleged events or conduct that occurred before October 23, 2012 that Pearson argues were relevant to the question of whether Shanahan had a retaliatory intent when he fired her, include:

> Shanahan's August 2012 false accusation of worker's compensation fraud against Pearson, Shanahan's July 2012 false accusation against Pearson of losing a radio, Shanahan's May 2012 leak of Pearson's personnel records to the media, Shanahan's prior retaliation and leak of information in 2010 when employed by the city of St. Mary's, Shanahan's manipulation of the H.R. process to get Sam [Smith] to replace Pearson as manager after her demotion, and the retaliatory hostile work environment suffered by Pearson . . . .

None of that evidence has any tendency to make it more probable that Shanahan retaliated against Pearson <u>based on her October 2012 EEOC activities and filings</u>, instead of for some other reason, because all of that evidence relates to incidents that occurred before she did the first protected act.  <u>See</u> Fed. R. Evid. 401.

Pearson's evidence of pre-October 23, 2012 events and conduct actually tends to prove the lack of a retaliatory motive stemming from her protected conduct on and after that date. It shows that Shanahan had taken adverse actions against Pearson before she took the first step to filing the EEOC charge. Which tends to show there were other motives behind her termination. No matter how bad the motive for terminating Pearson may have been, if it was not in retaliation for her protected conduct in connection with the EEOC charge, it is not relevant — at least not in a direction that helps Pearson. If anything, the evidence would have harmed Pearson's retaliation case, which means that any error in excluding it would have been harmless to her. The district court did not abuse its discretion in excluding evidence of pre-October 23, 2012 conduct against Pearson.

## B. Exclusion Of Shanahan's December 2012 Email

Pearson contended at trial that Shanahan was the decisionmaker and there was evidence he knew about her EEOC claim before he fired her. The defendants contended that Mike Blanchard, who became human resources director after Shanahan, was the actual decisionmaker, and that Pearson submitted no evidence that Blanchard knew about her EEOC claim before he fired her.

The district court denied Pearson's motion to admit an email from Shanahan to a City human resources employee. She contends that email would have shown that Shanahan, not Blanchard, was the decisionmaker. Pearson offered the email

25

as a business record under Federal Rule of Evidence 803(6) during the testimony of Starina Styles, who was the human resources employee who allegedly received the email, but Styles did not recognize it.  The defendants objected to the admission of the email due to lack of foundation, and the trial court sustained the objection.

"The touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence."  United States v. Bueno-Sierra, 99 F.3d 375, 378 (11th Cir. 1996).  A document is admissible as a business record under Rule 803(6) if it was "made at or near the time by — or from information transmitted by — someone with knowledge[,] . . . [and] kept in the course of a regularly conducted activity of a business," and if it was the "regular practice" of the business to make that record.  Fed. R. Evid. 803(6)(A)–(C).  The party submitting the evidence must lay the foundation that those elements have been met, which requires "the testimony of the custodian or another qualified witness."  Id.; accord City of Tuscaloosa v. Harcros Chems., 158 F.3d 548, 559 n.12 (11th Cir. 1998).  The only person Pearson called for that purpose was Styles.  Because she did not remember or recognize the email, Styles was not a sufficient "custodian" or other "qualified witness" under Rule 803(6).  Pearson failed to lay the proper foundation for

admission of the email, so the district court did not abuse its discretion in sustaining the defendants' objection to it.

Pearson contends that even though she didn't lay the proper foundation, the email should have been admitted.  She points to a pretrial order saying that "[i]tems not objected to will be admitted when tendered at trial," notes that the email was listed in that order, and notes that the defendants did not object to it being included in the order.[10]  Based on that, Pearson argues that the defendants should not have been able to object to the admission of the email at trial.

Pearson provides no authority for the proposition that boilerplate language in a pretrial order relieves her of the burden of laying a foundation for evidence as required by Rule 803(6).  The only authority that she cites for the proposition that the evidence should have been admitted is a not-entirely-on-point, unpublished district court opinion from the Southern District of Indiana.  That decision, of course, is utterly non-binding on us.  See United States v. Johnson, 921 F.3d 991, 999 (11th Cir. 2019) ("Nor can we overlook that the opinion of a district court is not precedential.").  We are not convinced that the language in the pretrial order compelled the trial court to accept into evidence everything that was listed,

---

[10] Pearson also claims that Styles should have been able to refresh her recollection before answering whether she recognized the email.  But Styles was holding and reading the email when she stated that she did not recognize it.  It is unclear what more could have been done to refresh Styles' recollection.

regardless of the Federal Rules of Evidence.[11]  Again, the court did not abuse its discretion.[12]

## C.  Judgment As A Matter Of Law

Finally, Pearson contends that the district court erred by granting the defendants judgment as a matter of law, a ruling which we review de novo. Wilcox v. Corr. Corp. of Am., 892 F.3d 1283, 1286 (11th Cir. 2018).  In doing so, "[w]e view the evidence and draw all reasonable inferences in [Pearson's] favor, and we may affirm only if we conclude that a reasonable jury would not have a legally sufficient evidentiary basis to find for her."  Id. (citations and quotation marks omitted).

"To make out a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action."  Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211

---

[11] Pearson also makes two other cursory arguments for allowing the email in as evidence. First, she argues that under Federal Rule of Evidence 1003(a) the defendants failed to raise a genuine issue of authenticity, so a "duplicate [was] admissible."  But the evidence was excluded for lack of foundation under Rule 803(6), not because it was a duplicate.  Second, Pearson argues that under Federal Rule of Evidence 1008(b) the question of "genuineness" is a question for the jury.  But the evidence was excluded for lack of foundation, which is firmly within the province of the court.  United States v. Arias-Izquierdo, 449 F.3d 1168, 1183 (11th Cir. 2006).

[12] The evidence excluded under these rulings is the subject of a motion Pearson filed in this Court to supplement the record on appeal.  Because the district court did not abuse its discretion in excluding the evidence, the motion is DENIED AS MOOT.

(11th Cir. 2013).  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated."  Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quotation marks omitted). Once the plaintiff makes out a prima facie case of retaliation the burden shifts to the defendant to show a legitimate reason for the adverse action.  Id. at 715.  Then the burden shifts back to the plaintiff to establish that the proffered legitimate reason was pretextual.  Id.

The district court based its judgment for the defendants on two grounds. First, it found that Pearson had failed to establish a causal link between the protected activity (filing an EEOC charge) and the materially adverse action (termination).  Second, it found that she failed to rebut the legitimate reason provided by the defendants for her termination — that she could not return to work and had no additional leave.

Pearson contends that the evidence at trial showed that Shanahan was the person who decided to terminate her employment, he was aware of her EEOC activities including filing a charge, and the purported reason for her termination was pretextual.  We disagree.

Viewed in the light most favorable to Pearson, the evidence at trial established the following.  She suffered a work-related back injury in May 2012.

Because of that injury, she was out of work on approved medical leave beginning

on May 31, 2012. She was out on leave for eight months until mid-February 2013.

While on medical leave, she filed an EEOC charge in October 2012. Shanahan

became aware of the EEOC charge sometime that fall.

In December 2012 Pearson's doctor wrote a note to the City saying that she

would have to remain out of work until further notice and that he would update the

City about her ability to return to work in March 2013. Under the City's policy,

the only leave she had left to take was leave without pay. To qualify for it, she had

to get the approval of her department director, of the human resources director, and

of the city administrator. To get their approval for leave without pay, she had to

show either that she was applying for long-term disability or that the doctor could

confirm she would be able to return to work within six months. Pearson showed

neither.

Her application for leave was approved by the director of the recreation

department, Shanahan. But it was not approved by the head of the HR department

at that time, Mike Blanchard. Instead, an HR department employee put a sticky

note on the bottom corner of Pearson's final leave application that said "DENY +

SEND FFD LETTER AFTER XMAS" (FFD meaning fit for duty). Blanchard

later drafted a letter to Pearson explaining that she was "ineligible for any

additional leave of absence" because she had "exhausted any eligible FMLA leave,

accrued sick and vacation leave, and the unpaid leave of absence granted" to her.

The letter also warned that "if you are unable to return to work by February 13,

2013, we must regrettably separate you from service with Augusta, Georgia."  She

received that letter when she met with human resources on February 7.

There was some confusion about the precise date of Pearson's termination.

As a result, three Requests for Personnel Action (RPA) were created for Pearson,

all with different dates.[13]  Each RPA was requested by human resources and signed

by Shanahan as the parks and recreation department director.

On February 6, 2012, the day he signed the first RPA, Shanahan told a group

of City employees that Pearson had been "terminated" and "doesn't work here

anymore."  The next day Shanahan told a parks and recreation employee that

Pearson "don't [sic] work here anymore.  She's terminated."

---

[13] Pearson was first marked in the system as resigning.  Human resources requested that the Request for Personnel Action (RPA) be dated February 13, 2013, but there was an error and the parks and recreation department dated it February 1.  Pearson was granted a one-week extension to get a doctor's note, so human resources requested a new RPA with a termination date of February 20; it received a new RPA with a February 15 termination date.  Finally, human resources requested a third RPA, reflecting retirement instead of resignation (human resources did not specify the effective date, and the parks and recreation department dated it February 18).

Pearson testified during her deposition that the human resources employees she met with discovered on February 13, 2013 that she was listed as retired (and thus terminated) in the City's system as of February 1, 2013.  At trial the human resources representative testified that Pearson's "termination date" was January 31st and her "retirement date" was an unknown date in February.

Pearson contends that the evidence at trial shows that it was Shanahan who made the decision to terminate her employment.  But she points only to Shanahan's approval of the RPA on February 6, 2012, and his statements that day and the next that she had been terminated.  She ignores the evidence about what led up to that RPA.  It was Blanchard, not Shanahan, who denied Pearson's request for leave from January 3 until March 8, 2013, a request Shanahan had approved.  It was Blanchard, not Shanahan, who drafted the January 30, 2013 letter informing Pearson that her employment would be terminated if she could not return to work by February 13, 2013.  And it was Blanchard's, not Shanahan's, department of human resources that requested the RPAs.

The trial evidence shows that Blanchard, not Shanahan, made the decision to terminate Pearson, and Pearson presented no evidence that Blanchard was aware of her EEOC charge.  As a result, she failed to establish the causation element of her Title VII retaliation claim.  "[A] reasonable jury would not have a legally sufficient evidentiary basis to find for her."  Wilcox, 892 F.3d at 1286 (citations and quotation marks omitted).  The district court properly granted judgment as a matter of law to the defendants.

## IV. CONCLUSION

The district court erred in granting summary judgment to the defendants on Pearson's § 1983 equal protection and Title VII sex discrimination claims, both of

which alleged that her demotion was based on her sex.  The court did not err in any of the other decisions that Pearson appeals.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for a new trial on the section 1983 equal protection and Title VII sex discrimination claims.